## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION,
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004

      and

SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION,
1101 New York Avenue, N.W.
8th Floor
Washington, D.C.  20005

         Plaintiffs,

        v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,
3 Lafayette Centre
1155 21st Street, N.W.
Washington, D.C.  20581

        Defendant.

Civil Action No. _____

## COMPLAINT

Plaintiffs INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION and

SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION for their complaint

against Defendant, UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

allege, by and through their attorneys, on knowledge as to Plaintiffs, and on information and

belief as to all other matters, as follows:

## I. INTRODUCTION

1.      This is a lawsuit under the Administrative Procedure Act challenging a rule

recently promulgated by the U.S. Commodity Futures Trading Commission ("CFTC" or

"Commission").  In a closely divided 3-2 vote, in which dissenting commissioners and numerous

members of the public expressed significant concerns, the Commission promulgated a rule

setting hard position limits on derivatives contracts tied to twenty-eight different commodities—

a rule ostensibly designed to curb "excessive speculation."  *See* 76 Fed. Reg. 71,626 (Nov. 18,

2011) ("Position Limits Rule" or "Rule").  Such limits will constrain activity in markets that

have long been recognized as providing important benefits to market participants and the broader

economy.

2.      One of the three commissioners who voted *in favor* of the Position Limits Rule

concluded that "no one has presented this agency any reliable economic analysis to support

either the contention that excessive speculation is affecting the market we regulate or that

position limits will prevent the excessive speculation."  Tr. of Open Meeting on Two Final Rule

Proposals Under the Dodd-Frank Act (Oct. 18, 2011) ("Oct. 18 Tr."), at 13.  He believed that

"position limits, at best a cure for a disease that does not exist, are a placebo for one that does,"

and that "[a]t worst, position limits may harm the very markets we're intending to protect." *Id.*

at 14.  "Position limits," he predicted, "may actually lead to higher prices for commodities that

we consume on a daily basis." *Id.* at 13.  He voted for the Position Limits Rule only because he

believed—mistakenly—that a provision of the Dodd-Frank Wall Street Reform and Consumer

Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank Act"),

*required* the establishment of position limits irrespective of their necessity or wisdom.

3.      That Commissioner's troubling account of the utter lack of support for the

Position Limits Rule is confirmed by the Commission's analysis.  Its rule release expressly

declined to analyze whether excessive speculation in commodity derivatives is a real problem or

whether position limits would help address it—or even whether position limits would harm U.S.

businesses and consumers by causing more volatility in commodity markets and driving up the

price of goods. *See* 76 Fed. Reg. at 71,627. The Commission instead mistakenly maintained that

it was required to establish position limits without regard to their necessity, effectiveness, or

even potential harm to U.S. markets, investors, and consumers—that "Congress did not give the

Commission a choice." *Id.* at 71,628.

4.      Because of that interpretation, the Commission expressly stated that it was

ignoring "a number of studies and reports addressing the issue of whether position limits are

effective or necessary to address excessive speculation." 76 Fed. Reg. at 71,629 n.32. In the

Commission's view, because it lacked discretion to decline to impose position limits, "these

studies and reports [did] not present facts or analyses that [were] material." *Id.*

5.      The Commission grossly misinterpreted its statutory authority. Congress did not

require the Commission to establish position limits without regard to whether they would harm

the U.S. economy by increasing the cost of food, energy, and other necessities. Rather, Congress

authorized the Commission to establish position limits *only* if it first finds that they "are

necessary to diminish, eliminate, or prevent" "an undue and unnecessary burden on interstate

commerce" caused by "[e]xcessive speculation" (7 U.S.C. § 6a(a)(1)), and are otherwise

"appropriate" (*id.* § 6a(a)(2)(A), (a)(5)(A)). The Commission did not make those findings here.

Such an abdication of the Commission's responsibility to apply its expertise to record evidence

before establishing new regulations is the essence of unreasoned decisionmaking.

6.      Moreover, even if the Commission were required to impose position limits at

some level, it acted arbitrarily, capriciously, and contrary to law by failing to support the specific

limits set and related provisions with sufficient evidence, ignoring contrary evidence in the record, and insufficiently apprising members of the public of the basis for the proposed rule.

7.    The Commission also failed to give serious consideration to the significant costs that the Position Limits Rule will impose on commodity markets and the broader economy, which the Commission is required to do by statute. *See* 7 U.S.C. § 19(a). As mentioned by numerous commenters to the Commission's initial proposal, the Position Limits Rule will, among other things, make it more difficult for market participants to manage risk and impair the efficiency of markets in establishing commodity prices (referred to as "price discovery"). In particular, the unnecessarily narrow definition of bona fide hedging transactions and positions potentially will limit the ability of market participants to enter into transactions with counterparties needing to hedge risks or establish investment positions. Moreover, the Rule, including but not limited to its aggregation requirements, will require market participants to incur substantial costs in redesigning their trading strategies and building new infrastructure to comply, including unprecedented information-sharing mechanisms that may violate fiduciary duties and may be prohibited by contract, state law, or the law of a foreign jurisdiction. Rather than making a genuine effort to estimate those costs, the Commission cited its own failure to obtain empirical data that would enable it to assess the impact of the Position Limits Rule and acknowledged in its findings that the Rule was justified only "to the extent" that it would achieve its intended objectives.

8.    As one of the dissenting commissioners observed, the Commission's arbitrary, unsupported reasoning has had the effect of "passing our responsibilities on to the judicial system to pick apart this rule in a multitude of legal challenges." 76 Fed. Reg. at 71,706. That unfortunate fact necessitates this Court's intervention. Plaintiffs accordingly request that this

Court hold unlawful and set aside the Position Limits Rule in its entirety; enjoin the Commission from implementing and enforcing the Rule or giving it effect in any manner; and order such other relief as may be appropriate.

