**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INTERNATIONAL SWAPS AND DERIVATIVES
ASSOCIATION, INC. and
SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,

                Plaintiffs,

       v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

               Defendant.

Civil Action No. 11-cv-2146 (RLW)

**PLAINTIFFS' APPLICATION FOR
A PRELIMINARY INJUNCTION**

COME NOW PLAINTIFFS International Swaps and Derivatives Association, Inc. and Securities Industry and Financial Markets Association and hereby respectfully move this Court for a preliminary injunction staying the final rule and interim final rule promulgated by defendant United States Commodity Futures Trading Commission ("CFTC") pending the final resolution of this challenge, with the exception of the rule's amendments to 17 C.F.R.§ 150.2. *See* Position Limits for Futures and Swaps; Final Rule and Interim Final Rule, 76 Fed. Reg. 71,626 (Nov. 18, 2011).

This application is supported by the Memorandum of Points and Authorities filed concurrently herewith.  The CFTC opposes this application.

Because, as set forth in the Memorandum, plaintiffs are incurring significant, irreversible costs preparing to comply with the rule in the absence of a preliminary injunction, and because plaintiffs will continue to incur those costs until a preliminary injunction is granted, plaintiffs

respectfully request expedited briefing and consideration of this motion pursuant to Local Civil Rule 65.1(d).

Dated:  February 7, 2012

Respectfully submitted,

/s/ Miguel A. Estrada
Miguel A. Estrada, SBN 456289
  *Counsel of Record*
Eugene Scalia, SBN 447524
Jason J. Mendro, SBN 482040
John F. Bash, SBN 988874
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL SWAPS AND DERIVATIVES
ASSOCIATION, INC. and
SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,

               Plaintiffs,

    v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

               Defendant.

Civil Action No. 11-cv-2146 (RLW)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## APPLICATION FOR A PRELIMINARY INJUNCTION

Dated:  February 7, 2012

Miguel A. Estrada, SBN 456289
  *Counsel of Record*
Eugene Scalia, SBN 447524
Jason J. Mendro, SBN 482040
John F. Bash, SBN 988874
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................................... 3

SUMMARY OF ARGUMENT .............................................................................................. 12

ARGUMENT ................................................................................................................... 14

    I.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
        MERITS ............................................................................................................. 14

        A.    The Commission Failed To Make Statutorily Required Findings ........................ 19

        B.    The Commission Engaged In Unreasonable Decision-Making By Ignoring
            Record Evidence ............................................................................................ 23

        C.    The Commission Did Not Comply With The Requirement That It Conduct
            An Adequate Cost-Benefit Analysis Before Promulgating A Rule ..................... 27

    II.    THE RULE WILL IMPOSE IRREPARABLE HARM ON PLAINTIFFS'
        MEMBERS AND THE PUBLIC ................................................................................ 29

        A.    The Rule Will Cause Substantial, Irreparable Harm To Plaintiffs'
            Members ....................................................................................................... 30

        B.    The Rule Jeopardizes The Public Interest More Broadly .................................... 36

CONCLUSION ................................................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AFL-CIO v. Brock,*
    835 F.2d 912 (D.C. Cir. 1987)......................................................................................21

*AFL-CIO v. Chao,*
    297 F. Supp. 2d 155 (D.D.C. 2003)..............................................................18, 39, 40

*Air Line Pilots Ass'n v. FAA,*
    3 F.3d 449 (D.C. Cir. 1993)........................................................................................23

*\* Am. Equity Inv. Life Ins. Co. v. SEC,*
    613 F.3d 166 (D.C. Cir. 2010)..............................................................................15, 17

*Am. Petroleum Inst. v. Johnson,*
    541 F. Supp. 2d 165 (D.D.C. 2008)............................................................................18

*Arizona v. Thompson,*
    281 F.3d 248 (D.C. Cir. 2002) ...................................................................................23

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F. Supp. 2d 1 (D.D.C. 2009)..............................................................12, 18, 30, 40

*Brown v. Gardner,*
    513 U.S. 115 (1994)....................................................................................................20

*\* Business Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011).................................................................4, 16, 17, 28

*Celecom Commc'ns Corp. v. FCC,*
    789 F.2d 67 (D.C. Cir. 1986)......................................................................................26

*\* Chamber of Commerce v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005)..............................................................................17, 28

*Chem. Mfrs. Ass'n v. EPA,*
    217 F.3d 861 (D.C. Cir. 2000)..............................................................................16, 17

*Chevron USA, Inc. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984)....................................................................................................23

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008)..............................................................................32

*Friends of Blackwater v. Salazar,*
    772 F. Supp. 2d 232 (D.D.C. 2011) ...........................................................................18

**TABLE OF AUTHORITIES (continued)**

<u>Page(s)</u>

*Fund for Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003) ....................................................................39

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001)..........................................................................34

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002)..........................................................................19

*Indep. Bankers Ass'n v. Smith*,
  534 F.2d 921 (D.C. Cir. 1976) ..........................................................................36

* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29, 43 (1983)......................................................................................14

*Nalco Co. v. EPA*,
  786 F. Supp. 2d 177 (D.D.C. 2011)...................................................................35

* *Nat'l Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831 (D.C. Cir. 2006)..........................................................................15

*NetCoalition v. SEC*,
  615 F.3d 525 (D.C. Cir. 2010)..........................................................................28

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009).......................................................................37

*PDK Labs., Inc. v. DEA*,
  362 F.3d 786 (D.C. Cir. 2004)..........................................................................23

*Penobscot Indian Nation v. U.S. Dep't of Hous. & Urban Dev.*,
  539 F. Supp. 2d 40 (D.D.C. 2008) ...................................................................18

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*,
  471 F.3d 1350 (D.C. Cir. 2006)........................................................................23

*Philip Morris USA Inc. v. Scott*,
  131 S. Ct. 1 (2010)............................................................................................33

*Phillips Petroleum Co. v. FERC*,
  792 F.2d 1165 (D.C. Cir. 1986)........................................................................23

*Portland Cement Ass'n v. EPA*, ___ F.3d ___,
  2011 WL 6118574 (D.C. Cir. Dec. 9, 2011) ....................................................15

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ..........................................................................19

*Sottera, Inc. v. FDA*,
    627 F.3d 891 (D.C. Cir. 2010) ............................................................................32

*Tenneco Gas v. FERC*,
    969 F.2d 1187 (D.C. Cir. 1992) ..........................................................................16

*Thompson v. Clark*,
    741 F.2d 401 (D.C. Cir. 1984) ............................................................................16

*Wheaton Van Lines, Inc. v. ICC*,
    671 F.2d 520 (D.C. Cir. 1982) ............................................................................16

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................................................33

**STATUTES & RULES**

3 Fed. Reg. 3,145 (Dec. 24, 1938) ..........................................................................19

5 Fed. Reg. 3,198 (Aug. 28, 1940) ..........................................................................19

5 U.S.C. § 553 ..........................................................................................................26

5 U.S.C. § 706 ..........................................................................................................14

7 U.S.C. § 6a ......................................................................................1, 4, 5, 6, 19, 21, 22

7 U.S.C. § 7 ......................................................................................................5, 22

7 U.S.C. § 7b-3 ................................................................................................5, 22

7 U.S.C. § 19 ................................................................................................1, 4, 27, 28

16 Fed. Reg. 8,106 (Aug. 16, 1951) ........................................................................19

17 C.F.R. § 1.3(z) ......................................................................................................5

17 C.F.R. § 38 app. B ........................................................................................19, 20

17 C.F.R. § 150.2 ............................................................................................3, 4, 5

17 C.F.R. § 150.3 ......................................................................................................5

## TABLE OF AUTHORITIES (continued)

**Page(s)**

17 C.F.R. § 150.4 ..................................................................................................5

17 C.F.R. § 150.5 ............................................................................................4, 20

18 Fed. Reg. 443 (Jan. 22, 1953) ........................................................................19

18 Fed. Reg. 444 (Jan. 22, 1953) ........................................................................19

18 Fed. Reg. 445 (Jan. 22, 1953) ........................................................................19

21 Fed. Reg. 5,575 (July 25, 1956).....................................................................19

42 U.S.C. § 7412 .................................................................................................16

46 Fed. Reg. 50,938 (Oct. 16, 1981)...................................................................20

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010)..............................................1

Final Rule, Facilitating Shareholder Director Nominations,
   75 Fed. Reg. 56,668 (Sept. 16, 2010) ......................................................28

Further Definition of "Swap," etc.,
   76 Fed. Reg. 29,818 (May 23, 2011) ........................................................11

Notice of Proposed Rulemaking,
   76 Fed. Reg. 4,752 (Jan. 26, 2011)...............................................6, 7, 9, 20

Position Limits for Futures and Swaps; Final Rule and Interim Final Rule,
   76 Fed. Reg. 71,626 (Nov. 18, 2011) ................................................ *passim*

## OTHER AUTHORITY

Alexander Osipovich,
   *US Energy Firms Brace for Position Limits*, Energy Risk, Jan. 9, 2012................................31

## INTRODUCTION

This motion seeks to preliminarily enjoin the compliance date of a new regulation of the Commodity Futures Trading Commission ("Commission" or "CFTC"). The circumstances of the regulation's adoption are unusual: A majority of the Commission's five members concluded that the Rule was *unnecessary*, and could harm consumers and producers by raising the price of goods the public purchases every day, and by making it harder for producers to hedge against fluctuations in the prices of raw materials. Three Commissioners voted to adopt the Rule none-theless, because they believed that the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), compelled new "position limits" on trading in commodity derivatives markets regardless of the limits' consequences.

