# Exhibit 4

*Int'l Swaps & Derivatives Ass'n et al. v. CFTC*, No. 11-cv-2146 (RLW)

Memorandum in Support of Plaintiffs' Application for a Preliminary Injunction (Feb. 7, 2012)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. and SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION,<br><br>          Plaintiffs,<br><br>   v.<br><br>UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>          Defendant. | Civil Action No. 11-cv-2146 (RLW) |

### Declaration of Dr. Craig Pirrong

1.  I have been retained to evaluate whether participants in markets subject to the CFTC's rule on Position Limits for Futures and Swaps (17 CFR Parts 1, 150, and 151) would suffer irreparable harm if the rule is not stayed pending the outcome of the present legal action.  Based on my analysis, and my extensive knowledge of and experience in the commodity markets subject to the rule, I conclude that market participants would suffer irreparable harm if implementation of the rule is not stayed. In particular, they would incur costs even before the rule goes into effect, and further costs as long as the rule is in effect.  Market participants would not be able to recoup these costs if the rule is eventually invalidated.

2.  These costs arise from three sources.

3.  First, market participants will incur costs to comply with the rule.  Even prior to the rule going into effect, they will have to invest in systems and devise procedures to

1

ensure compliance.  Moreover they will have to devote personnel and other resources to monitor compliance as long as the rule is in effect.  Since the rules are extensive, and touch upon virtually every segment of the derivatives marketplace, all major market participants will necessarily incur these costs.  Moreover, these costs will be sunk, and hence unrecoverable, once they are made.

4.  Second, many market participants will have to adjust their trading strategies in order to comply with the rule.  That is, as the result of the rule they will not be able to utilize their preferred trading strategies, but will instead be forced to utilize inferior strategies that impose additional risks on them, or reduce their returns.  They will suffer from these higher risks and lower returns as long as the rule is in force, and will not be able to recoup the costs associated with the higher risks or recover the lost returns caused by the rule during the period of its operation even if it is eventually struck down.

5.  Third, the rule is likely to reduce liquidity and risk bearing capacity in the affected markets.  These reductions will raise the costs that market participants incur to hedge risk.  Moreover, they will induce market participants to utilize more costly ways to manage their risk exposures.  As a result of the greater risks, firms are likely to incur higher financing costs that will lead to reduced investment and employment. These costs will exist for as long as the rule is in effect and impairs liquidity and risk bearing capacity, and cannot be recovered if the rule is eventually eliminated.

**Background and Qualifications**

6.   I am Professor of Finance, and Director of the Global Energy Management Institute at the Bauer College of Business of the University of Houston.   Prior to joining the faculty of the University of Houston in January, 2003, I was the Watson Family Professor of Commodity and Financial Risk Management at Oklahoma State University. I assumed this endowed professorship in 2001 after holding research and teaching positions at the University of Michigan, the University of Chicago, and Washington University.   My *curriculum vitae* is attached.   It lists all of the publications that I have authored in the last ten years.   It also lists cases in which I have testified as an expert at trial or by deposition within the preceding four years.

7.   I have researched the economics of financial, futures, and securities markets for most of my academic career.   I have published scholarly articles concerning financial, securities and futures markets.   I have written articles on the behavior of futures prices, the organization and governance of futures exchanges, and various aspects of futures market regulation, including the regulation of market manipulation and speculation.   My publications are set out in my curriculum vitae, which is included as Exhibit A.

8.   As an academic and a consultant, I have been deeply involved for about 20 years in issues relating to commodity futures markets, commodity prices, and the economics of commodity market manipulation.   My research has been published in a wide variety of scholarly journals.   I have been a peer reviewer for many journals, including the American Economic Review, the Journal of Finance, the Journal of Law and Economics, the Journal of Futures Markets, Economic Inquiry, the Journal of Economic

Behavior and Organization, the Journal of Business, and the Journal of Business and Economics Statistics.

9.  Much of my research has focused specifically on issues of market manipulation.  I have published a book (titled *The Economics, Law, and Public Policy of Market Power Manipulation*), as well as ten economics, finance, and law review articles on this subject.

