# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL SWAPS AND DERIVATIVES
ASSOCIATION, INC. and
SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,

           Plaintiffs,

    v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

           Defendant.

Civil Action No. 11-cv-2146 (RLW)

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

Dated:  February 22, 2012

Miguel A. Estrada, SBN 456289
  *Counsel of Record*
Eugene Scalia, SBN 447524
Jason J. Mendro, SBN 482040
John F. Bash, SBN 988874
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

REPLY MEMORANDUM ................................................................................................... 1

I.    THE COMMISSION'S ARGUMENTS ON THE MERITS DO NOT
SALVAGE THIS FATALLY FLAWED RULE ................................................ 2

    A.    The Commission Misreads The CEA And In Any Event Concedes That It
Was Required To Make A Necessity Finding ........................................... 5

    B.    The Commission Did Not Engage In Reasoned Decision-Making In
Crafting The Specific Provisions Of The Rule .................................... 12

    C.    The Commission's Arguments Fail To Justify The Inadequate Cost-
Benefit Analysis It Conducted ............................................................. 18

II.    THE COMMISSION FAILS TO IDENTIFY ANY PUBLIC INTEREST
THAT WOULD JUSTIFY IMPLEMENTING THE COSTLY NEW RULE
BEFORE JUDICIAL REVIEW ................................................................. 21

    A.    The Commission Presents No Public Interest Factors Disfavoring A
Preliminary Injunction ........................................................................ 21

    B.    Absent A Preliminary Injunction, Plaintiffs' Members And Others Will
Incur Substantial And Unrecoverable Costs ........................................ 22

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Horse Prot. Ass'n v. Lyng,*
  812 F.2d 1 (D.C. Cir. 1987) ................................................................13

*Am. Mining Congress v. EPA,*
  907 F.2d 1179 (D.C. Cir. 1990)..........................................................15

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002)............................................................................11

*Brown v. Gardner,*
  513 U.S. 115 (1994)..............................................................................8

*Business Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011)..........................................................13

*Chamber of Commerce v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005) ...........................................................12

*Chevron USA, Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984)............................................................................18

*Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of
  World Color Press, Inc.,* 843 F.2d 1490 (D.C. Cir. 1988) ..................16

*Helvering v. Hallock,*
  309 U.S. 106 (1940)..............................................................................7

*Hospitality Staffing Solutions, LLC v. Reyes,*
  736 F. Supp. 2d 192 (D.D.C. 2010) ...................................................24

*Hui v. Castaneda,*
  130 S. Ct. 1845 (2010)........................................................................10

*Manin v. Nat'l Transp. Safety Bd.,*
  627 F.3d 1239 (D.C. Cir. 2011)............................................................6

*McDonnell Douglas Corp. v. U.S. Dep't of Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004)..........................................................15

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2007)............................................................16

*Navistar, Inc. v. EPA,*
  2011 WL 3743732 (D.D.C. Aug. 25, 2011) ........................................23

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ........................................................15

*Republican Nat'l Comm. v. FEC*,
    76 F.3d 400 (D.C. Cir. 1996) ...........................................................11

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ........................................................24

*R.J. Reynolds Tobacco Co. v. FDA*,
    --- F. Supp. 2d ---, 2011 WL 5307391 (D.D.C. Nov. 7, 2011) ............23

*Rowan Cos. v. United States*,
    452 U.S. 247 (1981) ...........................................................................7

*Sierra Club v. Van Antwerp*,
    661 F.3d 1147 (D.C. Cir. 2011) ........................................................12

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) .............................................................24

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..........................................................22

**STATUTES AND REGULATIONS**

7 U.S.C. § 6a ...............................................................................8, 9, 10, 11

15 U.S.C. § 8307 ..................................................................................10

17 C.F.R. § 38 app. B ............................................................................8

46 Fed. Reg. 50,938 (Oct. 16, 1981) ......................................................7

75 Fed. Reg. 4,144 (Jan. 26, 2010) ......................................................11

Futures Trading Act of 1982, Pub. L. No. 97-444, 96 Stat. 2294 .................7

Position Limits for Futures and Swaps; Final Rule and Interim Final Rule,
    76 Fed. Reg. 71,626 (Nov. 18, 2011) ........................3, 12, 19, 23, 24

**OTHER AUTHORITIES**

Random House Webster's Unabridged Dictionary (2d ed. 2001) ...............10

S. Rep. 97-384 (1982) ............................................................................7

# REPLY MEMORANDUM

The Commission has filed a brief arguing that it may burden the public with costly requirements that are not necessary, not effective, and not even "appropriate."  It cites no decision by any court endorsing that startling proposition.  This clear error is fatal to the Commission's opposition to Plaintiffs' Application for a Preliminary Injunction for at least three separate reasons.

*First*, the Commission misreads the plain text of the Commodity Exchange Act ("CEA") when it argues that it may adopt position limits without determining that limits are necessary and appropriate.  But even assuming that Congress did require the adoption of some rule regarding position limits, the Commission concedes that Congress did not dictate the particular decisions that make this Position Limits Rule onerous:  what level to set each limit, which commodities to regulate, and what aggregation rules and hedging exemptions to establish.  The Commission's brief repeatedly asserts that it exercised "discretion" in writing all these key elements of the Rule, yet it also openly admits that it ignored all record evidence showing that position limits were unnecessary and ineffective.  This failure to consider record evidence made it impossible for the Commission to reasonably evaluate and explain the choices it made—the central command of the Administrative Procedure Act ("APA")—and to assess the costs and benefits of the Rule under Section 19(a) of the CEA.

*Second* and related, even though it refused to do the hard work of analyzing the available evidence to determine whether position limits are necessary and effective, the Commission now does an about face and repeatedly claims—with no supporting evidence—that it extended certain pre-existing limits to a vast range of new contracts and financial instruments because those old limits were purportedly "effective" and "had worked well."  It cannot know that, however, because it refused to study those limits' effectiveness.  This contradiction pervades the Commis-

sion's defense of its action:  It cannot on the one hand argue that it did not and could not examine position limits' effectiveness because Congress required it to adopt the Rule, and on the other hand defend the discretionary decisions it made with unsubstantiated assertions about the very "effectiveness" that it refused to examine.  That argument will fail on the merits.