## II. PARTIES

9.      Plaintiff International Swaps and Derivatives Association ("ISDA") is an association that represents participants in the privately negotiated derivatives industry.  It promotes sound risk-management practices and processes, and engages constructively with policymakers and legislators around the world to advance the understanding and treatment of derivatives as a risk-management tool.  ISDA now has more than 825 members, including global, international, and regional banks; asset managers; energy and commodities firms; government and supranational entities; insurers and diversified financial institutions; and corporations, law firms, exchanges, clearinghouses, and other service providers.

10.     Plaintiff Securities Industry and Financial Markets Association ("SIFMA") is an association of hundreds of securities firms, banks, and asset managers.  Its mission is to support a strong financial industry, investor opportunity, capital formation, job creation, and economic growth, while building trust and confidence in the financial markets.

11.     Defendant CFTC is (and was at all relevant times) an agency of the U.S. government subject to the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1); 7 U.S.C. § 2(a)(2).  It was created in 1974.  *See* Pub. L. No. 93-463, § 101, 88 Stat. 1389, 1389 (Oct. 23, 1974).

## III. JURISDICTION AND VENUE

12.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, and the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ("CEA").  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

13.     Each Plaintiff has standing to bring this suit on behalf of its members because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States that resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.  BACKGROUND

### A.     Commodity Derivatives and Position Limits

15.     Markets in commodity derivatives are crucial for helping producers and purchasers of commodities manage risk, ensuring sufficient market liquidity for bona fide hedgers, and promoting price discovery of the underlying market.  As Congress found in enacting the CEA, transactions in commodity derivatives "provid[e] a means for managing and assuming price risks, discovering prices, [and] disseminating pricing information." 7 U.S.C. § 5(a).  Participation in derivatives markets by those who do not produce or consume the underlying commodities, such as financial institutions, plays an essential part in advancing these goals by ensuring that the markets remain liquid, enabling those seeking to hedge risks or establish positions to locate counterparties readily, and by facilitating price discovery.

16.     Three types of commodity derivatives are relevant to this lawsuit: futures contracts, options contracts, and swaps.

17.     A futures contract is an agreement to purchase or sell a commodity for delivery in the future (i) at a price that is determined at initiation of the contract; (ii) that obligates each party

to the contract to fulfill the contract at the specified price; (iii) that is used to assume or shift price risk; and (iv) that may be satisfied by delivery or offset.

18.     An options contract is a contract that gives the buyer the right, but not the obligation, to buy or sell a specified quantity of a commodity or other instrument at a specific price within a specific period of time, regardless of the market price of that instrument.

19.     Futures and options contracts either provide for the opportunity for "physical delivery" or are "cash-settled" based on the price of an underlying commodity. A "physical-delivery" contract provides the opportunity for a party to make or take delivery of the underlying commodity (or, with respect to an option on a futures contract, an underlying position in the futures contract) unless that party elects to offset its position before delivery. A "cash-settled" futures contract can only be settled by delivering an amount of cash equal to the difference between the contract's reference prices.

20.     A "swap" is a contract that typically involves an exchange of one or more payments based on the value of a notional quantity of one or more commodities, or other financial or economic interest, and that transfers between the parties the risk of a future change in such value without also transferring an ownership interest in the underlying asset or liability. As amended by the Dodd-Frank Act, the CEA sets forth a lengthy definition of "swap" that includes, *inter alia*, "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47) (as amended by Pub. L. No. 111-203).

21.     A "position limit" caps the maximum number of derivatives contracts to purchase (long) or sell (short) a commodity that an individual trader or group of traders may own during a given period.

22.     A position limit may impose a ceiling on either a "spot-month" position or a "non-spot-month" position.  A "spot month" is the specified period of time (which varies by commodity under the final Rule) that immediately precedes the date of delivery of the commodity under the derivatives contract.  A spot-month position limit, therefore, caps the position that a trader may hold or control in contracts approaching their expiration.  A non-spot-month position limit caps the position that may be held or controlled in contracts that expire in periods further in the future or in all months combined.

**B.     The CFTC's Authority to Set Position Limits under the CEA**

23.     Congress enacted the CEA in 1936.  *See* 74 Cong. Ch. 545, 49 Stat. 1491 (June 15, 1936).  The Act provided the basic statutory authority—then lodged in the Commodity Exchange Commission, the CFTC's predecessor—to set position limits:

> Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity.  For the purpose of diminishing, eliminating, or preventing such burden, the commission shall, from time to time . . . proclaim and fix such limits on the amounts of trading . . . *as the commission finds [are] necessary* to diminish, eliminate, or prevent such burden.

49 Stat. at 1492 (now codified at 7 U.S.C. § 6a(a)(1)) (emphasis added).  This statutory language concerning the Commission's authority to set position limits has remained essentially unchanged since 1936, although Congress has amended other language contained in Section 6a(a)(1).

24.     Regulations that predated the rulemaking that is the subject of this lawsuit establish position limits for derivatives in some agricultural commodities.  *See* 17 C.F.R. § 150.2.  These limits, however, do not apply to swaps.

25.     Commodity exchanges—commonly referred to as "contract markets," "Designated Contract Markets," or "DCMs"—are required by statute to impose position limits

"where necessary and appropriate." 7 U.S.C. § 7(d)(5). Under CFTC regulations that predated

the Position Limits Rule, contract markets were permitted to impose "position accountability

provisions in lieu of position limits for contracts on financial instruments, intangible

commodities, or certain tangible commodities" (other than for those contracts that the CFTC had

subjected to hard position limits under § 150.2 and major foreign currency contracts). 17 C.F.R.

§ 38, app. B (Core Principle 5). Rather than impose a hard cap on the overall size of positions

held, accountability provisions simply "requir[e] traders to provide information about their

position upon request by the exchange and to consent to halt increasing further a trader's

positions if so ordered by the exchange." *Id.* § 150.5(e).

    26.    In the Dodd-Frank Act, Congress amended the position-limits provision of the

CEA in a number of respects. *See* Pub. L. No. 111-203, § 737, 124 Stat. at 1722–25.

    27.    First, the Dodd-Frank Act amended the Commission's preexisting authority in

Section 6a(a)(1) to include the power to set position limits on "swaps traded on or subject to the

rules of a designated contract market or a swap execution facility, or swaps not traded on or

subject to the rules of a designated contract market or a swap execution facility that performs a

significant price discovery function with respect to a registered entity." 7 U.S.C. § 6a(a)(1).