That belief is fundamentally flawed. The Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq*. ("CEA"), which governs the Commission's rulemaking authority, expressly directs the Commission to analyze the consequences, including the costs and benefits, of potential position limits before adopting them. *Id.* § 19(a). Furthermore, the CEA authorizes the Commission to impose position limits only after finding that those limits are "necessary" to combat the negative effects (if any) of excessive speculation. *Id.* § 6a(a)(1). Far from reversing that requirement, the Dodd-Frank Act incorporated it into its new provisions, and provided, in addition, that the Commission may "establish limits on the amount of positions" only "as appropriate." *Id.* § 6a(a)(2).

These express statutory requirements mandate what can only be understood as the very essence of reasoned decision-making for *any* agency: Before adopting a rule, the agency must analyze the presence and magnitude of the threat being regulated and, in light of that threat, the regulatory measures best tailored to address the threat without causing unnecessary burdens, costs, or other adverse consequences.

Yet, in adopting the new "position limits" in issue here, the Commission made no finding that these limits or the other aspects of the Rule were necessary; it made no finding that they were appropriate; and it conducted no meaningful cost-benefit analysis. *See* Position Limits for Futures and Swaps; Final Rule and Interim Final Rule, 76 Fed. Reg. 71,626 (Nov. 18, 2011) ("Position Limits Rule" or "Rule") (Exh. 1). The Commission's mistaken view that these steps were dispensable led to a flawed rulemaking process and a deeply flawed Rule that cannot survive review under the Administrative Procedure Act ("APA").

If the Rule is allowed to take effect while Plaintiffs' challenge on the merits is pending, it will cause irreparable harm to Plaintiffs' members and the public. As one Commissioner observed, the Rule is expected to "lead to higher prices for commodities that we consume on a daily basis." Transcript of Open Meeting on Two Final Rule Proposals Under the Dodd-Frank Act (Oct. 18, 2011) ("Oct. 18 Tr."), at 13.[1] The Rule also will affect countless market participants, requiring immediate, costly compliance efforts. Those compliance efforts will include restructuring of corporate relationships and divestment—irreversible changes in ownership. In addition, the Rule will force market participants to forgo efficient trading strategies, and impair their ability to hedge against risks. These costs are being incurred now and will continue to rise absent a preliminary injunction, and they will be impossible to recoup if the Rule is invalidated—as it likely will be.

There is no justification for the public and market participants to incur these costs during judicial review of the Rule, particularly in the midst of a fragile economic recovery. Absent any regulatory finding that the Rule would be necessary *ever*, there surely is no basis to conclude that

---

[1] *Available at* http://www.cftc.gov/LawRegulation/DoddFrankAct/Rulemakings/DF_26_PosLimits/dfsubmission7_101811-trans.

it is necessary *now*.  This Court should therefore grant a preliminary injunction staying the effective date of the Rule until this challenge is resolved.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Commodity Exchange Act And The CFTC's "Position Limits" Authority

The CFTC regulates commodity derivatives markets pursuant to the CEA.  First enacted in 1936, the CEA authorizes the Commission to establish a comprehensive scheme of regulation for futures and options contracts in agricultural, metallurgical, energy, and other commodities and the private exchanges on which they are traded.  A futures contract is a standardized contract, developed by exchanges such as the Chicago Mercantile Exchange ("CME"), for the purchase or sale of a set quantity of a specified commodity (*e.g.*, natural gas) at a particular date and location.  For example, a trader may buy a CME Group Oats futures contract for delivery in May 2012, which would require either that the purchaser take delivery of 5,000 bushels of oats in that month or that the parties settle through a cash payment the difference between the price listed in the contract and the market price at the expiration of the contract.[3]  An options contract is similar but confers the right (not the obligation) to buy or sell.  Both are used to hedge against price fluctuations in the price of the commodity and to minimize other market risks.

---

[2]  Plaintiffs do not seek a preliminary injunction against the Rule's amendments to 17 C.F.R. § 150.2, which went into effect on January 17, 2012.  *See* 76 Fed. Reg. at 71,642, 71,673, 71,684.   Part 150 previously provided position limits related to nine commodities; the amendments to § 150.2 affect only the levels at which those position limits are set.  These amendments are distinct from the Rule's other provisions and can be implemented independently.  The balance of the Rule would introduce a new Part 151, which is designed to replace Part 150.  Enjoining only some of the provisions in Part 151 without enjoining others could have harmful, unintended consequences, because the contents of Part 151 are intertwined.

[3]  *See* http://www.cmegroup.com/trading/agricultural/grain-and-oilseed/oats_contract_ specifications.html.

The CEA permits the Commission to establish "position limits"—a maximum number of contracts, net long or short, to which a trader may be a party.  Section 6a authorizes the Commission to  "fix such limits on the amounts of trading which may be done or positions which may be held by any person" in contracts traded on commodity markets "as the Commission finds are *necessary* to diminish, eliminate, or prevent" an "undue and unnecessary burden on interstate commerce" caused by "[e]xcessive speculation."  7 U.S.C. § 6a(a)(1) (emphasis added).

In addition to this limitation on the Commission's authority to set position limits, the CEA separately requires the Commission to conduct a cost-benefit analysis before promulgating any new regulations.  Section 19(a) provides:  "The costs and benefits of the proposed [rule] shall be evaluated in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C.  § 19(a).  This provision is similar to cost-benefit requirements governing other agencies, such as the Securities and Exchange Commission ("SEC"), which the D.C. Circuit has vigorously enforced.  *See, e.g.*, *Business Roundtable v. SEC*, 647 F.3d 1144, 1146 (D.C. Cir. 2011) (vacating SEC rule under statutory provisions requiring agency "to consider the rule's effect upon efficiency, competition, and capital formation").

Before the adoption of the Position Limits Rule at issue here, the CFTC had set hard position limits on nine agricultural commodity futures and options contracts.  17 C.F.R. § 150.2.  It also required exchanges either to set position limits on futures and options contracts or, as a more flexible alternative, to establish "accountability" rules that require traders with large positions to disclose information about those positions upon inquiry (*id.* § 150.5(e)) —a regulatory approach

consistent with provisions of the CEA requiring exchanges to set limits or accountability rules "where necessary and appropriate."  7 U.S.C. § 7(d)(5); *see also id.* § 7b-3(f)(6)(A) (Dodd-Frank Act provision requiring swap execution facilities to adopt position limits or accountability rules "as is necessary and appropriate").  The preexisting position limits were subject to various exemptions for "bona fide hedging"—generally, circumstances in which a position is held to offset economic risk from trading of the underlying commodity.  The limits were also subject to "aggregation" rules, which dictate when positions in multiple accounts held by the same trader or group of traders must be combined for purposes of applying the limits.  *See* 17 C.F.R. §§ 1.3(z), 150.3, 150.4.

### B.   The Dodd-Frank Act And The Proposed Rule

In 2010, Congress enacted the Dodd-Frank Act.  That act modified Section 6a of the CEA in several respects.  It amended Section 6a(a)(1) to authorize the Commission to set position limits not only for futures and options contracts, but also for instruments called "swaps."  7 U.S.C. § 6a(a)(1).  Although not yet fully defined by regulation, swaps are broadly understood to be over-the-counter derivative instruments involving exchanges of payments based on changes in the prices of specified underlying commodities.  Unlike futures and options contracts, swaps are not standardized by exchanges but rather are negotiated between the parties to the contract.  Swaps vary widely in their specifications, can involve multiple commodities, and may include complex settlement and timing provisions.  Swaps are a critical risk-management tool for companies that sell commodities, such as energy producers, and companies that purchase them, such as airlines, because they help guard against large swings in commodity prices.  For instance, an oil producer that wanted to guard against volatility in the price of oil could agree to a swap

providing for the oil producer to pay the market price of oil over a period to a financial institution in exchange for fixed payments that will underpin budgeting decisions.

While adding swaps to the instruments within the Commission's regulatory authority, the Dodd-Frank Act left in place the CEA's longstanding requirement in Section 6a(a)(1) that the Commission set position limits only if it determines that they are necessary to prevent an undue burden on interstate commerce caused by excessive speculation.  7 U.S.C. § 6a(a)(1).

The Dodd-Frank Act also added Section 6a(a)(2) of the CEA, which provides that "the Commission shall by rule, regulation, or order establish limits on the amount of positions, *as appropriate*, other than bona fide hedge positions, that may be held by any person with respect to" futures and options contracts traded on exchanges.  7 U.S.C. § 6a(a)(2) (emphasis added).  It included a similar provision with respect to swaps.  *Id.* § 6a(a)(5).  Each of these two provisions (by cross-reference to another) requires the CFTC to exercise "its discretion" in setting position limits so that, "to the maximum extent practicable," they accomplish certain statutory objectives, among them "ensur[ing] sufficient market liquidity for bona fide hedgers" and "ensur[ing] that the price discovery function of the underlying market is not disrupted."  *Id.* § 6a(a)(3)(B).

On January 26, 2011, the Commission issued a notice of proposed rulemaking ("Notice") to set new position limits.  Notice of Proposed Rulemaking, 76 Fed. Reg. 4,752 (Jan. 26, 2011).  The Notice proposed position limits on contracts tied to 19 commodities beyond the nine that were previously subject to the Commission's limits.  *See id.* at 4,768–69.  It also proposed to extend all position limits to swaps for the first time and to make the exemptions and aggregation rules more restrictive.  *See id.* at 4,752, 4,760–62.  The Notice acknowledged that the "basic statutory mandate . . . to establish position limits to prevent 'undue burdens' associated with 'excessive speculation' has remained unchanged" and stated that the Dodd-Frank Act "reaffirm[ed] the

Commission's authority to establish position limits *as it finds necessary in its discretion* to address excessive speculation." *Id.* at 4,754–55 (emphasis added).