10. I was the primary author of a study commissioned by the Chicago Board of Trade ("CBOT"), later published as a book titled *Grain Futures Markets: An Economic Appraisal*.  That study analyzed the economics of the delivery system for CBOT corn, wheat, and soybean futures contracts, specifically focusing on how to revise that system to make it less vulnerable to manipulation.  I recommended the adoption of a multiple delivery point system, and specifically analyzed the pricing and hedging implications of such a system.  A part of this research on multiple deliverable contracts was published in a peer-reviewed journal.

11. I have consulted with commodity exchanges in Sweden and Germany regarding the design of futures contracts, including the design of the delivery mechanisms for wood pulp, European wheat and European pigs.

12. In 1997 and 1998 I served as a member of the CBOT's Grain Delivery Task Force ("GDTF").  This body was charged by the exchange with the responsibility of designing new delivery terms for CBOT corn and soybean futures contracts.  Such a redesign was mandated by the United States Commodity Trading Futures Commission ("CFTC") because the old delivery mechanism had become unduly susceptible to manipulation. The terms recommended by the GDTF were adopted by a large majority of the CBOT

membership, and approved by the CFTC (with some modifications for soybeans) in May, 1998.

13. I provided expert testimony in a case related to market manipulation, *In re* Soybean Futures Litigation, Nos. 89 C 7009, 90 C 11th 8 (N.D. Ill. 1995).  I have also been retained by the CFTC as an economic expert in a commodity manipulation case and I also served as an expert in manipulation matters by the Winnipeg Commodity Exchange, pursuant to enforcement actions undertaken by the WCE.  In addition, I have provided expert testimony in other manipulation cases, American Agric. Movement v. Board of Trade, 848 F. Supp. 814 (N.D. Ill. 1994), *aff'd in part, rev'd in part sub nom.* Sanner v. Board of Trade, 62 F.3d 918 (7th Cir. 1995), and Kohen v. Pac. Inv. Mgmt. Co., 2007 U.S. Dist. LEXIS 56389 (N.D. Ill. 2007).  I provided expert testimony in Energy Transfer Partners, L.P., a FERC case. My research has also been cited in a 7th Circuit Court of Appeals decision on manipulation.  Board of Trade v. SEC, 187 F.3d 713, 724 (7th Cir. 1999) (Easterbrook, J.).

14. I have testified before the House Agriculture Committee (which has jurisdiction over futures markets and exchanges) on matters relating to energy market speculation.

15. I have taught courses on derivatives at the graduate and undergraduate levels for eighteen years.  These courses have covered the pricing of derivatives instruments, including futures and swaps on the commodities referenced by the position limit rule, the use of derivatives for hedging and speculative purposes, manipulation, and the economic effect of speculation.  I currently teach the PhD course in futures and options in the Bauer College of Business at the University of Houston, and an MBA course in energy derivatives.

16. My book on commodity pricing, *Commodity Price Dynamics: A Structural Approach,* published in October by the Cambridge University Press, analyzes the economics of commodity price dynamics in detail.   This analysis in the book specifically addresses   the economic effects of speculation, and the economic consequences of restricting speculation.

17. I am currently director of the Global Energy Management Institute ("GEMI") at the Bauer College of Business of the University of Houston.  GEMI is a world leader in energy finance education.   Moreover, GEMI routinely hosts educational events for energy professionals, including a well-attended energy trading conference held every year.

**Participants in the Affected Markets Will Incur Irrecoverable Compliance Costs Prior to the Rule Going Into Effect, and Additional Costs Throughout the Entire Period It  Is In Effect**

18. The position limit rule has many facets that collectively affect virtually every aspect of the derivatives marketplace in the United States for the affected commodities.  In particular, in addition to the quantitative limits themselves, the sections of the rule pertaining to bona fide hedge exemption, aggregation, position "see through", and position visibility together will impose obligations and restrictions on virtually every large market user, not solely on large financial participants in the commodity derivatives markets.  These users will have to invest in systems and create procedures to ensure compliance with these various sections of the rule, and incur costs to remain in compliance as long as the rule is in effect.

19. For instance, the rule sets out very detailed criteria for determining whether a market participant that uses the futures and swaps markets in the affected commodities to hedge

risks can accumulate a position that is larger than the speculative limit.[1]   The "bona fide hedging exemption" requires users of the affected contracts to document that its trades in these contracts satisfy the criteria established by the Commission to qualify for the exemption.   This requires that those claiming the exemption must document that the position hedged by futures or swaps contracts falls under one of the enumerated exemptions.   The description of the information that those claiming the exemption must collect and report in the form required by the Commission takes up three full pages of the rule.