*Third*, the failure to determine the Position Limit Rule's necessity and effectiveness is such a serious regulatory lapse that it puts the Commission in the odd position of opposing a stay without ever telling the Court that its rule is needed, and that accordingly a stay will harm the public.  Has the government ever before opposed a stay request without telling the court that its rule is beneficial?  The Commission cannot represent that this rule would be beneficial, however, because the record would not support such a statement and the Commissioner who provided the crucial third vote for the Rule said the Rule was unnecessary and could harm consumers by raising the prices of everyday goods.  On the other hand, staying the Rule until the Court decides the parties' cross-motions for summary judgment indisputably offers the benefit of avoiding substantial costs that will be unrecoverable and are potentially unnecessary.  When it adopted the Rule the Commission admitted it will impose tens of millions of dollars in costs annually, many of them as "start-up" costs, while also forcing market participants to sell off investments and forgo the expected revenues.  Plaintiffs have now substantiated those costs with declarations.  The Commission has no basis to deny them.

This Court should enter the preliminary injunction requested by Plaintiffs.

## I.   THE COMMISSION'S ARGUMENTS ON THE MERITS DO NOT SALVAGE THIS FATALLY FLAWED RULE

The Commission's opposition brief fails to set forth a coherent justification for a rule that three Commissioners found to be unsupported by record evidence.  The Commission repeatedly passes the buck to Congress, claiming over and over again that it was not required to consider

costs and benefits of the Rule because Congress mandated the imposition of position limits regardless of their necessity or efficacy. *See*, *e.g.*, Opposition to Application for Preliminary Injunction, Dkt. 25 ("Opp."), at 12–13, 18, 20, 22, 27, 30. This is wrong as a matter of statutory construction; Congress nowhere repudiated the standards that have governed the Commission's position-limits authority for 75 years. *See* Memorandum in Support of Application for Preliminary Injunction, Dkt. 14 ("App."), at 19–23; *infra*, at 5–12.

But even accepting the Commission's mistaken reading of the statute, vacatur of the Rule would still be required. The Commission does not contend that the specific decisions it made— *which* commodities to subject to position limits, *what level* to set those limits, and *what exceptions and aggregation rules* to establish—were mandated by Congress. Indeed, throughout its brief, the Commission admits that it enjoyed discretion to make those decisions and was required to consider whether the provisions it established would be effective in curbing excessive speculation. Yet it conceded in the rule release, and it concedes repeatedly in its brief, that it ignored evidence showing that excessive speculation is not a problem with respect to these commodities and that position limits would be costly and ineffective. This evidence was highly relevant— indeed, central—to its decision-making task.

For example, the Commission states that studies addressing the efficacy of position limits "were not useful because they provided no guidance on how to implement the limits that Congress required." Opp. 28. But those studies were indubitably relevant to, for instance, whether to impose limits only on the nine previously regulated contracts, on some greater number of contracts, or on all 28 contracts covered by the Rule—a decision over which the Commission conceded it had discretion. *See* Position Limits for Futures and Swaps; Final Rule and Interim Final Rule, 76 Fed. Reg. 71,626, 71,629 (Nov. 18, 2011); Opp. 32. Similarly, studies indicating that

position limits were ineffective and costly would counsel in favor of setting very high position limits—another decision over which the Commission concedes it enjoyed discretion.  *See, e.g.*, Opp. 9.  And the studies in the record were immensely relevant to whether the Rule's aggregation provisions should be relatively lenient, lest they deter efficient market activity with no appreciable benefit.  But the Commission determined that its "aggregation policy had functioned effectively" in the past without even considering this evidence or explaining what measure it employed to determine that the prior policy had been "effective."  *Id.* at 35.  In truth, it conducted no such measurement.  Transcript of Open Meeting on Two Final Rule Proposals Under the Dodd-Frank Act (Oct. 18, 2011) ("Oct. 18 Tr."), at 189.[1]  This failure to evaluate relevant evidence and draw a connection between it and the Commission's decisions violated both the CEA and the APA.  In fact, the arguments that the Commission makes in its own brief fatally undercut the Rule.  In a stunning admission, the Commission now concedes that it was required to apply the necessity standard of Section 6a(a)(1) to the question of what *levels* to set the limits.  Opp. 24.  But no such necessity finding appears in the rulemaking record.

More broadly, the Commission concedes that it was required to "mitigate[] the costs of the rule *where feasible*."  Opp. 43 (emphasis added).  It failed to do so.  Given that Congress did not mandate the precise levels of the position limits, it was surely "feasible" to establish *very high* limits if the Commission determined that limits were costly or ineffective, or to establish lenient aggregation rules, or to adopt other provisions that would mitigate the costs of the Rule.  To determine what sort of cost-mitigation efforts were "feasible," the Commission would have had to engage in such basic tasks as assessing the costs of position limits on the economy and determining whether they would achieve any reduction of excessive speculation.  The Commis-

---

[1]  *Available at* http://www.cftc.gov/LawRegulation/DoddFrankAct/Rulemakings/DF_26_ PosLimits/dfsubmission7_101811-trans.

sion staff, however, admitted on the record that it did not even have a "working definition of 'excessive speculation,'" let alone attempt to measure it with respect to the 28 contracts subject to the limits.  Oct. 18 Tr. at 189.   And the Commission continues to concede that it ignored studies and evidence addressing "whether position limits are an effective regulatory tool."  Opp. 10.  Without taking that information into account, the Commission could not satisfy its statutory duties under either the APA or the CEA.