    28.    Second, the Dodd-Frank Act added six new subsections to Section 6a(a). Of

relevance here:

        a.    New Section 6a(a)(2) provides in relevant part that "[i]n accordance with

        the standards set forth in paragraph (1) of this subsection . . . the Commission shall by

        rule, regulation, or order establish limits on the amount of positions, as appropriate, . . .

        that may be held by any person with respect to contracts of sale for future delivery or

with respect to options on the contracts or commodities traded on or subject to the rules of a designated contract market." 7 U.S.C. § 6a(a)(2)(A).

      b.      Section 6a(a)(3) then sets forth objectives that the Commission must meet "to the maximum extent practicable, in its discretion," in exercising that authority: "diminish[ing], eliminat[ing], or prevent[ing] excessive speculation as described under this section"; "deter[ring] and prevent[ing] market manipulation, squeezes, and corners"; "ensur[ing] sufficient market liquidity for bona fide hedgers"; and "ensur[ing] that the price discovery function of the underlying market is not disrupted." 7 U.S.C. § 6a(a)(3)(B).

      c.      Consistent with the addition of swaps to Section 6a(a)(1), Section 6a(a)(5) provides that "the Commission shall establish limits on the amount of positions . . . , as appropriate, . . . that may be held by any person with respect to swaps that are economically equivalent to contracts of sale for future delivery or to options on the contracts or commodities traded on or subject to the rules of a designated contract market subject to paragraph (2)." 7 U.S.C. § 6a(a)(5)(A).  The Commission must develop these limits "concurrently with limits established under" Section 6a(a)(2) and "establish the limits simultaneously with limits established under" Section 6a(a)(2). *Id.* § 6a(a)(5)(B).

29.     A separate provision of the CEA requires that, before any rule is promulgated, the "costs and benefits of the [rule must] be evaluated in light of — (A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations." 7 U.S.C. § 19(a).

C.      **The Proposed Rule**

30.     The Commission issued a Notice of Proposed Rulemaking ("NPRM") for the Position Limits Rule on January 26, 2011. 76 Fed. Reg. 4,752. It proposed to establish both spot-month and non-spot-month position limits on futures contracts, options contracts, and swaps based on twenty-eight different physical commodities. *See id.* at 4,756–60.

a.      With respect to spot-month position limits, the NPRM proposed to limit the number of contracts that any trader or group of traders could control, net long or net short, during the spot month to 25% of deliverable supply for both physical-delivery and cash-settled contracts. Deliverable supply would be determined in two phases. In the initial phase, it would be determined, and the limit thus set, based on the existing limit determined by the relevant contract market. In the second phase, the Commission would determine deliverable supply based on its updated estimates or those of the contract markets. 76 Fed. Reg. at 4,757. Traders would be permitted to hold five times the physical-delivery contract limit in cash-settled contracts if certain conditions were met. *Id.* at 4,758.

b.      With respect to non-spot-month position limits, the NPRM proposed to cap the number of contracts that a trader or group of traders could control, net long or net short, in any given month to a certain percentage of the "open interest" for a particular contract. 76 Fed. Reg. at 4,758. "Open interest" means the total number of outstanding futures contracts (and options thereon) and swaps at any given time.

31.     In the NPRM, the Commission expressed its belief that Section 6a, as amended by the Dodd-Frank Act, gave it broad discretion to determine whether it was appropriate and necessary to impose position limits. "[T]he Commission may impose position limits prophylactically," the NPRM stated, "based on its reasonable judgment that such limits are

necessary for the purpose of 'diminishing, eliminating, or preventing' such burdens on interstate commerce that the Congress has found result from excessive speculation." 76 Fed. Reg. at 4,754. The NPRM interpreted the Dodd-Frank Act to "reaffirm[] the Commission's authority to establish position limits as it finds necessary in its discretion to address excessive speculation." *Id.* at 4,755.

32.     The NPRM also included a one-page discussion of the costs and benefits of the proposed rule under 7 U.S.C. § 19(a). The Commission concluded that although the proposed rule "could impose certain general but significant costs," "[i]nsofar as the provisions of the proposed [rule] effectuate the[] goals [identified in the CEA], then the market and the public as a whole would benefit." 76 Fed. Reg. at 4,764. The NPRM also stated that the proposed rule "may . . . promote the financial integrity of the markets and protect the public by reducing systemic risk." *Id.* It invited comment from members of the public on the costs and benefits of the proposed rule.

33.     The NPRM proposed a number of changes to related regulatory provisions, including: (i) exemptions from position limits for bona fide hedging transactions that were narrower in certain respects than the exemptions under the preexisting regulations (76 Fed. Reg. at 4,760–61); and (ii) aggregation provisions establishing when an entity with an ownership interest in, or control over, multiple accounts must aggregate them for the purpose of compliance with the position limits—rules that were broader in some respects and that contained narrower exemptions than the preexisting rules  (*id.* at 4,763).

**D.     Public Comment on the Commission's Proposal**

34.     The Commission received thousands of responses to its request for comments. *See* 76 Fed. Reg. at 71,626. These comments are available at http://comments.cftc.gov/ PublicComments/CommentList.aspx?id=965.