During the rulemaking, it became apparent that a majority of Commissioners were unlikely to conclude that new position limits were necessary to curb excessive speculation. On the contrary, a majority appeared to believe that the net effect of new limits would be harmful. At an open meeting shortly before the Notice issued, Commissioner Dunn stated that "to date CFTC staff has been unable to find any reliable economic analysis to support either the contention that excessive speculation is affecting the market we regulate or that position limits will prevent excessive speculation." Transcript of Open Meeting on the Ninth Series of Proposed Rulemakings Under the Dodd-Frank Act (Jan. 13, 2011), at 9.[4] "With such a lack of concrete economic evidence," he said, "my fear is at best position limits are a cure for a disease that does not exist, or at worst it's a placebo for one that does." *Id.* Nonetheless, he said, he was "voting for the proposed rules on position limits in order to gather more information." *Id.* "If there is evidence that position limits will lower the price we pay for gas, milk and steak while simultaneously ensuring the integrity of our markets in the price discovery process, we need to see it. Only after these questions have been answered will I be able to determine whether or not position limits are appropriate." *Id.* at 10.

During the comment period, the evidence submitted overwhelmingly confirmed that excessive speculation was not a problem in commodity markets and that position limits were not only unnecessary but would raise the price of goods by making it more difficult to hedge against price fluctuations. Commenters provided the Commission with extensive data demonstrating that position limits were *not* necessary or appropriate. The CME Group, which owns four of the

---

[4]  *Available at* http://www.cftc.gov/ucm/groups/public/@swaps/documents/dfsubmission/
dfsubmission4_011311-transcri.pdf.

most important commodity exchanges, cited numerous studies reflecting a "virtually unanimous academic agreement that commodity price changes have been driven by fundamental market conditions, not by speculation."  CME Group Comment, at 4 (Mar. 28, 2011).  Those studies included reports by the Government Accountability Office, the Organization for Economic Cooperation and Development, the European Commission, and the CFTC itself (as part of an interagency task force).  *Id.*  The OECD study, for example, found that "[t]here is no statistically significant relationship indicating that changes in index and swap fund positions [in agricultural and energy commodities] have increased market volatility."[5]  Similarly, the GAO paper reported that there is "limited statistical evidence of a causal relationship between speculation in the futures markets and changes in commodity prices."[6]

The CME Group also cited a "wealth of empirical evidence supporting the view that the proposed hard position limits . . . would actually be counterproductive by decreasing liquidity . . . which, in turn, would likely increase both price volatility and the cost of hedging."  CME Group Comment, at 2.  Numerous other commenters submitted studies and data showing that position limits are unnecessary and inappropriate and would impose tremendous costs on market participants and the broader U.S. economy.  *See, e.g.*, Edison Electric Institute et al. Comment, at 2 (Mar. 28, 2011) ("Such an approach likely will make the U.S. derivatives markets less efficient and more expensive for commercial entities seeking to manage the risks they incur in their businesses.").  As Plaintiffs explained in their comment letter, the proposed rule would impose "significant financial and regulatory burdens . . . on market participants" and result in a "loss of liquidity, increase in volatility in commodity markets and increased hedging costs."  ISDA-SIFMA Comment, at 6 (Mar. 28, 2011).

---

[5]  *Available at* http://www.oecd.org/dataoecd/16/59/45534528.pdf (p.1).

[6]  *Available at* http://www.gao.gov/new.items/d09285r.pdf (p.5).

### C.      Adoption Of The Final Rule

The Commission elected to forge ahead with the Rule nonetheless, adopting the Position Limits Rule on October 18, 2011, by a 3-2 vote.  76 Fed. Reg. at 71,699.  Although many components of the Rule remained unchanged from the Notice, some were made even more restrictive.  For example, the Commission set tighter limits on "cash-settled" contracts—contracts where the underlying commodity need not actually be delivered—than what was initially proposed.  *See* 76 Fed. Reg. at 71,634–38.  The Rule also significantly restricted the availability of important hedging exemptions and eliminated some of the more flexible aggregation provisions of the proposed rule.  For example, the final Rule withdrew an aggregation exemption called the "owned non-financial entity" ("ONF") exemption which would have "allow[ed] an entity to disaggregate . . . the positions of a nonfinancial entity in which it owns a 10 percent or greater ownership or equity interest" if it could "demonstrate that the owned nonfinancial entity is independently controlled and managed."  Notice, 76 Fed. Reg. at 4,762; *see* Rule, 76 Fed. Reg. at 71,653–54.

In the hearing in which the Rule was approved, Commissioner Dunn—who provided the crucial third vote for the Rule—made clear that the comment period had failed to resolve the significant misgivings he expressed at the outset of the rulemaking.  The Commission staff had not mustered "any reliable economic analysis to support either the contention that excessive speculation is affecting the market we regulate or that position limits will prevent the excessive speculation."  Oct. 18 Tr. at 13.  "[P]osition limits may harm the very markets we're intending to protect," he warned.  *Id.* at 14.  Commissioner Dunn declared that he was voting for the Rule *only* because he interpreted the Dodd-Frank Act's amendments to Section 6a to require the Commission to impose position limits.  *Id.* at 11.

9

In an attempt to counter the awkward fact that the Commission was adopting a rule that a majority of Commissioners believed to be ill-advised, the Commission staff put forward an interpretation of the Commission's statutory authority in the final rule release that departed from the interpretation in the Notice.  The Commission was *not* required to find that excessive speculation was a problem or that position limits were necessary in order to impose them on markets, the release said.  76 Fed. Reg. at 71,628.  Rather, the release claimed, "Congress mandated the imposition of position limits" in the Dodd-Frank Act and "the Commission does not have the discretion to alter an express mandate from Congress."  *Id.* at 71,663–64.  On this reasoning, the Commission declined even to consider "studies suggesting that there is insufficient evidence of excessive speculation in commodity markets."  *Id.* at 71,664.  Those studies "do not address issues that are material to this rulemaking," the Commission said.  *Id.*

The final release did not reconcile the Commission's claim that "it does not have . . . discretion" with the fact that the final Rule implemented important discretionary decisions that were clearly not mandated by the Act.  For example, the final Rule did not impose position limits on all futures and swaps contracts, but only on those that are associated with 28 specific commodities.  Likewise, the specific limits established by the Rule were not dictated by the statute, but instead were set by the Commission without any prior determination of how frequently "excessive speculation" occurred, the "size" of the positions that were associated with any such speculation, and the specific "contracts" most commonly associated with such speculation.  The final Rule's tightened provisions regarding cash-settled contracts and aggregation also were not required by statute.

Commissioner O'Malia and Commissioner Sommers each issued pointed dissents from the final Rule.  Commissioner O'Malia wrote that the Commission "fail[ed] to comply with

Congressional intent" and "misse[d] an opportunity to determine and define the type and extent" of harmful speculation "so that it can respond with rules that are reasonable and appropriate." 76 Fed. Reg. at 71,700. Commissioner Sommers lamented that the Commission "ha[s] chosen to go way beyond what is in the statute and ha[s] created a very complicated regulation that has the potential to irreparably harm these vital markets." *Id.* She was "most concerned that rules designed to 'rein in speculators' have the real potential to inflict the greatest harm on bona fide hedgers—that is, the producers, processers, manufacturers, handlers and users of physical commodities." *Id.* at 71,699. "This rule," she said, "will make hedging more difficult, more costly, and less efficient, all of which, ironically, can result in increased food and energy costs for consumers." *Id.*

The final Position Limits Rule was published in the Federal Register on November 18, 2011, with the key provisions set to take effect 60 days after the CFTC and SEC jointly further define the term "swap" in a separate rulemaking that is expected to be completed soon. *See* Further Definition of "Swap," etc., 76 Fed. Reg. 29,818 (May 23, 2011).

### D.   Plaintiffs' Challenge To The Rule

Plaintiffs—two organizations that represent participants in the commodity-derivatives markets—filed a complaint in this Court on December 2 and a petition for review that same day in the U.S. Court of Appeals for the District of Columbia Circuit. On December 12, Plaintiffs sought a stay of the Rule from the Commission, which the Commission denied. *See* Exh. 2.

On January 20, 2012, the Court of Appeals dismissed the petition for review for lack of jurisdiction. That Court noted the "normal default rule . . . that persons seeking review of agency action go first to district court rather than to a court of appeals" and found that the default rule applied to this case in light of the absence of any statutory authorization for direct review in a

court of appeals.  Exh. 3, at 1 (quotation marks omitted).  The Court of Appeals, in the same or-

der, dismissed for lack of jurisdiction an emergency stay motion that Plaintiffs had filed in that

court.

Plaintiffs now seek a stay from this Court.[7]

## SUMMARY OF ARGUMENT

This Court considers four factors in deciding whether to issue a preliminary injunction:

(1) Whether the plaintiff has established "a substantial showing of likelihood of success on the

merits"; (2) whether the plaintiff "would suffer irreparable injury if the injunction were not

granted"; (3) whether "an injunction would not substantially injure other interested parties"; and

(4) whether "the public interest would be furthered by the injunction." *Brady Campaign to Pre-*

*vent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11–12 (D.D.C. 2009).  "[A] particularly strong

showing in one area can compensate for weakness in another." *Id.*

Each of these factors favors issuance of a preliminary injunction here.  The Commission

adopted a new regulation without first determining that it was necessary, and without ascertain-

ing the scope of the problem to be regulated.  That would be arbitrary and capricious in any cir-

cumstance, since an agency cannot craft a sensible regulatory solution to a problem without first

determining the extent and seriousness of the problem.  Such a failure is particularly egregious in

this case, where the agency is under an express statutory command to determine whether a rule is

"necessary," and to adopt position limits only "as appropriate."