20. Any market participant that uses the contracts subject to the rule to manage risks will necessarily incur costs to collect and report the information required to obtain a hedge exemption.   This will entail the creation of new information systems, or adaptation of existing information systems, to collect the information and produce reports acceptable to the Commission and the development of procedures defining the utilization of these systems.   Those claiming a hedge exemption will need to make the expenditures necessary to create these systems and procedures before the rule goes into effect.   By their nature, these costs are largely sunk once incurred: software or procedures created to ensure compliance with the rule have virtually no alternative use.   In addition, those claiming the exemption will necessarily incur ongoing costs to ensure compliance with the rule while it is in effect, and to produce the reports required by the Commission. These include compensation for personnel responsible for ensuring compliance and

---

[1] "Hedging" refers to the use of derivatives contracts such as futures and swaps to reduce exposure to risk, typically price risk.  For instance, a holder of inventory of crude oil can reduce his exposure to changes in the price of oil by selling oil futures contracts.  The futures position earns a profit if prices decline: the seller can repurchase the contract he sold at a price lower than the price at which he sold it.  This gain offsets, in whole or in part, the loss in the value of inventory that occurs due to the price decline.  There is no free lunch, of course.  If prices rise, the value of the inventory rises but there is a loss on the futures position.  The fact that gains (losses) on one position (e.g., the inventory) are offset by losses (gains) on the other (e.g., the futures) implies that this combined--"hedged"--position is less risky than either part is by itself.

costs associated with modifying and upgrading systems.  Again, by their very nature, these costs are sunk once incurred.  Given the sunk nature of the up-front costs of creating the infrastructure necessary to ensure compliance with the hedging exemption rule and the ongoing costs of ensuring compliance, market participants claiming the exemption will be able to recover virtually none of the costs they incur from the time that the rule is initiated.[2]

21. The position limit rule also obligates market participants with positions in multiple accounts meeting certain criteria to aggregate these positions for the purpose of determining compliance with the limits.  To adhere to this aggregation requirement, market participants (including *inter alia* commodity pool operators, fund managers, futures commission merchants) who hold positions in multiple accounts will have to incur costs to create systems and procedures to collect and combine information from these multiple accounts.  Moreover, they will have to incur costs on an ongoing basis to operate these systems to aggregate information from multiple accounts.  By their nature, these costs are sunk once the rule goes into effect and is in operation, and cannot be recovered if the rule is invalidated.

22. The position limit rule permits those holding positions in multiple accounts to apply for an exemption from the aggregation requirement.  The costs incurred to apply for the exemption are sunk once made, and cannot be recouped if the rule is eventually struck down.

---

[2] The rule reports capital and startup costs in "annualized" terms, e.g., 76 FR 223 at 71682.  These costs are depreciated on a straight-line basis over five years. *Id*. at fn. 518.  Thus, taking the cost estimates presented in the rule as correct, the costs that would be incurred but not recovered even before the rule goes into effect is on the order of five times the capital and startup cost estimates presented in the rule.

23. The position limit rule also requires persons holding positions above certain threshold levels ("visibility levels") to file reports to the Commission on positions in the referenced commodities.  Compliance with this requirement entails the costly creation and operation of systems and procedures to track positions and file the necessary reports. These costs are sunk once incurred, and cannot be recovered if the rule is eliminated.

24. The position limit rule permits some market participants to claim a hedge exemption on positions for which the counterparty is a bona fide hedger.  To utilize this "pass through" exemption, the position holder (such as a swap dealer) must obtain from its counterparty a representation that the trade qualifies as an enumerated hedge.  It must do so at the time every trade is executed, and must retain records of this representation.  Compliance requires the costly development of systems and procedures (e.g., the modification of confirmation documents), and again, these costs are sunk once incurred.  Compliance further requires incurring costs on an ongoing basis to obtain and record the necessary information on every trade, and to monitor the proper functioning of the process.  These costs are incurred as long as the rule is in force, and cannot be recovered if the rule is eventually invalidated.

25. The rule will impact a significant number of firms. The rule presents estimates of affected entities: for instance, it states that the bona fide hedging reporting requirements will affect 200 firms (76 FR 223 at 71682).  Visibility and aggregation requirements would also affect a large number of firms (76 FR 223 at 771682-71683).