**A.   The Commission Misreads The CEA And In Any Event Concedes That It Was Required To Make A Necessity Finding**

**1.   *The Plain Text Of The CEA Requires A Finding Of Necessity***

The Commission has abandoned its erroneous argument that it would be entitled to *Chevron* deference of its interpretation of Section 6a (*see* App. 23 n.11), so this Court's role is to interpret the statute according to its plain text.  That text is straightforward.  Under subsection (a)(1), position limits may be imposed only if the Commission finds that they are "necessary to diminish, eliminate, or prevent" an undue burden on interstate commerce caused by excessive speculation.  When Congress added subsections (a)(2) and (a)(5) in the Dodd-Frank Act regarding a new position-limits rulemaking, it expressly stated that any new limits must be "[i]n accordance with the standards set forth in [Paragraph 6a(a)(1)]."  The Commission declined to make the necessity finding below—three Commissioners, after all, would not have signed on to any such finding—and that alone demands vacatur of the Rule.

In response to Plaintiffs' common-sense reading of the statute, the Commission observes that the phrase "as the Commission finds are necessary" is more closely preceded by the phrase "proclaim and fix such limits on the amounts of trading" than by the verb "shall."  Opp. 24.  As a result, the Commission says, the statute requires a necessity finding only with respect to what *level* to set position limits, not whether to impose them at all.  *Id.*  This concession that the

Commission was required to make a necessity finding with respect to the *level* at which the limits are set is fatal to the Rule.  No such finding appears in the rulemaking record, and "the law does not allow [a court] to affirm an agency decision on a ground other than that relied upon by the agency."  *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

In any case, the Commission's interpretation, which was not set forth in the rule release, fails as a matter of simple grammar.  In Section 6a(a)(1), the verb "shall" is an auxiliary verb to the verbs "proclaim and fix"; pared down to its operative command, the statute reads, "the Commission shall . . . proclaim and fix such limits . . . as the Commission finds are necessary to diminish, eliminate, or prevent such burden."  It is baseless to assert that the phrase "as the Commission finds are necessary" modifies the phrase "proclaim and fix" but not the word "shall."  And even if it did, it is entirely unclear why that would mean that the necessity requirement would apply only to the levels at which the Commission sets position limits, not to the decision to impose them at all.  The Commission's head-scratching textual argument only underscores that the correct interpretation of Section 6a(a)(1) is that the Commission may set position limits that it finds are necessary.

The Commission also argues that, despite the plain text of Section 6a(a)(1), Congress has "long understood" that the Commission may impose position limits without finding that limits would prevent or limit excessive speculation.  Opp. 3–6, 21.  The Commission relies on a paragraph from a 1981 Commission order and claims that Congress "effectively ratified" the Commission's atextual understanding of that order in a 1982 statute amending the CEA.  Opp. 5.  But as Plaintiffs explained in their opening memorandum, that 1981 paragraph nowhere states that the Commission may impose position limits without making the statutorily-required necessity finding.  App. 20.  Rather, the paragraph states only that Congress has found that "excessive

speculation is harmful to the market" and that "speculative limits are an effective prophylactic measure." 46 Fed. Reg. 50,938, 50,940 (Oct. 16, 1981). That does not suggest that Congress has found that excessive speculation is a threat with respect to any given commodity or that position limits are always appropriate to combat it.[2] The 1981 order certainly does not demonstrate the sort of "long, uniform administrative construction" that the Supreme Court has required to presume that Congress intended to ratify an agency's interpretation. *Helvering v. Hallock*, 309 U.S. 106, 121 n.7 (1940); *see also Rowan Cos. v. United States*, 452 U.S. 247, 262 (1981) (administrative actions that lend "only the most ambiguous support" to interpretation are insufficient).

   Moreover, the text of the 1982 statute does not contain even a hint that Congress "ratified" the interpretation that the Commission is now advancing to salvage the Position Limits Rule. That act made revisions to Section 6a that have nothing to do with the necessity finding, and it left the key language in place. *See* Futures Trading Act of 1982, Pub. L. No. 97-444, § 205, 96 Stat. 2294, 2299–2300. The Commission cites the act's Senate Report for the unremarkable propositions that Congress continued to believe that excessive speculation was harmful and that position limits can be an important regulatory tool. Opp. 4–6. But the Commission omits the key sentence in that report: "[T]he Committee contemplates that, before establishing speculative limits, the Commission will consider *objective economic data* relevant to the *need* for restraints on the markets." S. Rep. 97-384, at 45 (1982) (emphases added). The 1982 act's legis-

---

[2] The Commission also cites a sentence from the 1981 order dismissing the relevance of "observations concerning the general desirability of limits." Opp. 4. But as the preceding sentences in the order make clear, the "observations" to which the Commission was responding were arguments "question[ing] whether the prevention of sudden or unwarranted price fluctuations was a reasonable regulatory objective, or alternatively, whether such price movements could in any event be prevented by the imposition of limits." 46 Fed. Reg. at 50,940. Plaintiffs do not disagree that the prevention of sudden or unwarranted price fluctuations is a reasonable regulatory objective, nor that Congress contemplated that the Commission may find limits necessary to prevent such fluctuations caused by excessive speculation in certain circumstances. But nothing in the 1981 order dispenses with the necessity requirement.

lative history thus confirms that the Commission committed serious error by failing to make a necessity finding.[3]

The Commission claims that this legislative history "shows that Congress was aware of the prophylactic approach the Commission had taken with respect to position limits."  Opp. 5. The fact that position limits may be imposed prophylactically, however, does not obviate the necessity requirement:  The statute expressly contemplates that the Commission might determine that position limits are "necessary" to "*prevent*[]" a future undue burden caused by excessive speculation (in addition to "eliminating" or "diminishing" current excessive speculation). 7 U.S.C. § 6a(a)(1) (emphasis added).  But the necessity finding is still required.  There is, in reality, "no . . . evidence to suggest that Congress was even aware of the [Commission's] interpretive position"—a position the Commission concocted in 2011 to justify this Rule without any evidentiary support—and so the 1982 "re-enactment [is] without significance." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (quotation marks omitted).  In fact, it is far more plausible that Congress "ratified" the Commission's decades-long practice of making a necessity finding each time that it extended the limits to a new commodity. *See* App. 19 & n.9.