35.     As the Commission acknowledged, "numerous commenters posited that the

Commission did not adequately demonstrate, or perform sufficient analysis establishing, the

need for or appropriateness of the proposed limits and related requirements." 76 Fed. Reg. at

71,628.

a.      A number of commenters pointed out that the Commission was under no

statutory obligation to impose position limits and that, in fact, the CEA required it to

make findings of necessity and appropriateness before doing so—findings that it had not

made in the NPRM.  As explained by the CME Group, Inc. (which owns four commodity

exchanges), Section 6a requires the Commission to conduct a two-part analysis before

imposing position limits.  "First, [under Section 6a(a)(1)], the Commission must 'find'

that position limits are 'necessary'—a directive that Congress reaffirmed in the Dodd-

Frank [Act].  Second, once the Commission makes the 'necessary' finding, it must

establish a position limit regime only 'as appropriate'—a statutory requirement added by

Dodd-Frank [in Sections 6a(a)(2) and 6a(a)(5)]."  CME Group, Inc. Comment (Mar. 28,

2011), at 2.  CME Group argued that "[i]n its position limits proposal, the Commission

has not met its burden of showing that the proposed position limit regime is 'necessary'

and 'appropriate.'"  *Id.*  That view was echoed by a number of other commenters.  *See,*

*e.g.*, ISDA-SIFMA Comment (Mar. 28, 2011), at 3; Coalition of Physical Energy

Companies ("COPE") Comment (Mar. 28, 2011), at 2–3; Commodity Markets Council

Comment (Mar. 28, 2011), at 1–2; Edison Electric Institute *et al.* Comment (Mar. 28,

2011), at 2, 4–5; Futures Industry Association Comment (Mar. 25, 2011), at 2–3, 7.

b.      Commenters further noted that the Commission had come forward with

"no empirical basis to conclude excessive speculation has burdened or harmed modern

markets in any way." COPE Comment, at 3. The CME Group explained that "there is

virtually unanimous academic agreement that commodity price changes have been driven

by fundamental market conditions, not by speculation." CME Group Comment, at 4; *see*

*also*, *e.g.*, BlackRock Comment (Mar. 28, 2011), at 3 ("[E]conomists, academics,

international agencies, and U.S. governmental entities, including the Commission itself,

have not identified a causal link between speculation . . . and price volatility in

commodities."). Indeed, one commenter highlighted that the Commission itself, as part

of a task force with other agencies, had concluded in July 2008 that there was no

evidence that speculation had an impact on commodity markets:

> If a group of market participants has systematically driven prices, detailed
> daily position data should show that that group's position changes
> preceded price changes. The Task Force's preliminary analysis, based on
> the evidence available to date, suggests that changes in futures market
> participation by speculators have not systematically preceded price
> changes. On the contrary, most speculative traders typically alter their
> positions following price changes, suggesting that they are responding to
> new information—just as one would expect in an efficiently operating
> market.

COPE Comment, at 4 (quoting Interagency Task Force on Commodity Markets, Interim

Report on Crude Oil, at 3 (July 2008)); *see also* Commodity Markets Council Comment,

at 2; Futures Industry Association Comment, at 2–3. As one commenter put it, "[i]nstead

of reasoned analysis based on objective facts, the Proposed Rule assumes that excessive

speculation exists (or could exist) and then establishes a pervasive and burdensome

regulatory regime to remedy this assumed problem." Edison Electric Institute *et al.*

Comment, at 2.

      c.     Commenters also argued that even assuming excessive speculation is a

problem, the Commission had presented no evidence that position limits are a useful,

cost-effective tool to combat it. *See, e.g.*, Centaurus Energy Master Fund, LP Comment

(Mar. 28, 2011), at 1. Moreover, they noted, any "legitimate concerns over potential

harm from 'excessive speculation' are better dealt with by exchanges through existing

market surveillance programs on a contract by contract basis." Commodity Markets

Council Comment (Mar. 28, 2011), at 2; *see also* CME Group Comment, at 5.

36.    Commenters further observed that the Commission had failed to collect sufficient

data to determine whether position limits would negatively impact investors and the economy.

For example, the Colorado Public Employees Retirement Association stated that although it "is

not necessarily against the concept of position limits if there were clear empirical data to support

their need, we are concerned that in the absence of such data, the Commission's choice to

proceed with the position limits proposal could be deleterious to institutional investors."

Colorado Public Employees Retirement Association Comment (Mar. 28, 2011), at 2. *See also*,

*e.g.*, Morgan Stanley Comment (Mar. 28, 2011), at 4; Centaurus Energy Master Fund, LP

Comment, at 2. Similarly, commenters noted that the Position Limits Rule would impair the

price-discovery function of derivatives markets, contrary to Congress's instruction that any such

rules "to the maximum extent practicable . . . ensure that the price discovery function of the

underlying market is not disrupted." 7 U.S.C. § 6a(a)(3)(B)(iv). *See, e.g.*, Morgan Stanley

Comment, at 3.

37.    The Commission also received a number of comments faulting it for conducting

an inadequate cost-benefit analysis under 7 U.S.C. § 19(a). These commenters contended that

the "Commission . . . ignore[d] the wealth of empirical evidence supporting the view that the

proposed hard position limits (and related aggregation policy and restrictive exemptions) would

actually be counterproductive by decreasing liquidity in the CFTC-regulated markets which, in

turn, would likely increase both price volatility and the cost of hedging especially in deferred months." CME Group Comment, at 2; *see also* ISDA-SIFMA Comment, at 5–6; BlackRock Comment, at 2.

38.     Commenters also objected to a number of discrete aspects of the Position Limits Rule, including but not limited to:

      a.     The Commission failed to provide a reasoned explanation for selecting the twenty-eight commodity contracts to subject to position limits (along with economically equivalent futures contracts, options contracts, and swaps). *See* Edison Electric Institute *et al.* Comment, at 5.

      b.     The Commission defined "deliverable supply" too narrowly. *See, e.g.,* ISDA-SIFMA Comment, at 5; National Grain and Feed Association Comment (Mar. 28, 2011), at 5.

      c.     The Commission failed to justify subjecting cash-settled contracts to position limits. *See, e.g.,* ISDA-SIFMA Comment, at 6–7; Minneapolis Grain Exchange Comment (Mar. 28, 2011), at 4; Futures Industry Association Comment, at 10–11.

      d.     In establishing aggregation rules, the Commission did not account for the fact that "aggregation of positions might create legal jeopardy for certain market participants" by requiring separately owned entities "to coordinate business plans, including trading activities and commercial hedging opportunities, in potential violation of contractual or legal obligations," including "fiduciary duties as asset managers or advisers of discretionary accounts." ISDA-SIFMA Comment, at 16.