The *reason* the Commission failed to determine whether a rule was necessary, and the

consequences of that failure, also make this a particularly flawed rulemaking in which Plaintiffs

---

[7] On January 17, 2012, the Court entered a stay of litigation in light of the pendency of Plain-
tiffs' petition for review in the D.C. Circuit.  Dkt. 9.  The Court lifted the stay on February 2.
Dkt. 11.

are substantially likely to succeed in their challenge on the merits.  The Commission shrank from its statutory duty to determine that a rule was necessary because extensive record evidence showed that it was not; indeed, a majority of the Commissioners expressly concluded the Rule was **un**necessary.  In adopting the Rule nonetheless, the Commission attempted to excuse its clear regulatory failure with a flawed statutory interpretation under which Congress supposedly directed an expert agency to adopt a rule—and to impose the regulatory costs that inevitably follow—regardless of whether a rule was needed.  In acting on that flawed statutory interpretation, the Commission ignored clear record evidence—in violation of the most basic command of the APA—and then adopted 28 highly specific "position limits" that lacked any basis in reason because an agency cannot properly tailor a rule to a problem without first taking the problem's *measure*.  Likewise, because it did not determine the scope of the problem that existed (if any), the Commission could not and did not perform a proper cost-benefit analysis despite explicit, detailed statutory requirements that it do so—no agency can determine whether a rule's benefits outweigh its costs without first ascertaining the scope of the problem to be addressed and therefore what the regulation would *achieve*.  In this case, moreover, the record evidence showed that excessive speculation is not harming the commodities markets, leading a majority of the Commissioners themselves to conclude that the Rule's net cost-benefit would be negative, harming the commodities markets and consumers.  By the Commissioners' own conclusion, then, the Rule's costs outweigh its benefits.

In these unusual circumstances, all the other factors for issuing a preliminary injunction plainly also are met.  There will be no harm to the public from staying a rule that is not shown to be necessary and that a majority of the agency's Commissioners determined was unnecessary.  A stay will, however, avoid imposing costs that the agency concedes will occur and that a majority

of the Commissioners determined would harm consumers and the markets as a whole.  Simply,

Plaintiffs' members will experience added costs and irreparable harm each day this Rule remains

in effect, and there will be no identifiable harm from a stay.

## ARGUMENT

## I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

Judicial review of government action is an essential feature of the modern regulatory

state.  It ensures that the rights of the public are not infringed, and their personal and economic

interests are not restricted, without the government adhering to the required procedures and ob-

serving the substantive constraints on its power.  The APA provides that when an administrative

agency's action is "arbitrary," "capricious," or "otherwise not in accordance with law," the

courts "shall" vacate the action.  5 U.S.C. § 706.

Agency action is arbitrary and capricious when, among other things, the agency "entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Thus, in that leading Supreme Court decision,

the Court invalidated the rule in part because there were "no findings and no analysis here to jus-

tify the choice made."  *Id.* at 48 (quotation marks omitted).

In discharging its statutory duty to consider every "important aspect of the problem," an

agency's first task before adopting a regulation is to ascertain the scope and seriousness of the

"problem" it intends to regulate.  Without doing so the agency cannot know how intense a regu-

latory response is warranted, nor can it determine what regulatory measures are properly cali-

brated to the problem; indeed, it cannot be confident a rule is needed at all.  The courts have not

hesitated to strike down rules adopted to address perceived "problems" that were not substantiated.  For example, in *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006), the Federal Energy Regulatory Commission ("FERC") revised "standards of conduct" that natural gas companies were to follow with respect to their non-marketing affiliates, to prevent abuses of market power.  Two dissenting commissioners accused the agency of "relying on a record of abuse that in fact did not exist," and indeed, the court held, the dissenters "were plainly correct" because there was "no evidence of a real problem with respect to pipelines' relationships with non-marketing affiliates."  *Id.* at 841.  Finding that "FERC has cited no complaints and provided zero evidence of actual abuse between pipelines and their non-marketing affiliates," the court vacated the rule.  *Id.* at 843 (emphases omitted).

Similarly, in *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), the SEC adopted a rule to make "fixed-index annuities" subject to the heightened disclosure requirements of the federal securities laws, rather than leaving them subject to regulation at the state level only.  The D.C. Circuit invalidated the rule because, among other things, the agency failed to "assess the baseline level of price transparency and information disclosure under state law."  *Id.* at 178.  The court explained:  "The SEC's failure to analyze the efficiency of the existing state law regime renders arbitrary and capricious the SEC's judgment that applying federal securities law would increase efficiency."  *Id.* at 179.  In other words, without determining that the existing state system of regulation fell short, the SEC could not determine that federal regulation was warranted.

The APA imposes other important requirements on agency rulemaking.  The agency must "'examine the relevant data and articulate a satisfactory explanation for its action[s],'" *Portland Cement Ass'n v. EPA*, ___ F.3d ___, 2011 WL 6118574, at *5 (D.C. Cir. Dec. 9, 2011) (per curi-

am) (quotation marks omitted; alteration in original), and must "respond to substantial problems raised by commenters," *Business Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011). An agency's "fail[ure] adequately to consider relevant evidence . . . falls afoul of [the] requirement that an agency engage in reasoned decision-making by supporting its conclusions with 'substantial evidence' in the record." *Tenneco Gas v. FERC*, 969 F.2d 1187, 1214 (D.C. Cir. 1992) (per curiam).  Likewise, if "data . . . in the rulemaking record [ ] demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, the rule cannot stand." *Thompson v. Clark*, 741 F.2d 401, 405 (D.C. Cir. 1984).  In sum, "[i]t is the court's function to assure that the agency has given reasoned consideration to the facts it has latitude to find, the conclusions drawn therefrom and the judgments it makes based on the record evidence." *Wheaton Van Lines, Inc. v. ICC*, 671 F.2d 520, 527 (D.C. Cir. 1982).

Even statutory deadlines and mandates, where they do exist, will not excuse an agency's failure to observe these requirements of the APA.  In *Chemical Manufacturers Association v. EPA*, 217 F.3d 861 (D.C. Cir. 2000), the D.C. Circuit vacated an EPA rule that imposed an expedited schedule on businesses that were unwilling to meet stricter emission standards to cease burning hazardous waste; the rule purported to implement a statutory provision requiring "compliance as expeditiously as practicable." *Id.* at 865–68; 42 U.S.C. § 7412(i)(3)(A).  Although in adopting the rule the EPA claimed that the early cessation program would yield public health benefits, "it neither pointed out what those benefits would be nor explained how any such benefits might result from the early cessation program." 217 F.3d at 865.  And, when the agency argued that it was required by statute to impose the two-year requirement, the court rejected its attempt to lay blame on Congress.  It was unreasonable, the court held, to interpret Congress's

command "as requiring [the agency] to impose costly obligations on regulated entities without regard to the Clean Air Act's purpose." *Id.* at 867.

In a string of recent unanimous decisions, the D.C. Circuit has repeatedly invalidated rules of the SEC—a sister agency to the CFTC—for failures to assess rules' costs and benefits that are strikingly similar to the CFTC's shortcomings here. *See Business Roundtable*, 647 F.3d 1144; *Am. Equity Inv. Life Ins. Co.*, 613 F.3d 166; *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005). Last year's *Business Roundtable* case, for example, concerned an SEC rule that would have enabled certain large shareholders to use companies' proxy materials to put forward information about the shareholders' nominees for corporate boards of directors. Holding that the SEC had acted arbitrarily and capriciously in adopting the rule, the Court explained that it was the Commission's responsibility to "frame[] the costs and benefits of the rule," "adequately to quantify . . . costs or . . . explain why those costs could not be quantified," and to "support its predictive judgments." 647 F.3d at 1148–49. Yet, the SEC had "d[one] nothing to estimate and quantify the costs it expected companies to incur; nor did it claim estimating those costs was not possible." *Id.* at 1150. One key deficiency was that the SEC had not reliably estimated the frequency with which contested elections would occur under the new rule compared to existing practices; "[w]ithout this crucial datum, the Commission has no way of knowing whether the rule will facilitate enough election contests to be of net benefit." *Id.* at 1153. The SEC's "failure to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation makes promulgation of the rule arbitrary and capricious and not in accordance with law." *Id.* at 1148 (quotation marks omitted).

The judges of this Court, like the judges of the D.C. Circuit, have not hesitated to vacate federal rules when agencies failed to reasonably explain their action or otherwise satisfy their

statutory responsibilities.  *See, e.g., Friends of Blackwater v. Salazar*, 772 F. Supp. 2d 232, 245 (D.D.C. 2011) (vacating rule of U.S. Fish & Wildlife Service for failure to adhere to require-ments of Endangered Species Act); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 184–89 (D.D.C. 2008) (vacating EPA rule under the APA because court could not "conclude that the agency engaged in a course of reasoned decisionmaking"); *Penobscot Indian Nation v. U.S. Dep't of Hous. & Urban Dev.*, 539 F. Supp. 2d 40, 52–54 (D.D.C. 2008) (vacating HUD rule when the "agency did not genuinely engage in reasoned decisionmaking").

The judges of this Court will also preliminarily enjoin a challenged regulation pending judicial review in appropriate circumstances, such as when a rule of questionable validity would result in significant costs or cause parties to take irreversible compliance measures.  *See, e.g., Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) (pre-liminarily enjoining rule permitting concealed weapons in national parks); *AFL-CIO v. Chao*, 297 F. Supp. 2d 155, 162 (D.D.C. 2003) (preliminarily enjoining Department of Labor rule where compliance would have required parties "to take numerous irreversible steps").