26. In sum, the rule imposes a variety of obligations on a broad range of market participants. Compliance with these rules requires payment of sunk costs from the time the rule goes into effect, and which cannot be recovered if the rule is eliminated.

**Participants in the Affected Markets Will Be Forced to Forego Preferred Trading Strategies Throughout the Entire Period the Rule Is In Effect**

27. As soon as the rule goes into effect, some market participants will have to cease utilizing their preferred trading strategies, and will forego the benefits of these strategies as long as the rule is in effect. These foregone benefits are an irrecoverable cost arising from the rule, and are incurred throughout the rule's existence.

28. For instance, the rule limits the types of transactions in the referenced commodities that qualify as bona fide hedges. Some trades that market participants currently utilize pursuant to risk management objectives will be treated as speculative, and hence subject to position limits (and visibility requirements) under the rule. Some firms will respond to this constraint by using less efficient or more costly hedging strategies--or will hedge less--in lieu of the strategies that do not receive bona fide hedging treatment under the rule. Given that they could have utilized these alternative strategies in the absence of the rule, but didn't, this substitution necessarily makes the firms worse off: i.e., it imposes costs or additional risks on them. These costs are incurred as long as the rule is in effect, and cannot be recovered if the rule is eventually eliminated.

29. Firms are also likely to substitute other, more costly ways to manage risk. It has been known since the work of the pioneering scholar of derivatives markets, Holbrook Working, that derivatives hedges are a temporary substitute for a transaction in a physical market channel to be executed later.[3] By raising the cost of derivatives hedges, some market participants will substitute transactions in physical marketing channels in their place. These substitutes include long term contracts and vertical integration. Thus,

---

[3] Holbrook Working, Hedging Reconsidered, 35 J. Farm Econ. (1953) 544-561.

firms may vertically integrate because it is costlier to use derivatives market transactions to manage the risk of price changes at different segments of the value chain.  These integration decisions are costly to reverse, once made.  Firms may also use alternative contracting methods to manage risk.  As an example,   they are more likely to enter into long term contracts to lock in prices with suppliers or buyers because it is more costly to manage these risks through derivatives markets.  These long term contracts are costly to exit, and hence many are likely to remain in force even if the rule is struck down.

30. As another example, the rule may also constrain the size of some popular commodity investment vehicles, such as commodity exchange traded funds (ETFs) that hold positions in the referenced commodities.  As a result, some investors may decide not to purchase any ETFs, or will be forced to purchase ETFs they consider less desirable. Precluding investors from buying the funds that they prefer imposes a cost on them; this cost is incurred as long as the rule constrains their choice; and cannot be recouped if the rule is struck down.

31. As yet another example, the pass through rule denies bona fide hedge treatment to some transactions that facilitate the efficient transfer of risk.  Specifically, a financial intermediary (such as a swap dealer) can obtain a hedge exemption only on positions in which a bona fide hedger is the direct counterparty.  At present, many of these intermediary's trades are indirectly with a firm that would be considered a bona fide hedger, and hence facilitate risk transfer.  For instance, a swap dealer may buy an oil swap contract from a hedge fund, and the hedge fund may buy an oil swap contract from an oil producer that would be considered a bona fide hedger: the economic substance of this chain of transactions is that the oil producer is transferring risk to the swap dealer.

Under the position limit rule, however, the swap dealer would not receive pass through treatment on this transaction.   Since the rule limits the non-hedge positions that any market participant can hold, it limits the swap dealer's capacity to make this sort of trade. Thus, the rule will constrain market participants' ability to make transactions that facilitate efficient risk transfers.   Binding constraints impose costs, and these costs accumulate as long as the rule that creates the constraint exist, and cannot be recovered once the rule is no longer in place.

32. The more restrictive aggregation requirements included in the rule also raise the costs that banks, fund managers, commodity trading advisors, insurance companies, and commodity pool operators incur to manage multiple accounts.   To mitigate the impact of the aggregation requirements, some of these entities are likely to reorganize their operations. These reorganizations are costly, and costly to reverse, and are hence likely to persist even if the rule is struck down.   The costs of the reorganization are sunk once made, and the reorganizations that are too expensive to reverse will result in higher costs even if the rule is eliminated.

33. And of course, firms that cannot utilize a bona fide hedging exemption that are directly constrained by the rule necessarily forgo trades that they believe to be the best way to achieve their risk-return objectives.   Those subject to the constraints will realize poorer risk-return performance as long as the rule is in effect, and cannot recover the lost performance if the rule is terminated.