In contrast to the vague inference the Commission attempts to draw from the 1981 order, the regulations *actually codified* in the Code of Federal Regulations tell a different story.  The Commission's "core principles" for private exchanges expressly provide that "position limits are not necessary for markets where the threat of excessive speculation or manipulation is nonexistent or very low," and "[t]hus, contract markets do not need to adopt speculative position limits for [those] futures markets."  17 C.F.R. § 38 app. B (Core Principle 5).  Revealingly, the Commission buries in a footnote its admission that it adopted a "different approach" in the 1990s—

---

[3]  The Commission cites testimony by the Chairman of the CFTC in the legislative history of the 1982 act (Opp. 5), but that testimony nowhere discussed the necessity requirement.

*after* the 1981 order—by permitting private exchanges to adopt much more flexible accountabil-ity levels where position limits were unnecessary to curb excessive speculation.  Opp. 6 n. 3.  If anything, therefore, under the Commission's reasoning, when Congress amended the CEA in 2008 and then in 2010 with the Dodd-Frank Act, it must have "ratified" the Commission's prac-tice in the 1990s of *not* imposing position limits unless they were necessary.

The Commission nevertheless argues that the Dodd-Frank Act mandated the establish-ment of position limits in Sections 6a(a)(2) and 6a(a)(5), implicitly doing away with the necessi-ty requirement.  Opp. 6, 21–22.  Of course, even if that were true, that could not possibly negate the Commission's responsibility to find that the *levels* it sets for position limits are necessary and appropriate—as the Commission concedes it was required to do.  But in fact, the Commission's interpretation of the Dodd-Frank Act is mistaken.  The Commission relies almost exclusively on the fact that Congress set a deadline of 180 days for the promulgation of "the limits required un-der" Section 6a(a)(2).  Opp. 21; 7 U.S.C. § 6a(a)(2)(B), (C).  There is no doubt that Congress intended the Commission to initiate a rulemaking and to impose position limits if they met the statutory standards.  But Section 6a(a)(2) expressly incorporates "the standards set forth in [Sec-tion 6a(a)(1)]"—including the necessity standard—in directing the Commission to complete a rulemaking.  And Congress added swaps to the coverage of Section 6a(a)(1) while leaving the necessity requirement in place.  The only reasonable reading of the Dodd-Frank amendments to Section 6a is that Congress intended the Commission to immediately gather evidence relating to whether excessive speculation was harming commodity markets and to impose position limits where necessary and appropriate to prevent an undue burden on the economy.  There is certainly no indication that Congress intended to implicitly repeal Section 6a(a)(1).  "[R]epeals by impli-cation are not favored and will not be presumed unless the intention of the legislature to repeal is

clear and manifest." *Hui v. Castaneda*, 130 S. Ct. 1845, 1853 (2010) (quotation marks omitted).

The Commission claims that Section 6a(a)(2)'s express incorporation of "the standards set forth in [Section 6a(a)(1)]" refers to "factors that relate to the level at which the Commission sets the limits"—primarily, the parts of Section 6a(a)(1) relating to aggregation and exemptions—"not the prerequisites for setting them." Opp. 25. The Commission strangely draws this interpretation from the dictionary definition of "standard" as a measure of weights and values (e.g., "gram"). But in ordinary legal parlance, a "standard" is "a rule or principle that is used as a basis for judgment." Random House Webster's Unabridged Dictionary 1857 (2d ed. 2001). The necessity requirement is the principal "standard" set forth in Section 6a(a)(1).[4]

Grasping at straws, the Commission points to a provision of the Dodd-Frank Act that requires the Commission to submit a report to Congress about this rulemaking. Opp. 22–23; 15 U.S.C. § 8307(a). Nothing in that provision purports to alter the statutory standards of Section 6a. Nor does it say that the Commission *must* impose position limits, even if it concludes that they are unnecessary and ineffective; the reporting provision would be phrased precisely the same way whether Congress believed position limits to be mandatory or discretionary.

The Commission also maintains that the reporting requirement "demonstrates that Congress contemplated that the position limits it mandated might not have any effect on excessive speculation." Opp. 22. Apparently the Commission contends that not only was it required to establish useless and costly regulations, but Congress expressly intended that it would do so—an

---

[4]   The Commission also cites Section 6a(a)(3), which establishes criteria that the Commission must consider in setting position limits. Opp. 21–22. But that section requires the Commission to set position limits only "as appropriate," and two of the four criteria—"ensur[ing] sufficient market liquidity for bona fide hedgers" and "ensur[ing] that the price discovery function of the underlying market is not disrupted"—disfavor position limits. 7 U.S.C. § 6a(a)(3). By its own admission, the Commission did not take these factors into account in deciding whether to establish position limits, and the rulemaking record does not reflect that these considerations informed the levels at which the Commission set the limits.

absurd reading of the statute.  It is far more likely that Congress contemplated that the Commission might err in predicting that position limits are necessary.

Finally, the Commission resorts to floor statements by members of Congress during the debate over the Dodd-Frank Act.  Opp. 6–7.  Of course, floor statements by individual Senators cannot overcome the text of Section 6a(a)(1), which the Dodd-Frank Act left intact.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002).  The D.C. Circuit is especially reluctant to give weight to such statements where, as here, the amendment carried over the key language from the previous version of the statute "without substantial change," because it "is essentially post-enactment history, carrying little probative weight." *Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 405 (D.C. Cir. 1996).[5]  In any case, none of the statements supports the Commission's interpretation.  They discuss the new aggregation provisions of the statute that permit the Commission to set limits across exchanges; they do not address what findings the Commission must make before imposing position limits or what standards govern the levels at which it sets limits.

> **2.**      ***At Minimum, The Commission Was Required To Find That Position Limits Were An "Appropriate" Response To A Regulatory Problem***

Even if one ignores the necessity requirement, the text of the provisions added by the Dodd-Frank Act required that, at minimum, the Commission determine that position limits were "appropriate" before imposing them.  7 U.S.C. § 6a(a)(2)(a), (a)(3), (a)(5)(A).  The Commission, again, expressly disclaimed any such requirement.  Much like with the necessity requirement, the

---

[5]   The Commission suggests that in 2010, it interpreted Section 6a(a) not to require a finding of necessity when it proposed position limits for energy commodities—a proposal that never resulted in an order and so was never subject to judicial review.  But the cited passage stated only that it could impose position limits without "a specific finding that an undue burden on interstate commerce *had actually occurred*." 75 Fed. Reg. 4,144, 4,146 (Jan. 26, 2010) (emphasis added).  As discussed above, authorization to impose position limits prophylactically—i.e., to "prevent[]" a foreseeable undue burden in the future—is not equivalent to ignoring the necessity requirement.