E.     **The Final Rule**

39.     At an open meeting on October 18, 2011, the Commission adopted the Position

Limits Rule by a vote of 3 to 2.  The final rule was published in the Federal Register on

November 18, 2011.  76 Fed. Reg. 71,626.

40.     The Position Limits Rule sets forth both spot-month and non-spot-month limits

for all "Referenced Contracts," a defined term under the Rule.  17 C.F.R. §§ 151.1, 151.4(a),

(b).[1]  The Rule identifies as a baseline twenty-eight "Core Referenced Futures Contracts"—

standardized contracts traded on commodity exchanges, such as Chicago Mercantile Exchange

Class III Milk.  *Id.* § 151.2; 76 Fed. Reg. at 71,629.  The Rule then defines a "Referenced

Contract" as either a Core Referenced Futures Contract or "a futures contract, options contract,

swap or swaption . . . [d]irectly or indirectly linked" to either the price of a Core Referenced

Futures Contract or to the price of the commodity underlying a Core Referenced Futures

Contract.  17 C.F.R. § 151.1; 76 Fed. Reg. at 71,630.

1.     **Spot-Month Position Limits**

41.     The spot-month position limits restrict traders from holding more than the

specified number of Referenced Contracts for delivery in a given spot month.  The limits are

based on the formula set forth in the NPRM: "one-quarter of the estimated spot-month

deliverable supply."  17 C.F.R. § 151.4(a)(1), (2)(i).

a.     The Position Limits Rule defines the "spot month" slightly differently for

different Referenced Contracts.  *See* 17 C.F.R. § 151.3.  The definition is based on certain

dates set forth in the Core Referenced Futures Contracts.

---

[1]     The new part 151 of Title 17 of the Code of Federal Regulations is set forth at 76 Fed.
Reg. at 71,685–99.

b.      The Commission defines "deliverable supply" as "the quantity of the commodity meeting a derivative contract's delivery specifications that can reasonably be expected to be readily available to short traders and saleable by long traders at its market value in normal cash marketing channels at the derivative contract's delivery points during the specified delivery period, barring abnormal movement in interstate commerce." 76 Fed. Reg. at 71,633.

c.      With the exception of natural-gas contracts, the Commission elected not to permit parties to control an amount of cash-settled contracts equal to five times the limit for physical-delivery contracts, as the NPRM had proposed. Rather, the spot-month position limits formula of 25% of deliverable supply applies separately to both physical-delivery contracts and cash-settled contracts. *See* 17 C.F.R. § 151.4(c)(1). That is, a trader may hold a position equal to the position limit for both its physical-delivery contracts and its cash-settled contracts. But by the same token, a trader may not net the two types of contracts in order to stay within the position limits, even though having an offsetting position is economically equivalent to having no position. *See* 76 Fed. Reg. at 71,632–33.

d.      The Commission established the limits for cash-settled contracts on an "interim final rule basis" and invited further comments on whether "the interim final rule best maximizes the four objectives" set forth in Section 6a(a)(3)(B) and whether the Commission "should set a different ratio for different commodities." 76 Fed. Reg. at 71,635, 71,638. Despite the "interim" label, those limits will be binding on the compliance date.

42.    The Commission issued a list of initial spot-month limits for each of the twenty-eight Core Referenced Futures Contracts.  They are set forth in Appendix A to Part 151 of Title 17 of the Code of Federal Regulations.  *See also* 76 Fed. Reg. at 71,695–96.  These initial limits are based on the contract markets' estimates of deliverable supply.  *See* 17 C.F.R. § 151.4(d)(1); 76 Fed. Reg. at 71,631–32.  They will take effect 60 days after the term "swap" is further defined in a separate rulemaking, conducted jointly by the CFTC and the U.S. Securities and Exchange Commission, for which an NPRM was issued on May 23, 2011.  *See* 17 C.F.R. § 151.4(d)(1); Further Definition of "Swap," etc., 76 Fed. Reg. 29,818 (May 23, 2011).

43.    The initial limits will expire on January 1 of the second calendar year after they take effect.  *See* 17 C.F.R. § 151.4(d)(2)(i).  At that point, the regulations require the Commission to establish new limits based on updated estimates of deliverable supply submitted by contract markets or based on the Commission's own updated estimates.  *See id.* § 151.4(d)(2)(ii)-(iii).

### 2.    Non-Spot-Month Position Limits

44.    The Position Limits Rule also establishes non-spot-month position limits for Referenced Contracts.  These limits apply to a trader's position, net long or short, in a commodity both in all months combined and in any single month.  *See* 17 C.F.R. § 151.4(b).

45.    The Position Limits Rule establishes different non-spot-month position limits for "legacy Referenced Contracts" and "non-legacy Referenced Contracts."

a.    Legacy Referenced Contracts are contracts that are subject to position limits under preexisting regulations set forth in part 150 of Title 17.  *See* 17 C.F.R. § 151.2(a)(1); 76 Fed. Reg. at 71,632 n.59.  They remain subject to fixed non-spot-month position limits rather than position limits that are based on a formula.  *See* 17 C.F.R. § 151.4(b)(3).  The Position Limits Rule raised the preexisting limits for legacy

Referenced Contracts. *See* 76 Fed. Reg. at 71,642. Because new part 151 will not take effect until 60 days after "swap" is further defined, the Position Limits Rule also amends part 150 to raise these preexisting limits with respect to futures contracts and options contracts, effective 60 days after its publication (i.e., January 17, 2012). *See* 76 Fed. Reg. at 71,684–85. They will apply to swaps as well 60 days after "swap" is further defined. *See* 17 C.F.R. § 151.4(d)(4).

b.      Non-legacy Referenced Contracts are Referenced Contracts not previously subject to position limits by the Commission. The Position Limits Rule establishes a formula for the non-spot-month limits for these contracts: "10 percent of the first 25,000 contracts of average all-months-combined aggregated open interest with a marginal increase of 2.5 percent thereafter." 17 C.F.R. § 151.4(b)(1). The initial non-spot-month position limits for non-legacy Referenced Contracts will be published one month after the Commission obtains the data necessary for the calculation of "aggregated open interest." *See* 17 C.F.R. § 151.4(d)(3)(i). Subsequent non-spot-month position limits for non-legacy Referenced Contracts will be established two years later based on updated data. *See id.* § 151.4(d)(3)(ii).