Against these background principles, and as shown below, it is plain that the Commission violated the most basic requirements for reasoned agency decision-making by adopting a rule without first determining that it was necessary, indeed, without determining the extent or even the existence of the problem it purported to address.  In so doing, the Commission ignored the plain terms of the CEA and also ignored extensive evidence in the rulemaking record.  And, that textbook violation of the APA prevented the agency from discharging its separate responsibility under the CEA to appraise the Rule's costs and benefits.  For these and other reasons, Plaintiffs are substantially likely to succeed on the merits of their challenge to a rule that a majority of Commissioners themselves determined was unnecessary, and would hurt American consumers

and the economy by raising the price of everyday goods.  *See* 76 Fed. Reg. at 71,699 (Sommers, Comm'r, dissenting); *id.* at 71,703 (O'Malia, Comm'r, dissenting); Oct. 18 Tr. 12–14 (statement of Dunn, Comm'r).

### A.      The Commission Failed To Make Statutorily Required Findings

Under the plain text of the CEA, the Commission could establish only those position limits that "the Commission finds are *necessary* to diminish, eliminate, or prevent" adverse effects associated with excessive speculation.  7 U.S.C. § 6a(a)(1) (emphasis added).  The Commission, however, expressly declined to make that finding.  76 Fed. Reg. at 71,627.  That was clear error requiring vacatur of the Rule.  "When a statute requires an agency to make a finding as a prerequisite to action, it must do so."  *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002); *cf. Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (vacating rule based on agency's failure to consider factor as required by statute).

The Commission's principal explanation in the rule release for ignoring its longstanding statutory mandate was to assert (in a footnote) that it is "not necessary in light of the congressional findings in section [6a] of the Act."  76 Fed. Reg. at 71,629 n.30.  But these congressional findings state only that *excessive* speculation imposes an undue burden on commerce—*not* that excessive speculation exists with respect to any given commodity or that particular position limits are necessary.  *See* 7 U.S.C. § 6a(a)(1).  That is what the Commission, in its expert judgment, is empowered to find.  But it did not do so here.[8]  Tellingly, since 1936, the Commission (and its predecessor agencies) repeatedly made necessity findings before imposing position limits.[9]  The

---

[8]  The Commission has made clear that, in its judgment, position limits *are not* invariably necessary.  *See, e.g.*, 17 C.F.R. § 38 app. B (Core Principle 5).

[9]  *See* 3 Fed. Reg. 3,145 (Dec. 24, 1938); 5 Fed. Reg. 3,198 (Aug. 28, 1940); 16 Fed. Reg. 8,106 (Aug. 16, 1951); 18 Fed. Reg. 443 (Jan. 22, 1953); 18 Fed. Reg. 444 (Jan. 22, 1953); 18 Fed. Reg. 445 (Jan. 22, 1953); 21 Fed. Reg. 5,575 (July 25, 1956).

claim that the necessity finding is not required is inconsistent with the Notice for this very rule-making, which stated that Congress, in the Dodd-Frank Act, had "reaffirm[ed] the Commission's authority to establish position limits *as it finds necessary* in its discretion to address excessive speculation." 76 Fed. Reg. at 4,755 (emphasis added).

In responding to Plaintiffs' motion to stay the Rule before the D.C. Circuit, the Commission argued that in a 1981 rulemaking it had interpreted Section 6a not to require a finding of necessity, and that Congress approved that interpretation when it amended the CEA in 2008. *See* Opposition, *Int'l Swaps & Derivatives Ass'n v. CFTC*, No. 11-1469 (D.C. Cir. filed Jan. 19, 2012) ("Opp. to Stay"), at 3, 12 (citing 46 Fed. Reg. 50,938 (Oct. 16, 1981)). (The D.C. Circuit did not reach Plaintiffs' stay motion because it found it lacked jurisdiction.) That argument by the Commission is wrong on both counts. First, the 1981 rulemaking nowhere suggests that the Commission had interpreted Section 6a—contrary to decades of settled understanding—not to require a necessity finding. The portion of the rulemaking the Commission quoted to the D.C. Circuit stated only that "the prevention of large and/or abrupt price movements which are attributable to extraordinarily large speculative positions is a Congressionally endorsed regulatory objective of the Commission." 46 Fed. Reg. at 50,940. That statement does not speak to whether excessive speculation is present with respect to any given commodity and whether position limits are necessary to combat it. (That is no doubt why the Commission has long permitted exchanges to use more flexible regulatory alternatives than position limits. *See* 17 C.F.R. § 150.5(e); *id.* § 38 app. B (Core Principle 5).) Second, the 1981 rulemaking certainly did not evince the degree of clarity necessary to conclude that Congress incorporated the regulatory interpretation into a re-adopted statute, and there is nothing in the congressional record indicating such an intent. *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) (where "there is

no . . . evidence to suggest that Congress was even aware of the [agency's] interpretive position[,] . . . we consider . . . re-enactment to be without significance" (quotation marks omitted)); *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987) ("This court has also consistently required express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated.").

In promulgating the Rule, the Commission went even further than claiming that it no longer was required to make a necessity finding.  It asserted that the Dodd-Frank amendments to Section 6a *compelled* it to impose position limits, regardless of their costs or their necessity. "Congress did not give the Commission a choice," it said.  76 Fed. Reg. at 71,628.  That assertion cannot be reconciled with the text of the Dodd-Frank Act or with the Commission's own actions.

In opposing Plaintiffs' stay request before the D.C. Circuit, the Commission relied on Section 6a(a)(2), added by the Dodd-Frank Act, which states that "the Commission *shall* . . . establish limits on the amount of positions, as appropriate" within certain time frames.  7 U.S.C. § 6a(a)(2)(A) (emphasis added); *see* Opp. to Stay at 4–5.  Tellingly, however, this quotation *omitted the introductory clause of the provision*, which instructs that limits must be established "[i]n accordance with the standards set forth in paragraph (1)."   7 U.S.C. § 6a(a)(2). "[P]aragraph (1)" refers to Section 6a(a)(1)—the very provision that requires the Commission to find position limits "necessary" before adopting them.  *Id.* § 6a(a)(1).  The Commission's statutory analysis was thus deeply flawed; the provision it relied on for its argument that position limits are compelled actually incorporates the statutory command that they can be adopted only if they are necessary.

The Commission also gave insufficient consideration to the fact that in Section 6a(a)(2) the word "shall" is modified by "as appropriate," and ignored the CEA's command that it exercise "its discretion" to impose limits to advance specified objectives. *Id.* § 6a(a)(3)(B). It read those modifications, which obviously confer discretion on the Commission, to refer only to the *level* at which position limits would be set, not whether to establish position limits at all—a qualification found nowhere in the text of the statute.

The Commission's interpretation conflicts with other provisions of the CEA as well. The statute sets forth various "core principles" with which exchanges must comply. 7 U.S.C. § 7(d). One of those principles is that exchanges "shall adopt position limitations or position accountability for speculators, *where necessary and appropriate*." *Id.* § 7(d)(5) (emphasis added). The Dodd-Frank Act added a similar requirement for swap execution facilities. *See id.* § 7b-3(f)(6)(A) ("[A] swap execution facility that is a trading facility shall adopt for each of the contracts of the facility, *as is necessary and appropriate*, position limitations or position accountability for speculators." (emphasis added)). Those provisions confirm Congress's belief that position limits should be adopted only where necessary, since otherwise unwarranted burdens and costs would result with no corresponding benefit. The provisions also show that Congress did not issue an inexorable command to the Commission to impose position limits regardless of their need—were that not the case, there would be no room left for the exchanges to determine whether *they* believed limits were necessary and appropriate and to adopt them—or not—accordingly.[10]

---

[10]  In addition, subsection (e) of Section 6a provides that "*if the Commission shall have fixed limits under this section* . . . then the limits fixed by . . . [a] contract market, derivatives transaction execution facility, or electronic trading facility or [a] board of trade shall not be higher than the limits fixed by the Commission." 7 U.S.C. § 6a(e) (emphasis added). The plain import of the word "if" is that that the Commission will not necessarily set position lim-

Indeed, the Commission itself recognizes that it was not under an unwavering command to adopt position limits; its interpretation of the statute is, therefore, internally inconsistent. The Commission acknowledged that it had the discretion to establish position limits for some commodity contracts and not others: The Rule imposes position limits only for contracts relating to 28 specific commodities. But the text of Section 6a nowhere distinguishes between different commodities. Therefore, if, as the Commission concedes, the statute does not require the Commission to establish position limits for all commodities, there is no textual basis to conclude that it is required to regulate any of them. The Commission's "internally inconsistent" interpretation of the Dodd-Frank Act is "therefore unreasonable and impermissible" and cannot withstand judicial review under the APA. *Air Line Pilots Ass'n v. FAA*, 3 F.3d 449, 453 (D.C. Cir. 1993).[11]

### B.   The Commission Engaged In Unreasonable Decision-Making By Ignoring Record Evidence

Even supposing the Commission was obligated to impose *some* position limits, evidence about the extent and effects of excessive speculation, and about the efficacy of position limits, remained central to the Commission's responsible exercise of its regulatory authority. This evi-

---

its. *See also id.* § 7b-3(f)(6)(B)(i) (similar provision with respect to swap execution facilities).