**The Rule Will Impair Market Liquidity and Risk Bearing Capacity As Long As It Is In Effect**

34. It is well known, and the statute and the Commission acknowledge, that purely financial participants in derivatives trading provide liquidity and risk bearing capacity to the

market.   A primary purpose of futures and swaps markets is to facilitate the transfer of risk from hedgers, who incur a high cost to bear it, to financial participants, who incur a lower cost.   Although the participation of financial firms in physical commodity derivatives is sometimes criticized, this reflects a fundamental misunderstanding of how derivatives markets work.   Hedgers cannot reduce their risk exposure unless there is someone willing to assume it.   That is what purely financial participants  do, and hence their trading is necessary to permit hedging.   In essence, financial participants in commodity derivatives markets serve the same role as investors in stock or bond markets.   Indeed, some financial participants in commodity derivatives view them as another asset class to include in an investment portfolio.

35. Moreover, some financial participants incur lower costs than others to bear risk.  Basic economics implies that at the margin, the cost of bearing risk is equalized across all active participants in the market.   Basic economics further implies that requiring some traders to reduce their positions--as binding speculative position limits do--therefore raises the cost of bearing risk.

36. This is true because some participants who are willing to bear some risk are prevented from doing so.   The risk must therefore be borne by others who incur a higher cost: we know that they incur a higher cost because if they did not, they would have borne the risk prior to the imposition of the binding limit.

37. Thus, binding position limits will force some financial participants and hedgers to bear more risk than they should, and some financial participants to bear less risk than they should.  This distortion in the allocation of risk is costly.

38. More generally, position limits will limit the risk bearing capacity in the market.  Some financial participants  with the capacity and willingness to take on risk that hedgers want to shed will be unable to do so.  This forces the hedgers to bear more risk than they would like, which imposes costs on them.

39. Some financial participants stand willing to buy or sell on short notice.  These market participants supply "liquidity" to the market, and permit hedgers to enter and exit positions quickly and cheaply in response to changed circumstances.  By constraining the positions that some liquidity suppliers can hold, position limits will reduce market liquidity.  This means that hedgers will trade at less favorable prices when they try to establish or terminate their hedge positions.   That is, hedgers will incur higher transactions costs to manage risks in the presence of position limits.

40. Reducing the amount of hedging by raising the costs of risk transfer and reducing liquidity has adverse effects on investment and employment.  For instance, an important reason for hedging is to reduce financing costs: by managing risk, some firms are able to borrow more cheaply, or issue equity at better prices.  Making hedging more costly, either directly through restrictions on hedging exemptions, or indirectly, by reducing the capacity of financial participants to absorb that risk or by reducing liquidity, will result in less hedging.  This, in turn, will be associated with higher costs to finance capital investment--resulting in less investment, and less employment in the affected industries.  This lower investment and employment will persist at least as long as the rules are in effect, and indeed longer, because firms will make costly-to-reverse changes in response to the impairment in their ability to manage risk through derivatives markets.  Thus,

even if the rule is eliminated, some of the higher costs resulting from the rule will persist long afterwards.

41. Moreover, the effects of increasing the cost of risk incurred by firms are no different than the effects of raising other more tangible expenses (such as labor costs). These costs will ultimately be passed on to consumers, or to the firms' suppliers.

42. The position limit rule will have the most pronounced impact on the energy industry because heretofore energy derivatives have not been subject to these limits, and the energy industry is the largest commodity market and user of commodity derivatives. By value, approximately 80 percent of the exchange traded commodity futures and options are on energy products. By raising the costs of managing and transferring risks, the position limit rule will raise the cost of energy to consumers, and reduce the prices that producers of energy receive.

43. The costs arising from distorted risk bearing are incurred as long as binding position limits are in place. Moreover, the costs incurred while the rule is in effect cannot be recovered after it is not. Furthermore, since the position limit rules will cause firms to make costly-to-reverse changes to their operations, the rule will impose costs on commodity producers, consumers, and merchandisers that would persist even after such time the rule was struck down. That is, these cost-raising effects of the rule will outlive the rule itself, because some of the costs result from changes in investment or contracting practices that are costly to reverse, and hence will persist even if the rule is eliminated.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 6th day of February, 2012 at St. Louis, Missouri