Commission offers a contorted statutory reading whereby the repeated phrase "as appropriate" in Section 6a somehow applies only to the *levels* at which the Commission sets limits, not to whether it imposes limits at all.  Opp. 24.

The Commission also fails to reconcile its evident belief that it lacked *any* discretion not to impose position limits with its action in declining to impose position limits on all commodities—a choice that its brief describes as "a reasonable exercise of *discretion*."  Opp. 33 (emphasis added).  The Commission cannot logically profess that it lacked discretion not to impose position limits on the 28 commodities subject to the Rule while, in the same breath, maintaining that it had discretion to refrain from imposing position limits on all other commodities.

### B.   The Commission Did Not Engage In Reasoned Decision-Making In Crafting The Specific Provisions Of The Rule

Even assuming that the Commission was required to establish position limits, it failed to engage in reasoned decision-making in the specific choices it made in the Rule.  Most significantly, the Commission concedes that it did not take into account studies and evidence addressing "whether position limits are an effective regulatory tool" and that it "dismissed objections regarding the effectiveness and need for position limits."   Opp. 4, 10.  Although it claims that it "carefully *considered* all the comments and studies it received" (*id.* at 10 (emphasis added)), the Commission admitted in the rulemaking and its brief that it believed that the studies did "not present facts or analyses that are material to the Commission's determinations in finalizing the Proposed Rules."  76 Fed. Reg. at 71,629 n.32; *see*, *e.g.*, Opp. 13.  It is blackletter administrative law that merely "considering" relevant evidence in the sense of acknowledging it, without giving it due weight, is unreasonable—a principle that the D.C. Circuit has vigorously enforced.[6]  In

---

[6]   *See also*, *e.g.*, *Chamber of Commerce v. SEC*, 412 F.3d 133, 144–45 (D.C. Cir. 2005) (invalidating rule because SEC failed to give serious consideration to proposal set forth in comments and dissents); *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1157 (D.C. Cir. 2011) (re-

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011), for example, the court noted that although the SEC had "acknowledged the numerous studies submitted by commenters" casting doubt on the agency's empirical conclusions, the Commission "discounted those studies" on specious grounds. *Id.* at 1149–51. Meanwhile, other studies were given undue weight. *Id.* Here, the Commission's error is far worse—it provided no meaningful discussion of any study at all.

The Commission's sole explanation for this failure to evaluate all evidence in the rule-making record is that it "did not have discretion to ignore a mandate from Congress" and so such studies "should be provided to Congress." Opp. 28. As discussed above, there was no such mandate to impose position limits. *See id.* at 32. But even supposing that the Commission was required to impose *some* position limits, it was still required to determine that the specific levels at which it set position limits were necessary and appropriate—as the Commission concedes in its brief—and to abide by the basic standard of reasoned decision-making of the APA. Any evidence that excessive speculation was not a problem with respect to a given commodity or that position limits would be ineffective should have weighed in favor, at least, of setting *very high* position limits. It also should have been relevant to the exemptions and aggregation rules that the Commission established. The evidence certainly should not have been deemed "not material."

The only justifications the Commission gives in its brief for the key choices it made consist of conclusory invocations of its experience and expertise. For example, in defending the specific levels it set for the position limits, the Commission states that it chose "the same specu-

---

manding action of Army Corps of Engineers because it failed to respond to significant public comment); *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 5–6 (D.C. Cir. 1987) (finding agency officer's statement that he had "reviewed studies and other materials" to be "conclusory" and therefore "insufficient to assure a reviewing court that the agency's refusal to [depart from prior regulations] was the product of reasoned decisionmaking").

lative position limits that it and the exchanges had long used for futures contracts, options and a certain narrow class of swaps," and that "in the Commission's estimation, the position limits had worked well" in the past.  Opp. 29.  But the Commission had no way of knowing whether the limits had "worked well" in the past, because it made no attempt to estimate whether the limits had curtailed excessive speculation or imposed costs on the economy, and, more importantly, it expressly ignored studies showing that the limits have *not* worked well.  As Commissioner Dunn stated, "no one has presented this agency any reliable economic analysis to support either the contention that excessive speculation is affecting the market we regulate or that position limits will prevent the excessive speculation."  Oct. 18 Tr. at 13.

The Commission's appeals to its experience, moreover, are exceptionally misleading because the Rule significantly changes the preexisting position-limits regime.  Most obviously, the Rule imposes position limits on swaps that have never before been subject to such limits, either by the Commission or private exchanges (because swaps are not traded on exchanges).  The Commission therefore could not possibly have concluded that position limits in this market— which is several times larger than futures and options markets—have "worked well" in the past. In addition, for a number of futures and options contracts, the Rule changes the preexisting regime by replacing flexible accountability levels with hard limits.  It is a clear transgression of the most basic APA requirements for an agency to shirk the hard work of grappling with empirical studies submitted for the rulemaking record, and to fall back instead on its unsubstantiated "experience."  *See, e.g., McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1191 (D.C. Cir. 2004) (invalidating agency action where agency "failed to explain how its knowledge or experience supports [its] understanding").