**3.      Other Provisions of the Final Rule**

46.      The final Rule included a number of other key provisions, including but not limited to:

a.      The Rule sets forth the circumstances in which a trader must aggregate positions held in multiple accounts for the purpose of compliance with the position limits. *See* 17 C.F.R. § 151.7. Subject only to limited specified exceptions, a trader must aggregate all accounts in which the trader has at least a ten percent ownership or equity

interest. *See id.* § 151.7(b).  One of the exceptions provides that aggregation is not

required when it would entail the sharing of information in violation of federal law and

the trader does not have actual knowledge of the information, but there is no exception

for violations of state law or the law of a foreign jurisdiction.  *See id.* § 151.7(i).

      b.     In addition, although the NPRM included an aggregation exemption for

passive investments in independently controlled and managed commercial entities, that

exemption was omitted from the final Rule without an opportunity for notice and

comment and without adequate explanation or consideration of its costs.  As a result,

many commercial enterprises that have 10% or more common ownership but are

otherwise independent operations will experience substantial costs and dislocation in

aggregating their commodity derivatives positions.

      c.     The Rule includes a severability clause, which never had been suggested

or even mentioned in the NPRM and was not discussed in the final rule release.  That

unannounced clause provides that if any provision of the Rule is held invalid, "such

invalidity shall not affect other provisions . . . which can be given effect without the

invalid provision or application."  17 C.F.R. § 151.13.

**4.     The Commission's Analysis**

47.     In the final rule, the Commission did not present evidence that excessive

speculation was a problem in commodity markets or that position limits were a necessary or

appropriate way to combat excessive speculation.  Instead, the Commission announced that, in

contrast to the statutory analysis set forth in the NPRM, it was now interpreting the provisions

that the Dodd-Frank Act added to 7 U.S.C. § 6a to *require* the establishment of position limits

without regard to their necessity or appropriateness.  *See* 76 Fed. Reg. at 71,6127–29.  In its

view, "Congress did not give the Commission a choice" but rather "directed the Commission to impose position limits and to do so expeditiously." *Id.* at 71,628.

      a.    The Commission based its interpretation of the statute on two of the subsections of Section 6a added by the Dodd-Frank Act, which state that the Commission "shall" establish position for futures contracts, options contracts, and swaps within certain time periods. *See* 76 Fed. Reg. at 71,628. In response to the argument, made by a number of commenters, that the relevant clauses in the statute are modified by the words "as appropriate," the Commission declared, with little analysis, that "that phrase, when considered in the context of the position limits provisions as a whole, is most sensibly read as directing the Commission to exercise its discretion in determining the extent of the limits that Congress required the Commission to impose." *Id.* at 71,629.

      b.    Because the Commission considered itself bound to establish position limits, it did not consider information submitted by commenters demonstrating that excessive speculation was not a problem in commodity markets and that position limits were unnecessary and inappropriate. Although the Commission acknowledged that "commenters submitted a number of studies and reports addressing the issue of whether position limits are effective or necessary to address excessive speculation," it declared that "these studies and reports do not present facts or analyses that are material to the Commission's determinations in finalizing the Proposed Rules." 76 Fed. Reg. at 71,629 n.32.

48.    One of the three Commissioners who voted for the Position Limits Rule, Commissioner Dunn, declared at the October 18 hearing that the only reason that he was voting to adopt the Rule was that he believed that Congress had required the imposition of position

limits: "Congress has tasked the CFTC with preventing excessive speculation by imposing position limits. This is the law. The law is clear, and I will follow the law." Oct. 18 Tr., at 11. But he candidly admitted that "position limits and the rules that go along with them may make it actually more difficult to hedge the risks that [market participants] take on in order to provide the public with milk, bread, and gas." *Id.* at 12. For that reason, he stated, "[p]osition limits may actually lead to higher prices for commodities that we consume on a daily basis." *Id.* at 13. He was "left with the conclusion that no one has presented this agency any reliable economic analysis to support either the contention that excessive speculation is affecting the market we regulate or that position limits will prevent the excessive speculation." *Id.*

49.     In dissent, Commissioner O'Malia argued that the Commission had misinterpreted the CEA to require the establishment of position limits "without making a determination that such limits are necessary and effective in relation to the identifiable burdens of excessive speculation on interstate commerce." 76 Fed. Reg. at 71,700. "In aggrandizing a market condition [i.e., excessive speculation] that it has never defined through quantitative or qualitative criteria in order to justify draconian rules," he explained, "the Commission not only fails to comply with Congressional intent, but misses an opportunity to determine and define the type and extent of speculation that is likely to cause sudden, unreasonable and/or unwarranted commodity price movements so that it can respond with rules that are reasonable and appropriate." *Id.* "Congress could not be more clear," he wrote, "in its directive to the Commission to utilize not only its expertise, but the public rulemaking process, each and every time it determines to establish position limits to ensure that such limits are essential and suitable to combat the actual or potential threats to commodity prices due to excessive speculation." *Id.*

a.      Commissioner O'Malia also faulted the Commission for adopting the

Position Limits Rule "without the benefit of performing an objective factual analysis

based on the necessary data to determine whether these particular limit and limit formulas

will effectively prevent or deter excessive speculation." 76 Fed. Reg. at 71,702. "The

Commission," he stated, "did not even provide for public comment a determination as to

what criteria it utilized to determine whether or not excessive speculation is present or

will potentially threaten prices in any of the commodity markets affected by the new

position limits." *Id.*

b.      Commissioner O'Malia further objected that the Rule "failed to provide a

legally sound, comprehensible rationale based on empirical evidence" and that he could

not "support passing our responsibilities on to the judicial system to pick apart this rule in

a multitude of legal challenges, especially when our action could negatively affect the

liquidity and price discovery function of our markets." 76 Fed. Reg. at 71,706.