[11] The Commission suggested in a footnote in its D.C. Circuit brief that its interpretation of Section 6a as embodying a congressional "mandate" to impose position limits would be entitled to deference under the standard set forth in *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984). Opp. to Stay, at 13 n.5. That is incorrect. As the D.C. Circuit has repeatedly held, "'deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress.'" *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)); *see also Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) ("Deference to an agency's statutory interpretation 'is only appropriate when the agency has exercised its *own* judgment,' not when it believes that interpretation is compelled by Congress." (quoting *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C. Cir. 1986))).

dence was highly relevant to, for example, which commodity contracts the Commission chose to regulate, the level at which it set the position limits, and what hedging exemptions it established.

And yet, in adopting various provisions of the Rule, the Commission disregarded critical rulemaking evidence, and even made the extraordinary statement that "studies and reports addressing the issue of whether position limits are effective or necessary to address excessive speculation . . . do not present facts or analyses that are material to the Commission's determinations." 76 Fed. Reg. at 71,629 n.32. Thus, for example, record evidence showed that limiting contracts for energy is not beneficial, and might even be harmful (*see, e.g.*, CME Group Comment, at 4 (Mar. 28, 2011)), but the Commission subjected four energy contracts to new position limits without any meaningful analysis of that evidence. As one comment letter characterized the Commission's overall approach, "[i]nstead of reasoned analysis based on objective facts, the Proposed Rule assumes that excessive speculation exists (or could exist) and then establishes a pervasive and burdensome regulatory regime to remedy this assumed problem." Edison Electric Institute et al. Comment, at 2 (Mar. 28, 2011).

Most glaringly, the Commission failed to exercise reasoned discretion in determining the *specific levels* at which to set the limits it was imposing. This task required determining what limits were *necessary*—What risks exist? How great are they? What are their consequences? But because the Commission assumed that this most basic constraint on regulatory decision-making did not apply, it adopted onerous limits without a reasoned basis. The Commission paid lip service to "the potential impact of both overly restrictive and unrestrictive limits," but conducted no meaningful analysis to demonstrate that the limit levels it selected would advance Congress's objectives. 76 Fed. Reg. at 71,665. For instance, commenters proposed limits for contracts outside the "spot month" that would have been significantly less restrictive than those

24

imposed by the Commission.  *See id.* at 71,639 & n.127.  The Commission rejected these pro-posals, asserting, without any analysis, that a more restrictive limit "would help prevent exces-sive speculation and deter and prevent market manipulations."  *Id.* at 71,639.  But since the agency had not first determined that excessive speculation existed, nor the extent of the risk it posed, there was no rational basis to select a more costly restriction on the ground that it is more "effective."

The Commission similarly provided no reasoned explanation for a host of other decisions it made:

- The Commission rejected Plaintiffs' proposal for a broader measure of "deliverable supply" (a key input in the formula for certain position limits), with no explanation whatsoever.  The Commission merely noted the comment and moved on.  *See* 76 Fed. Reg. at 71,633 & n.71.

- In choosing which commodity contracts it would subject to position limits, the Com-mission failed to make any inquiry into which commodities are currently subject to excessive speculation, but rather based its choice on criteria that bear little relevance to the congressional purpose of position limits—the prevention of excessive specula-tion.  *See id.* at 71,629–31.

- The Commission established the same limits for cash-settled contracts as physical-delivery contracts, even though the rationale for limits on physical-delivery con-tracts—the need to avoid market-manipulation tactics like "corners" and "squeez-es"—does not apply to cash-settled contracts.  *See id.* at 71,634–37.

- The Commission decided to apply the same position limits to swaps as to futures and options contracts, even though the term "swap" has not yet been fully defined and the

Commission conceded it lacks sufficient data on swaps to evaluate the necessity for position limits or their economic costs. *See, e.g., id.* at 71,671 n.432 ("[A]bsent complete data on swaps positions, the Commission cannot accurately estimate a trader's position for the purposes of compliance with spot-month limits for cash-settled contracts.").

- The Commission declined to retain the proposed ONF exemption, which would have permitted the disaggregation of positions held by independently controlled and managed non-financial subsidiaries, on the ground that the final Rule reinstated a different, preexisting exemption for independently controlled accounts that applies to entirely different conduct. *See id.* at 71,653–54; *see also id.* at 71,704–05 (O'Malia, Comm'r, dissenting) ("[T]he Commission provided no substantive rationale for its decision to fully drop the ONF exemption from consideration. . . . This is especially disconcerting since at least one commenter has pointed out that baseless decisionmaking of this kind creates a risk that a court will strike down our action as arbitrary and capricious.").

- The Commission failed to exempt traders from the aggregation rules when compliance with those rules might require them to violate state or foreign law.

Such failures to "consider the relevant evidence presented and offer a satisfactory explanation" for the Commission's decisions requires vacatur of the Rule. *Celecom Commc'ns Corp. v. FCC*, 789 F.2d 67, 71 (D.C. Cir. 1986); *see also* authorities, *supra*, at 14–18.

Finally, the Commission also failed to sufficiently afford "interested persons an opportunity to participate in the rule making"—another violation of the APA. 5 U.S.C. § 553(c). For example, without notice or adequate explanation, the Commission changed the spot-month limits

formula for cash-settled contracts from what was proposed in the Notice and added a severability clause that had not been mentioned in the Notice. *See* 76 Fed. Reg. at 71,653–54; *see also id.* at 71,679 n.496.

### C.     The Commission Did Not Comply With The Requirement That It Conduct An Adequate Cost-Benefit Analysis Before Promulgating A Rule

The Commission also failed to satisfy its independent statutory obligation to conduct a meaningful cost-benefit analysis. *See* 76 Fed. Reg. at 71,705 (O'Malia, Comm'r, dissenting). Although the CEA requires that "[t]he costs and benefits of the proposed [rule] shall be evaluated" (7 U.S.C. § 19(a)(2)), the Commission failed to collect data that would enable it to evaluate the costs of the Rule. *See*, *e.g.*, 76 Fed. Reg. at 71,665.  And when evidence was submitted by commenters demonstrating that the Rule is unnecessary and would have significant adverse effects on the markets and consumers, the Commission ignored it. *See*, *e.g.*, *id.* at 71,663–64 (describing this evidence but ultimately disregarding it).

The cost-benefit analysis in the Position Limits Rule suffers even deeper flaws than the rules of the CFTC's sister agency—the SEC—that were invalidated in a series of unanimous D.C. Circuit decisions applying similar statutory cost-benefit requirements. *See supra* at 17. The sparse findings the Commission offered were tentative and superficial and merely begged questions that the Commission was required to answer.  For instance, the Commission found that the Rule "*should* protect the efficiency, competitiveness, and financial integrity of futures markets," but only "[*t*]*o the extent* that the position limit formulas achieve [their] objectives."  76 Fed. Reg. at 71,675 (emphases added).  Having thus posited that assessing the Rule's effects on efficiency, competitiveness, and financial integrity required evaluating the Rule's success in achieving its objectives, the Commission failed to consider or demonstrate in any way "the ex-

27

tent to which" those objectives would be achieved.  This empty "analysis"—which posed, rather than answered, a question—is plainly insufficient to fulfill the Commission's obligations.  Indeed, when the SEC recently sought to justify a rule with similar conjecture about what might occur "to the extent that" certain conditions obtained (*see* Final Rule, Facilitating Shareholder Director Nominations, 75 Fed. Reg. 56,668, 56,770 (Sept. 16, 2010)), the D.C. Circuit vacated the rule, holding that the agency failed "adequately to assess [its] economic effects."  *Business Roundtable*, 647 F.3d at 1148.

In opposing a stay in the D.C. Circuit, the Commission sought to blame its failure to conduct an adequate cost-benefit analysis on members of the public, complaining that "commenters provided little quantitative data."  Opp. to Stay, at 18.  But the statute does not put the onus on members of the public who choose to submit comments to supply the Commission with data.  Rather, it is the Commission itself that must evaluate the costs of a new regulation, 7 U.S.C. § 19(a), and "[a]n agency may not shirk a statutory responsibility simply because it may be difficult."  *NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010).  Although "uncertainty may limit what the Commission can do, . . . it does not excuse the Commission from its statutory obligation to do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure."  *Chamber of Commerce*, 412 F.3d at 144 (invalidating SEC rule).

Ultimately, the Rule's deeply-flawed cost-benefit assessment originates from the Commission's refusal to confront the most basic question in any cost-benefit analysis—whether there is a problem, and what costs it imposes—a responsibility the Commission abdicated because it knew, as a majority of Commissioners professed, that the rulemaking record showed there was not harmful excessive speculation and that a rule would impose unjustified costs.  Even suppos-

ing therefore that the Commission had a statutory duty to adopt *some* position limits rule—and it did not—its responsibility was to minimize at every available opportunity the burdens that rule would impose, since the costs of those burdens are indisputable while the benefits are chimerical. Instead, the Commission compounded its error by ignoring record evidence, rejecting commenters' proposals to lighten the Rule's burdens and costs, and even tightening some of the constraints contained in the proposed rule.  Such a failure to limit a rule's burdens in light of its admittedly illusory benefits would be a violation of the APA in any circumstance; the violation is particularly pronounced when Congress gave the agency a heightened statutory duty to consider economic effects.

## II.     THE RULE WILL IMPOSE IRREPARABLE HARM ON PLAINTIFFS' MEMBERS AND THE PUBLIC

Three Commissioners agreed that the Position Limits Rule would not promote the interests of American consumers and the economy.  Commissioner Dunn, who cast the deciding vote in favor of the Rule based solely on an erroneous view of the law, announced that he believed it was "important to let the public know what may happen once we implement position limits": "Position limits may actually lead to higher prices for commodities that we consume on a daily basis."  Oct. 18 Tr. 11, 13.  For "farmers, producers, and manufacturers," he explained, "position limits and the rules that go along with them may make it actually more difficult to hedge the risks that they take on in order to provide the public with milk, bread, and gas."  *Id.* at 12. Commissioner Sommers likewise foresaw "increased food and energy costs for consumers," and Commissioner O'Malia predicted that "our action could negatively affect the liquidity and price discovery function of our markets."  76 Fed. Reg. at 71,699, 71,706.  Indeed, at a time of record gasoline prices, the Rule is most likely to increase energy costs because derivatives in energy

commodities have never before been subject to position limits.  Decl. of Craig Pirrong (Exh. 4), ¶ 42.