The Commission also repeatedly alludes to the Dodd-Frank Act's deadline for promul-

gating the Rule as justification for its decision to ignore record evidence in setting limits and making other choices. *See* Opp. 30, 34 n.28, 42. But rulemaking deadlines are no excuse to violate the basic tenets of the APA. For example, in *American Mining Congress v. EPA*, 907 F.2d 1179 (D.C. Cir. 1990), the EPA, in promulgating a rule, had ignored relevant data and had failed to "respond with sufficient clarity or specificity to . . . specific challenges in the record." *Id.* at 1188–91. Much like the Commission here, the EPA defended its rulemaking on the ground that it was entitled to "'extra deference'" because under the terms of a prior remand, the D.C. Circuit had given the agency "'very little time'" to promulgate the rule. *Id.* at 1191 (quoting EPA's brief). In vacating the rule, the D.C. Circuit flatly rejected that reasoning: "That an agency has only a brief span of time in which to comply" with a rulemaking deadline, the court held, "cannot excuse its obligation to engage in reasoned decisionmaking under the APA." *Id.*[7]

The Commission's perfunctory treatment of record evidence and disregard for the requirements of reasoned decision-making pervade the key choices it made in the Rule:

***Non-Spot Month Limits.*** The Commission concedes that the non-spot month limits that the Rule imposes are more stringent than the regime it claims "worked well" in the past, which in many cases did not require position limits at all. Opp. 6 n.3. The Commission's explanation for the formula it imposed is that "comments [were] pointing in all directions" and it was facing a deadline. *Id.* at 30. That sort of explanation does not pass muster under the APA, particularly where the Commission outright ignored studies showing that such limits would not work. "The agency's job is to exercise its expertise to make tough choices about which of the competing [cost] estimates is most plausible, and to hazard a guess as to which is correct." *Pub. Citizen v.*

---

[7]   The district court cases cited by the Commission at Opp. 34–35 n.28 were decisions ordering agencies to promulgate rules; they are not decisions reviewing final agency rules and holding that an expedited timetable excused unreasonable decision-making that otherwise violated the APA.

*Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).

   ***Spot-Month Limits for Cash-Settled Contracts.***   The Commission does not deny that the reason for setting such low limits on physical-delivery contracts—the possibility of manipulation tactics like corners and squeezes—does not exist for cash-settled contracts (which include the much larger swaps market that has never before been subject to position limits).  Opp. 33.  The Commission's only explanation for setting spot-month limits for cash-settled contracts at the same low level as physical-delivery contracts is that "imposing parity between physical-delivery and cash-settled contracts would help protect against price distortion."  *Id.*  The rulemaking record, however, includes absolutely no evidence that such "price distortion" has ever occurred, despite the fact that swaps were not previously subject to position limits.  That sort of "conjecture cannot substitute for a reasoned explanation."  *Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1494 (D.C. Cir. 1988).  The Commission "has provided no evidence of a real problem" with respect to the alleged manipulation tactics.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006).

   ***Definition of Deliverable Supply.***   In their comment, Plaintiffs proposed a broader definition of "deliverable supply" (an input into the position-limit formulas) and the Commission rejected it without explanation.  The Commission's only defense in its brief is that it "chose to retain its long-standing definition of the term."  Opp. 31.  That is a conclusion, not an explanation.

   ***Selection of Which Contracts to Regulate.***   The Commission concedes that it had discretion in selecting which contracts to regulate—a concession fatal to its claim that it lacked authority under the Dodd-Frank Act *not* to set position limits for any given commodity.  Opp. 32.  But even ignoring that error, the Commission failed to set forth reasonable grounds for selecting the contracts that it did.  The Commission more than tripled the contracts covered by Commission-

set position limits without finding that any of those limits would be effective in preventing excessive speculation that imposes an undue burden on the economy. Rather than tying its selection to commodities most susceptible to excessive speculation, the Commission based its choice merely on those contracts with "the highest levels of outstanding activity." *Id.* But if anything, it is more likely that such deep markets are *less* susceptible to manipulation than markets with relatively few participants. The Commission should have employed its expertise to evaluate which markets posed the greatest danger of excessive speculation.

*Treatment of Swaps.* Perhaps nothing epitomizes the Commission's flawed rulemaking process better than its perfunctory treatment of its decision to expand the economic impact of its regime several times over by including swaps within the Rule's coverage without any serious assessment of the costs that such expansion would impose on the economy or the need for limits on swaps to prevent a burden caused by excessive speculation. Again, the Commission blames Congress, citing the statutory requirement that limits for swaps were to be developed concurrently with limits for futures and options and must be tailored to achieve the same goals. Opp. 33–34. But nothing in the text comes close to suggesting that the *level* at which the limits are set must be the same for swaps and other contracts, and the rulemaking record includes no evidence showing that the previously unregulated swaps market should be subject to the same limits as the futures and options markets. The Commission also resorts to citing its general and unsubstantiated "experience and expertise"—even though this market has never before been subject to position limits. The Commission was obligated to come forward with evidence that excessive speculation was a real problem in the swaps market for each of the 28 commodities, justifying the new imposition of position limits at the same levels as in the futures and options markets.

*Owned Non-Financial Entity ("ONF") Exemption.* The ONF exemption would have

permitted a party with an ownership stake in another non-financial entity to disaggregate that entity's positions if it did not exercise any control over the entity.  The Commission elected not to adopt this exemption on the sole basis that it decided to retain a *different* exemption (the "IAC exemption") that applies to *different* conduct.  *See* App. 26.  Its opposition brief continues to offer no justification for this, stating only that this arbitrary action reflects a "cautious approach" to implementing the statute.  Opp. 35.  That is not an explanation at all—particularly given that the Commission undertook nothing resembling a "cautious approach" in vastly expanding the position-limits regime to swaps and other contracts.

      ***Violation of State or Foreign Law.***  The Commission's brief presents no substantive defense of its failure to exempt traders from aggregating positions with those held by other entities when such coordination would violate state or foreign law.  Opp. 36.

## C.    The Commission's Arguments Fail To Justify The Inadequate Cost-Benefit Analysis It Conducted

      The Commission's principal justification for its failure to reach any meaningful conclusions in its cost-benefit analysis is its familiar claim that Congress mandated the imposition of position limits.  Opp. 37.  As discussed above, that is wrong as a matter of statutory interpretation.  But even more critically, the Commission concedes that Congress did not mandate the levels at which the limits should be set, the aggregation rules and exemptions, and which contracts it would subject to the position-limits regime.  There is no conceivable argument that Congress intended to exempt the Commission from its obligation to conduct a cost-benefit analysis with respect to *those* issues.  The Commission's citation of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), thus badly misses the mark:  Congress has not "'directly spoken to the precise question at issue.'"  Opp. 38 (quoting 467 U.S. at 843).