50.     Commissioner Sommers also dissented from the Position Limits Rule in what she

described as "the single most significant vote I have taken since becoming a Commissioner." 76

Fed. Reg. at 71,699. She expressed her concern that the new regulations "have the real potential

to inflict the greatest harm on bona fide hedgers—that is, the producers, processors,

manufacturers, handlers and users of physical commodities." *Id.* The Position Limits Rule, she

said, "will make hedging more difficult, more costly, and less efficient, all of which, ironically,

can result in increased food and energy costs for consumers." *Id.*

51.     Indeed, the Commission itself acknowledged that the Rule likely would impose

great costs on market participants. The Commission conceded that it "anticipates that the final

rules establishing position limits and related provisions will result in costs to market

participants . . . associated with developing, implementing and maintaining a method to ensure

compliance with the position limits and its attendant requirements" as well as "costs to market

participants whose market participation and trading strategies will need to take into account and

be limited by the new position limits rule." 76 Fed. Reg. at 71,665.  But it concluded that it was

not "reasonably feasible to quantify or estimate the costs from such changes in trading

strategies." *Id.*  "Because the economic consequences to any particular firm will vary depending

on that firm's business model and strategy," it stated, "it is impractical to develop any type of

generic or representative calculation of these economic consequences." *Id.*

      a.      In a similar vein, in response to numerous concerns raised by commenters

on the costs of various provisions of the Position Limits Rule, the Commission repeatedly

conceded that it lacked data permitting it to reasonably estimate the costs of the rule.

*See, e.g.*, 76 Fed. Reg. at 71,670 ("At this time, the Commission's data set does not allow

the Commission to estimate the specific number of traders that could potentially be

impacted by the limits on cash-settled contracts . . . ."); *id.* at 71,672 ("[T]he Commission

is unable to determine or estimate the number of entities that may need to alter their

business strategies.").

      b.      Even though the Position Limits Rule extends position limits to swaps for

the first time, the Commission conceded that "[a]t present, the Commission has limited

data concerning swaps transactions in Referenced Contracts (and market participants

engaged in such transactions)." 76 Fed. Reg. at 71,665.  It declared only that it "should

be able to obtain an expanded set of swaps data" in the future. *Id.* at 71,665 n.389; *see*

*also id.* at 71,668 n.411 ("The Commission's estimates of the number of affected

participants for both spot-month and non-spot-month limits are based on the data it

currently has on futures, options, and *the limited set of data it has on cleared swaps*."

(emphasis added)). The Commission nonetheless proceeded to require market

participants to adhere to the position limits with respect to swaps as of the Rule's

compliance date.

        c.      The Commission only briefly addressed the § 19(a) factors and engaged in

no serious analysis of whether those factors favored or disfavored the Position Limits

Rule. *See* 76 Fed. Reg. at 71,674–75, 71,677–78, 71,679–80. Many of its conclusions

stated only that "to the extent" that the Rule achieved its intended objectives, it would

satisfy those factors. *See, e.g.*, *id.* at 71,675 ("To the extent that the position limit

formulas achieve these objectives, the final rules should protect the efficiency,

competitiveness, and financial integrity of futures markets."). The Commission did not

address in any manner "the extent" to which the Rule reasonably could be expected to

achieve those objectives, or the basis for such conclusions. The Commission's analysis

of the impact of the Position Limits Rule on market liquidity and price discovery was

especially conclusory. *See* 76 Fed. Reg. at 71,675, 71,678, 71,679–80.

**COUNT ONE:**

**VIOLATION OF THE COMMODITY EXCHANGE ACT—**
**FAILURE TO DETERMINE THE RULE TO BE**
**NECESSARY AND APPROPRIATE**

52.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

53.     Plaintiffs and their members have been, and will continue to be, adversely

affected or aggrieved by the CFTC's promulgation of the Position Limits Rule.

54.     The plain text of the CEA permits the CFTC to adopt position limits only "as the

Commission finds are necessary to diminish, eliminate, or prevent" "an undue and unnecessary

burden on interstate commerce" caused by "[e]xcessive speculation." 7 U.S.C. § 6a(a)(1).

Furthermore, the Commission is permitted to establish position limits only if it finds that they are "appropriate." *Id.* § 6a(a)(2)(A), (a)(5)(A). The Commission expressly declined to make these required findings in the Position Limits Rule, and it ignored evidence showing that these requirements were not met. Moreover, even if the Commission had been able to make these findings, it still enjoyed discretion whether to impose limits under the statute, which it failed to exercise in any meaningful or reasoned manner.

55.     In adopting the Rule without making these statutorily mandated findings or giving a reasoned explanation for any discretion that it exercised, the Commission violated the CEA and acted in a manner that is arbitrary, capricious, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).

56.     Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT TWO:

### VIOLATION OF THE COMMODITY EXCHANGE ACT— INSUFFICIENT EVALUATION OF COSTS AND BENEFITS

57.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

58.     The Commodity Exchange Act requires that before a rule is promulgated, "[t]he costs and benefits of the proposed [rule] shall be evaluated in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations." 7 U.S.C. § 19(a).

59.     Notwithstanding its statutory obligation to evaluate the Rule's costs and benefits, the Commission failed to assess whether the Rule—including but not limited to the position

limits, the circumscribed bona fide hedging exemptions, and the broader aggregation provisions—would be effective in curbing excessive speculation.  The Commission ignored substantial evidence submitted by commenters demonstrating that the Rule was unnecessary to address supposed excessive speculation and that adopting the Rule would have significant and systemic adverse effects on the commodity markets and, ultimately, on American consumers.  In fact, it adopted the Rule despite the conclusion of a majority of the Commissioners that it would impose significant costs without producing compensating benefits.

60.    Furthermore, despite overwhelming evidence showing that the Rule would impose significant costs on market participants, the Commission failed to collect data that would enable it to fairly evaluate the costs of the Rule.  The Commission did not acquire any significant data on swaps, even though the Rule extends position limits to swaps for the first time.