Unless it is enjoined during this litigation, the Position Limits Rule also will impose irreversible costs on market participants.  The Commission itself pointed to "significant costs" in the rule release, explaining that the Rule is "expected to result in costs to market participants whose market participation and trading strategies will need to take into account and be limited by the new position limits rule."  76 Fed. Reg. at 71,665, 71,677.  Significantly, compliance with the Rule will require irreversible changes in ownership structures, such as divestments, to ensure that market participants do not run afoul of position limits by owning small stakes (as little as 10%) in other entities that trade commodity derivatives.  Those fundamental changes will be costly or impossible to reverse should the Rule be vacated, because once ownership stakes are sold off, it is enormously difficult to reconstruct the investment portfolio with the same composition.

On the other hand, there will be no harm whatsoever from staying the Rule.  The Commissioner whose vote was crucial to approval of the Position Limits Rule stated on the record that he believed that the Rule was "at best a cure for a disease that *does not exist*."  Oct. 18 Tr. 14 (emphasis added).  The rule release itself declined to find the limits necessary (or even appropriate).  As a result, the Commission has "not set forth any reason as to why the Final Rule must be implemented at this time, as opposed to after a resolution on the merits of Plaintiffs' claims." *Brady Campaign*, 612 F. Supp. 2d at 27.

## A.     The Rule Will Cause Substantial, Irreparable Harm To Plaintiffs' Members

If the Rule takes effect while still subject to judicial review, it will cause substantial, irreversible harm to Plaintiffs' members.

The Rule requires countless market participants to undertake onerous measures to come into compliance by its key provisions' effective date, which they must assume at all times could be within 60 days, since the CFTC has not announced when the rule further defining "swap" will be finalized.  Those measures include developing real-time monitoring systems to track at every moment whether a trader's positions—plus the positions of other entities that are required to be aggregated—exceed the Rule's position limits, including implementing technically daunting new monitoring systems for "swaps," which are not traded on centralized exchanges and have never been subject to position limits before.  In addition, because the Rule exempts not only contracts used by a firm for bona fide hedging activities, but also contracts in which the *counterparty* is engaged in bona fide hedging, the systems will have to be able to apply the legal standard for bona fide hedging to the counterparty to any given contract, an extremely complex operation. Decl. of Donald J. Casturo (Exh. 8), ¶ 6.  Initiatives to modify existing systems and create new ones are underway already and will impose many millions of dollars in additional costs that could never be recouped if the Rule is not enjoined.  *See* Pirrong Decl.; Decl. of Michael A. Camacho (Exh. 5); Decl. of Simon Greenshields (Exh. 6); Decl. of Roger Jones (Exh. 7); Casturo Decl.  Although the key provisions of the Rule will not take effect for 60 or more days, the compliance obligations are so extensive that market participants already are incurring significant costs in an effort to comply by the Rule's effective date.  Camacho Decl. ¶¶ 3–4; Greenshields Decl. ¶¶ 4–7; Jones Decl. ¶¶ 4–5, 10; *see also* Alexander Osipovich, *US Energy Firms Brace for Position Limits*, Energy Risk, Jan. 9, 2012 (describing extensive compliance costs being incurred now by energy sector).[12]  Indeed, the rule release, even while relying on unrealistically conserva-

---

[12]   *Available* at http://www.risk.net/energy-risk/news/2135993/energy-firms-brace-position-limits#.

tive estimates of compliance costs, itself acknowledged that market participants would face considerable costs. *See, e.g.*, 76 Fed. Reg. at 71,662.

Several aspects of the Position Limits Rule, many of which the Commission declined to consider or considered only perfunctorily, will impose substantial costs on market participants during the period in which the Rule is under review. For example, position limits have never before been applied to swaps, and market participants must now create systems to monitor all of their swaps positions. *See* 76 Fed. Reg. at 71,667 n.402 ("[G]enerally, entities have not previously tracked their swaps positions for purposes of position limits compliance."). Because "swaps are not standardized or uniform" and therefore "can vary widely in terms of what rights are exchanged, the amount or volume of those rights, and the timing or duration of those rights," it will be "substantially more difficult to determine and monitor [a firm's] positions in them for purposes of the Rule than it is" for futures and options contracts. Camacho Decl. ¶¶ 9–10. Firms will have to design systems that can take into account and process the diverse characteristics of these instruments in order to comply with the Rule. For example, the Rule exempts from its coverage a "commodity index contract," which is a swap based on prices of multiple commodities. *See* 76 Fed. Reg. at 71,631 n.49. Firms will have to develop systems that can discern on a real-time basis whether each swap entered into by the firm (or any other entities whose positions the firm must aggregate) qualifies as a "commodity index contract." Casturo Decl. ¶ 5.[13]

These harms are "irreparable *per se*" because the government cannot be made to pay damages to redress them. *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *see also Sottera, Inc. v. FDA*, 627 F.3d 891, 898 (D.C. Cir. 2010). Although "[n]ormally the mere

---

[13] Market participants "will also have to develop systems that comply with the new reporting requirements imposed by the Rule, including the filings necessary to invoke bona fide hedging exemptions." Jones Decl. ¶ 9.

payment of money is not considered irreparable, . . . that is because money can usually be recovered from the person to whom it is paid." *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers). But "[i]f expenditures cannot be recouped, the resulting loss may be irreparable." *Id.* In its briefing in the D.C. Circuit, the Commission asserted that it was "well settled that economic harm of the type Petitioners allege does not generally constitute irreparable harm, unless such harm threatens 'the very existence of their business.'" Opp. to Stay, at 8 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). That argument took a quotation from the D.C. Circuit's decision in *Wisconsin Gas* out of context. What the court actually said was that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." 758 F.2d at 674 (emphasis added). In *Wisconsin Gas*, the alleged harm could have been recovered from other private entities after judicial review. *See id.* at 675. In this case, by contrast, if this Court ultimately vacates the Position Limits Rule, the damage caused to scores of market participants would be irreparable because *it cannot be recovered* from the government or other parties.

The Rule's aggregation requirements also will impose sizeable, irreversible costs on market participants. *See*, *e.g.,* Casturo Decl. ¶¶ 9–10. As with the addition of swaps to the position-limits regime, firms inevitably will "incur [costs] to develop and implement systems sufficient to comply with the Rule's ownership and control aggregation requirements"—which generally require aggregation of the *entire* position of an owned entity even if the firm's ownership stake in the entity is only 10% and even if there is no control over or involvement in the other entity's trading.[14] Greenshields Decl. ¶ 7. Once it identifies all companies in which the firm owns the

---

[14] The proposed rule's ONF exemption would have partially mitigated the enormous burden imposed by the aggregation requirements by allowing disaggregation of positions held by non-financial subsidiaries that were independently controlled and managed. *See supra* at 9.

minimal equity interest—a difficult task in itself given the complex ownership structures in modern finance—a firm's compliance system will have to be able "to identify those entities that trade futures and swaps contracts related to the 28 referenced contracts and . . . whether such trading qualifies for one of the limited exemptions." *Id.* ¶ 9 n.1. Thus, firms will have to create ways not only to modify their own trading in futures, options, and swaps, but also the trading activity of countless other firms in which they may own only a minimal stake.

The ability to construct these systems depends critically on the assumption "that an entity in which the [firm] has only a small, passive investment with no control over operations would be willing to (a) share its trading information with the [firm] and (b) modify or build systems that will communicate their futures and swap positions in a timely fashion to the [firm]." Greenshields Decl. ¶ 10. A single firm may have hundreds, if not thousands, of affiliated entities whose positions must be aggregated, including many that it does not control and from which it cannot demand essential trading data. Pirrong Decl. ¶ 21; Greenshields Decl. ¶ 9; Jones Decl. ¶ 11.

If owned entities are unwilling to share their trading information, or if aggregating their trading with a firm's trading will cause the firm to exceed position limits, a firm will have to consider measures to rearrange ownership structures, and "for certain entities, the only available solution may be to divest certain ownership interests." Greenshields Decl. ¶ 8. Companies will be forced to spin off ownership interests just to avoid the imputation of the subsidiaries' trading positions. Such changes to a trader's business model and ownership stakes in other entities will in many cases be "impossible as a practical matter to undo." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001); *see also* Greenshields Decl. ¶ 12 ("[I]f a market participant is com-

---

But without any meaningful analysis, the Commission abandoned this exemption in the final Rule. 76 Fed. Reg. at 71,653–54; *see also id.* at 71,704–05 (O'Malia, Comm'r, dissenting).

pelled to divest its interests in these entities to avoid such potential violations, such decisions to divest likely will cause irreparable harm as they cannot be reversed or can only be reversed by incurring the risk of loss and additional costs in reinvesting.").  In some circumstances, moreover, a company may be bound by a shareholder agreement that prohibits it from divesting its shares in another entity, and as a result, market participants could be impaired in their ability to come into compliance with the Rule without potentially violating other obligations.  Casturo Decl. ¶ 10.