      The Commission's only other response—that "it is simply not possible to conduct the

sort of precise evaluation of costs and benefits that Plaintiffs would have this Court require"—misunderstands Plaintiffs' argument.  Opp. 37.  Plaintiffs do not contend that the Commission was required precisely to quantify each cost and benefit.  But it had to reach reasonable conclusions about each of the factors set forth in Section 19(a).  And given that a majority of Commissioners determined that there are *no* discernible benefits to the Rule (with Commissioner Dunn describing it as "a cure for a disease that does not exist," Oct. 18 Tr. at 14), and that even the rule release conceded that the Rule would impose millions of dollars in costs on market participants who must change trading strategies and forgo efficient transactions, a reasonable cost-benefit analysis would have demanded that the Rule not be promulgated with such restrictive provisions.

The Commission repeatedly punted the key issues, concluding that the limits it set were cost-effective "to the extent" they would achieve their objectives—and then failing to ascertain "the extent that" those objectives were achieved.  *See* App. 27–28.  The Commission claims that Plaintiffs take "one sentence" out of context, and that in fact the Commission did reach definitive conclusions about the costs and benefits of the Rule.  Opp. 41.  That is incorrect.  The rule release's cost-benefit analysis *repeatedly*—with respect to virtually every Section 19(a) factor—stated that the factor would be met only "to the extent" that the limits were effective in achieving their objectives.  *See* 76 Fed. Reg. at 71,675 ("To the extent that the position limit formulas achieve these objectives, the final rules should protect the efficiency, competitiveness, and financial integrity of futures markets."); *id.* ("[T]o the extent that the position limits described herein protect prices from market manipulation and excessive speculation, the final rules should protect the price discovery function of futures markets."); *id.* ("To the extent that these position limits prevent any market participant from holding large positions that could cause unwarranted price fluctuations in a particular market, facilitate manipulation, or disrupt the price discovery process,

such limits serve to prevent market participants from holding positions that present risks to the overall market and the particular market participant as well."); *see also id.* at 71,679.  More fundamentally, it would have been *impossible* for the Commission to reach any definitive conclusions, because, as the Staff admitted on the record, the Commission lacked even a "working definition of 'excessive speculation'" and failed to develop any "criteria . . . to determine what speculation becomes excessive."  Oct. 18 Tr. at 189.

The Commission falls back on the argument that this Court is required to afford deference to its "predictive calculations."  Opp. 38.  It is true that where an agency actually employs its expertise to make a predictive judgment, a court should defer where the judgment is reasonable.  But in this case, the Commission *declined* to exercise that judgment by ruling that evidence in the record demonstrating that position limits were costly and ineffective did "not present facts or analyses that are material to the Commission's determinations in finalizing the Proposed Rules."  76 Fed. Reg. at 71,629 n.32.  In conducting the Section 19(a) cost-benefit analysis, the Commission reiterated this point, expressly stating that "studies suggesting that there is insufficient evidence of excessive speculation in commodity markets fail to address that the Commission must impose position limits, and do not address issues that are material to this rulemaking." *Id.* at 71,664.  It was impossible for the Commission to properly weigh the costs of the *levels* at which it set the position limits (and the other decisions it made) against their purported benefits, without predicting whether the Rule would advance the goal of preventing excessive speculation.  That is the fundamental error in the Commission's cost-benefit analysis: As the Commission states in its brief, it elected not to evaluate whether the "limits would prevent or limit [excessive] speculation."  Opp. 21.  Had the Commission found that position limits were not effective, Sec-

tion 19(a) would have demanded imposing a far less restrictive rule.[8]

## II. THE COMMISSION FAILS TO IDENTIFY ANY PUBLIC INTEREST THAT WOULD JUSTIFY IMPLEMENTING THE COSTLY NEW RULE BEFORE JUDICIAL REVIEW

### A. The Commission Presents No Public Interest Factors Disfavoring A Preliminary Injunction

In a remarkable tacit concession, the Commission sets forth no reason why immediate enforcement of the Position Limits Rule would serve the public interest. The Commission provides no factual basis to believe that immediate implementation of the Rule is necessary, or even beneficial. *See* Opp. 43–44. Nor does it respond to any of the points in Plaintiffs' opening memorandum, supported by a detailed expert declaration, that the Rule will harm consumers and producers of commodities by reducing liquidity in the markets and therefore driving up the price of basic materials. *See* App. 36–40. This failure to give this Court any reason to conclude that immediate implementation would serve the public interest is consistent with the rulemaking record, which caused a majority of Commissioners to conclude that the Rule likely would be harmful to the public interest by raising the costs of necessities like gas and food. In Commissioner Dunn's words, "[p]osition limits may actually lead to higher prices for commodities that we consume on a daily basis." Oct. 18 Tr. at 13.

The one paragraph that the Commission devotes to the public interest relies exclusively on its mistaken view that Congress required the imposition of position limits. According to the Commission, "Congress has already made the public interest and balance-of-equities determinations here." Opp. 43. Not only does this argument beg the question of the Rule's validity, but on

---

[8]  The Commission complains that confidential data submitted by Plaintiffs' members in support of this motion was not provided to the Commission below. Opp. 39 & n.32. But Plaintiffs do not rely on that data for their *merits* arguments and do not suggest that the Commission should have taken it into account in the rulemaking. The Commission, however, should have given serious attention to the studies that were in the record—which it ignored.

the Commission's own reading of the Dodd-Frank Act, it cannot possibly be correct.  Congress did not identify which commodity contracts to subject to position limits, and it certainly did not endorse the specific levels at which the Commission set those limits, or the aggregation rules.

The Commission, moreover, provides no reason to believe that Congress would favor immediate implementation of a rule for which the Commission has inadequately considered costs and benefits.  The Commission's obligation was to comply with all its statutory responsibilities; it defies common sense and basic principles of statutory construction to suppose that Congress wanted a rule in place regardless of its ineffectiveness, its burdens on the economy, and the flawed process that led to its adoption.