61.    The Commission was unable to conclude that the Rule would advance the objectives set forth in Section 19(a), noting in particular that only "[t]o *the extent* that the position limit formulas" "deter and prevent manipulative behavior and excessive speculation" would they "protect the efficiency, competitiveness, and financial integrity of futures markets." 76 Fed. Reg. at 71,675 (emphasis added).  It offered only short, conclusory assertions with respect to such critical issues as market liquidity and price discovery.

62.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT THREE:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS AGENCY ACTION IN PROMULGATING THE POSITION LIMITS RULE

63.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

64.    The Administrative Procedure Act requires an agency to examine relevant data

and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the decisions made.

65.    Despite that obligation, the Commission ignored data (including data that the Commission has itself collected and published) demonstrating that position limits and related provisions set forth in the Position Limits Rule were unnecessary and would be ineffective and harmful to the U.S. economy, and it did not justify the Rule through reasoned analysis and record evidence.  The Commission also failed to collect, particularly with respect to swaps, data necessary for a fair evaluation of the costs and benefits of the Rule.

66.    By adopting the Rule on the basis of this incomplete, inconsistent assessment of the rulemaking record and of the Rule's benefits and costs, the Commission acted in a manner that was arbitrary, capricious, and otherwise not in accordance with the law.

67.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT FOUR:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS AGENCY ACTION IN ESTABLISHING SPECIFIC POSITION LIMITS AND ADOPTING RELATED REQUIREMENTS AND RESTRICTIONS

68.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

69.    The Commission also failed to comply with the Administrative Procedure Act's requirement that an agency articulate a rational connection between the facts found and the decisions made in its selection of specific position limits and its adoption of related requirements and restrictions.

70.    For example, the Commission did not set forth a reasonable explanation for establishing, for the first time, a position limit of 25% of deliverable supply for cash-settled

contracts.  Nor did the Commission provide a reasonable explanation for rejecting a broader measure of deliverable supply proposed by Plaintiffs.

71.     The Commission failed to provide a reasoned explanation for declining to exempt traders from the aggregation rules when compliance with those rules may require them to violate state law or the law of foreign jurisdictions.  In addition, the Commission did not reasonably explain its decision to eliminate the exemption for passive investments in independently controlled and managed commercial entities.

72.     The Commission also did not justify the newly circumscribed scope of the hedging exemptions.  For example, the Rule's restriction of permissible anticipatory hedging unjustifiably limits legitimate, and long practiced, conduct by merchandizers, reducing their ability to manage risk.

73.     The Commission failed to provide any explanation, much less a reasonable explanation, for including a severability clause in the final Rule that was not so much as mentioned in the NPRM.

74.     Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT FIVE:

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
FAILURE TO PROVIDE INTERESTED PERSONS A
SUFFICIENT OPPORTUNITY TO MEANINGFULLY
PARTICIPATE IN THE RULEMAKING**

75.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

76.     The Administrative Procedure Act provides that when an agency promulgates a rule it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).  This requirement compels an agency to set forth in an NPRM

the most critical factual material and reasoning on which it relied to formulate proposed regulations.

77.    The NPRM for the Position Limits Rule did not fairly apprise members of the public of empirical data and reasoning that the Commission was relying on to support the establishment of position limits.  In particular, its one-page discussion of the costs and benefits of the Rule failed to give members of the public a reasonable opportunity to evaluate and critique the Commission's justification for the Rule.  The NPRM also did not give commenters fair notice of various provisions of the final Rule, including its severability clause and its provisions circumscribing the scope of the hedging exemptions.

78.    Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(D).

## COUNT SIX:

### CLAIM FOR INJUNCTIVE RELIEF

79.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

80.    Plaintiffs and their members will be irreparably injured by the Position Limits Rule once it is effective.  The Rule will unjustifiably reduce market liquidity, impair the price-discovery function of derivatives markets, make it more difficult to manage risk, and require Plaintiffs' members to expend resources to bring their operations into compliance, including building necessary infrastructure, redesigning trading strategies, and reorganizing ownership structures, such as through divestitures and corporate restructurings.  The Rule also will require Plaintiffs' members to aggregate commonly held positions even when positions are separately managed and controlled, and where the sharing of information creates a risk of violating the law. Their injuries will be redressed only if this Court declares that the Position Limits Rule is unlawful in its entirety and enjoins the CFTC from implementing it.

81.    An injunction would serve the public interest by avoiding potential harms to the

efficiency and liquidity of the commodity markets. These markets perform the essential function of facilitating the transfer of price risk to professional risk managers, enabling producers of commodities to budget for and finance the development of resources and infrastructure.

82.     These concerns outweigh any interest identified by the CFTC in issuing the Position Limits Rule.

83.     Plaintiffs are therefore entitled to injunctive relief under 5 U.S.C. § 702.

**PRAYER FOR RELIEF**

84.     WHEREFORE, Plaintiffs pray for an order and judgment:

a.     Declaring that the Position Limits Rule was promulgated by the CFTC without statutory authority within the meaning of 5 U.S.C. § 706(2)(C); was not promulgated in accordance with procedures required by law within the meaning of 5 U.S.C. § 706(2)(D); and is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

b.     Vacating and setting aside the Position Limits Rule in its entirety;

c.     Enjoining the CFTC and its officers, employees, and agents from implementing, applying, or taking any action whatsoever under the Position Limits Rule;

d.     Issuing all process necessary and appropriate to postpone the effective date of the Position Limits Rule in its entirety and to maintain the status quo pending the conclusion of this case;

e.     Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

f.     Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  December 2, 2011

MIGUEL A. ESTRADA, D.C. Bar. No. 456289
MEstrada@gibsondunn.com
EUGENE SCALIA, D.C. Bar No. 447524
EScalia@gibsondunn.com
JASON J. MENDRO, D.C. Bar. No. 482040
JMendro@gibsondunn.com
NIKESH JINDAL, D.C. Bar. No. 492008
NJindal@gibsondunn.com
JOHN F. BASH, D.C. Bar. No. 988874
JBash@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202.955.8500
Facsimile: 202.530.9616

*Attorneys for Plaintiffs*