At the same time, firms badly in need of capital will find themselves without investors if they are engaged in trading of commodity derivatives due to the Rule's aggregation requirements.  *See* Greenshields Decl. ¶ 8 ("[P]ending the outcome of this litigation, the Company may be discouraged from making additional investments in certain entities that may be trading futures or swap contracts related to the 28 referenced contracts because of the difficulty of assessing or predicting the impact on aggregation.").  The important public interest in the efficient allocation of capital, therefore, would not be served by forcing market participants to make large-scale changes in their portfolios to comply with a rule that may ultimately be vacated.

The Position Limits Rule also would impose incalculable opportunity costs on market participants.  *See Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011).  Most obviously, position limits will make it far more difficult for producers and purchasers of commodities—farmers, energy companies, manufacturers—to hedge against price fluctuations, because the market will be far less liquid as a result of limits on the size of positions that may be controlled.  Moreover, investment firms will be prevented from adopting certain trading strategies and, as a result, will forgo efficient transactions.  Pirrong Decl. ¶¶ 29–31, 35.  In addition, while the Rule is under review, customers who might otherwise choose to hold accounts with a particular trader

will consider taking their business to overseas commodity markets subject to less onerous regulations, Camacho Decl. ¶ 19, or to dealers with smaller positions in the commodity markets, Greenshields Decl. ¶ 13.  Those lost customers will be difficult to regain even if the Rule is vacated because customers and traders often enter into long-term relationships, the terms of which could extend far beyond the end of the litigation.  Camacho Decl. ¶ 20; Greenshields Decl. ¶ 13; *see also* Jones Decl. ¶ 13 ("Such harm is likely to be irreversible, because some clients that establish new trading relationships will not return their full business to [the firm] if the Rule is vacated.").

The reduction in trading activity and restructuring of businesses that the Rule may require, moreover, "could require the reassignment or release of skilled personnel."  Jones Decl. ¶ 16.  Once that happens, "it will not be possible to replace them quickly or at the same cost as they were originally retained."  *Id.*

Given all these costs, and the significant problems with the Commission's analysis of the economic costs and benefits of the Rule, there is a compelling need to maintain the status quo while the Rule is under review.

### B.  The Rule Jeopardizes The Public Interest More Broadly

The broader public interest also favors maintaining the status quo pending judicial review.  *See Indep. Bankers Ass'n v. Smith*, 534 F.2d 921, 951 (D.C. Cir. 1976) ("[A] *fait accompli* is hardly in the public interest.").  Commissioner Dunn, who voted for the Rule, believed that it threatens to increase the cost of basic necessities at a time when many Americans are struggling financially, stating his fear that "position limits may harm the very markets we're intending to protect."  Oct. 18 Tr. 14.  He anticipated that "[i]f we limit participation in these markets through position limits, producers may receive inaccurate market signals when making production deci-

sions," and as a result "the prices we all pay for our groceries and to heat our homes may . . . become more volatile." *Id.* at 12. That view was echoed by the two dissenting Commissioners. *See* 76 Fed. Reg. at 71,699 (Sommers, Comm'r, dissenting) ("This Rule will make hedging more difficult, more costly, and less efficient, all of which, ironically, can result in increased food and energy costs for consumers."); *id.* at 71,706 (O'Malia, Comm'r, dissenting) ("I cannot support passing our responsibilities on to the judicial system to pick apart this rule in a multitude of legal challenges, especially when our action could negatively affect the liquidity and price discovery function of our markets, or cause them to shift to foreign markets."). In this unusual—perhaps unprecedented—case, where a *majority* of the members of an expert agency have concluded that a new regulation is not in the public interest and will harm ordinary American consumers, a court is fully justified in delaying the effective date of the Rule until it can be properly reviewed for compliance with the law.[15]

The Commissioners had good reason for their trepidation about the economic consequences of the Rule. The Rule will impair the ability of producers to hedge against the risk of fluctuations in the price of commodities by prohibiting certain hedging strategies, Pirrong Decl. ¶¶ 30–33, and by reducing liquidity in the commodity markets, *id.* ¶¶ 36–41, forcing companies to internalize more risk exposure to commodity markets. This, in turn, will raise the cost of products for consumers, *id.* ¶¶ 41–42, and will negatively affect investment and employment by raising the cost of capital, *id.* ¶ 40. The Rule also will impose costs on the economy by interfering with otherwise efficient transactions; for instance, some companies may decline investments in other companies to avoid creating sufficient ownership interests to trigger aggregation.

---

[15] It is also true that "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Greenshields Decl. ¶ 8.  Companies will also have less flexibility to hedge against market risks, which will lead to "higher costs to finance capital investment—resulting in less investment, and less employment in the affected industries."  Pirrong Decl. ¶ 40.

The price of energy is particularly threatened by the Rule.  The extensive comment record compiled by the Commission overwhelmingly predicted that the Rule would increase volatility of energy prices, make beneficial hedging more difficult, and ultimately increase the price of consumer products.  An organization representing energy companies that use commodity markets every day to manage commercial risk warned the Commission that the Rule "is not supported by empirical evidence and will impose a significant compliance burden on traders."  Coalition of Physical Energy Companies Comment, at 13 (Mar. 28, 2011).  Similarly, organizations representing electricity producers told the Commission that the Rule "likely will make the U.S. derivatives markets less efficient and more expensive for commercial entities seeking to manage the risks they incur in their businesses."  Edison Electric Institute et al. Comment, at 2.  At a time when consumers are suffering from soaring prices at the pump, the Rule "will have the most pronounced impact on the energy industry because heretofore energy derivatives have not been subject to these limits, and the energy industry is the largest commodity market and user of commodity derivatives."  Pirrong Decl. ¶ 42.  This will "raise the cost of energy to consumers." *Id.*

The likely adverse consequences of the Rule are not limited to producers and consumers of commodities.  As the Colorado Public Employees Retirement Association told the Commission, the Rule may have an "adverse impact" on its "ability to implement [its] commodities mandates and thereby on [its] ability to provide diversification and inflation protection to [its] members."  Colorado Public Employees Retirement Association Comment, at 1 (Mar. 28, 2011).  In-

stitutional investors of all stripes, including pension funds, rely on the ability to hedge risk in the commodity markets, and position limits constrain that ability with no documented benefit.

In contrast to the substantial harm to ordinary Americans and market participants that three Commissioners foresaw, the Commission found no countervailing need for position limits—indeed, it declined to find any need at all—and it did not conclude that excessive speculation is harming markets. Even once this case reached the litigation stage, the Commission failed to identify any public interest served by implementation, let alone *immediate* implementation, of the Rule, resting entirely on its mistaken belief that Congress mandated the limits imposed by the Rule in the Dodd-Frank Act. *See* Opp. to Stay, at 20. That disputed point of law is insufficient to support a factual showing that immediate implementation is in the public interest. *See AFL-CIO v. Chao*, 297 F. Supp. 2d at 165 ("It is noteworthy that the Secretary . . . did not claim any particular need for extraordinary urgency.").

Even where an agency has demonstrated compelling long-term benefits of a regulatory action (which the Commission does not even claim to have identified here), the judges of this Court have preliminarily enjoined the action if there was no showing that *immediate* implementation was necessary. *See, e.g., Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 237 (D.D.C. 2003) ("While defendants identify an equally strong public interest in preservation and restoration of Chesapeake Bay . . . [they] have not met their burden of demonstrating why reduction of the mute swan population in Maryland absolutely *must* begin at this time in order to achieve this long-term goal . . . .").

The Commission has certainly made no showing that position limits must be implemented in the immediate future. Even if this Court issues a preliminary injunction, the Commission would have ample tools to combat manipulative or disruptive trading practices. Commission-set

position limits would remain in place for nine of the commodities subject to the Rule, and exchange-set limits and accountability rules would be in place for other derivatives during the pendency of this case.  There is nothing to suggest that retaining this regime during the pendency of this litigation would be adverse to the public interest.  For decades the Commission has relied on exchanges to set limits and other rules for trading activity, and the Commission has not found that this method of regulation is inadequate to protect markets.  Accordingly, there is no justification for upending the status quo before this Court reviews the validity of the Rule.  *See AFL-CIO v. Chao*, 297 F. Supp. 2d at 165 ("[T]here is certainly good reason to preserve the status quo as it existed before the effective date of the new regulation, especially when that status quo has been deemed acceptable by the Department of Labor for over 40 years.").

In short, the public interest will not be served by imposing significant, unnecessary burdens on an economy still in the midst of a fragile recovery—particularly given that there is no finding in the record that such burdens are outweighed (or even mitigated) by countervailing benefits.  To the contrary, "[t]he public . . . has an interest in ensuring that the Final Rule promulgated by the [Commission] does not give way to unintended . . . consequences that have not (but should have) been evaluated." *Brady Campaign*, 612 F. Supp. 2d at 26.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction against the

Commission's final rule and interim final rule pending judicial review.


Dated: February 7, 2012                    Respectfully submitted,

                                           /s/ Miguel A. Estrada
                                           Miguel A. Estrada, SBN 456289
                                             *Counsel of Record*
                                           Eugene Scalia, SBN 447524
                                           Jason J. Mendro, SBN 482040
                                           John F. Bash, SBN 988874
                                           http://www.cftc.gov/HER LLP
                                           1050 Connecticut Ave., N.W.
                                           Washington, D.C.  20036
                                           Telephone:  (202) 955-8500
                                           Facsimile:  (202) 467-0539

                                           *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 7th day of February, 2012, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.

I also certify that I caused the foregoing document to be served on the following counsel by CM/ECF:

> Lawrence DeMille-Wagman
> lwagman@cftc.gov
> Mary T. Connelly
> mconnelly@cftc.gov
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street, N.W.
> Washington, D.C.  20581

/s/ Jason J. Mendro
Jason J. Mendro