## B.   Absent A Preliminary Injunction, Plaintiffs' Members And Others Will Incur Substantial And Unrecoverable Costs

In contrast to the Commission's failure to set forth *any* public-interest considerations disfavoring a preliminary injunction, there is no doubt that the Rule will impose severe costs on market participants—as the Commission's own analysis in the rule release made clear.  Inexplicably, the Commission persists in maintaining, as it did in its D.C. Circuit filing, that the court held in *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) (per curiam), that economic harm to parties is not irreparable unless it "threatens 'the very existence of [their] business.'" Opp. at 16 (quoting *Wisconsin Gas*, 758 F.2d at 674) (alteration in original).  As explained in Plaintiffs' opening memorandum, that case held only that *recoverable* economic harm was not irreparable unless it threatens a party's existence—naturally, because that harm can be remedied later by money damages.  But here, the harms imposed on Plaintiffs' members are indisputably *unrecoverable*; Plaintiffs' members will be unable to sue the Commission for damages even if the Rule is vacated.  Indeed, the Commission concedes in a footnote that *Wisconsin Gas* "does not address whether insubstantial unrecoverable expenses constitute irreparable harm." Opp. 17

n.10.

None of the other cases cited by the Commission remotely suggests that tens of millions of dollars in *unrecoverable* direct costs—and many times that amount in indirect costs—do not qualify as irreparable harm unless they threaten the continued existence of the movants.  Those cases stand only for the proposition that the harm must be "serious or great."  *Navistar, Inc. v. EPA*, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011).  Losses of this magnitude certainly count, even if they are not enough to put Plaintiffs' members out of business.  As another judge of this Court recently explained, even monetary harm that "represents approximately twelve one-hundredths of one percent of plaintiffs' combined annual sales as reported for 2010" qualifies as irreparable due to "[p]laintiffs' inability to recover costs from [a federal agency]."  *R.J. Reynolds Tobacco Co. v. FDA*, --- F. Supp. 2d ---, 2011 WL 5307391, at *9 (D.D.C. Nov. 7, 2011) (Leon, J.) (quotation marks omitted).  Plaintiffs' members submitted detailed affidavits specifying the costs that they would incur in coming into compliance with the Position Limits Rule.  These costs are representative of the unrecoverable and entirely unnecessary damages that participants nationwide will incur if the Rule goes into effect but is later vacated.  The Commission presents no argument that such harms are anything but irreparable.

The Commission's only response is to characterize these very real costs as "general, vague, and conjectural."  Opp. 18.  But there is no doubt that the Rule will impose substantial costs in coming into compliance by requiring companies to overhaul information-technology and operations systems and to refrain from trading strategies that they would otherwise employ.  These are the same costs that the rulemaking release identified.  *See, e.g.*, 76 Fed. Reg. at 71,665 ("The final rules are also expected to result in costs to market participants whose market partici-pation and trading strategies will need to take into account and be limited by the new position

23

limits rule."); *id.* at 71,666 (discussing millions in costs "associated with adjusting systems for monitoring futures and swaps Referenced Contracts to track compliance with position limits"). The costs tallied in the rule release alone (an unduly conservative estimate that expressly excluded the Rule's enormous economic costs) totaled nearly $50 million in the first year alone, including "start-up" costs that will prove totally unnecessary should the Rule be invalidated.  76 Fed. Reg. at 71,666–79; *see also id.* at 71,672 ("The economic costs (or for[gone] benefits) of the level of position limits is difficult to determine accurately or quantify . . . ."). And elsewhere in its brief, the Commission concedes that these costs are real—and rationalizes the rulemaking's perfunctory assessment of them on the ground that they were too difficult to quantify.  *See* Opp. 40 ("The Commission further noted that the position limits *could lead traders to alter their business strategies* . . . ." (emphasis added)).

Unable to dispute that the Rule is *certain* to impose these costs, the Commission's evident position is that if Plaintiffs cannot place a precise dollar figure on all such costs, the harm is not irreparable.  That argument turns the law of remedies on its head.  The ordinary rule is that, even where money damages are theoretically available (unlike here), "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or *difficult to ascertain*."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (emphasis added; alteration in original; quotation marks omitted).  That general principle applies to cases involving economic losses to a business where "absent a [preliminary injunction], [the business] would lose incalculable revenues." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quotation marks omitted); *cf. Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 199 (D.D.C. 2010) (explaining that even *recoverable* economic harm is irreparable where it is "*either* incalcu-

lable *or* so substantial as to threaten the employer's ability to stay in business" (emphases add-ed)).  Thus, to the extent the members' opportunity costs cannot be precisely calculated, that *favors* injunctive relief.

The Commission finally claims that the costs of coming into compliance with the Rule are not irreparable because Congress has required position limits for swaps, so market partici-pants will ultimately have to update their systems to monitor swaps.  Opp. 18.  Of course, this argument incorrectly assumes that the Commission was required to adopt position limits for swaps.  *See supra* at 9–10.  It also ignores that establishing systems to track compliance with po-sitions for swaps in nine commodities would be substantially less costly than creating systems for 28 different commodities.  More broadly, the Commission's argument disregards the numer-ous other costs identified in the sworn affidavits, such as the likelihood that market participants will have to divest from positions in other entities and forgo efficient transactions because of the levels at which the limits are set and the overly inclusive aggregation rules.  These costs, which the Commission's own rule release acknowledges, are lost investments and lost revenues that will never be recovered even when this deeply flawed rule is vacated.

## CONCLUSION

The Court should grant a preliminary injunction against the Commission's final rule and interim final rule pending judicial review.

Dated: February 22, 2012

Respectfully submitted,

/s/ Miguel A. Estrada
Miguel A. Estrada, SBN 456289
  *Counsel of Record*
Eugene Scalia, SBN 447524
Jason J. Mendro, SBN 482040
John F. Bash, SBN 988874
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 22nd day of February, 2012, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.

I also certify that I caused the foregoing document to be served on the following counsel by CM/ECF:

Lawrence DeMille-Wagman
lwagman@cftc.gov
Mary T. Connelly
mconnelly@cftc.gov
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C.  20581

/s/ Jason J. Mendro
Jason J. Mendro