## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, et al.** | |
| Plaintiffs, | |
| v. | Civil Action No. 11-cv-2146 (RLW) |
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION** | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiffs International Swaps and Derivatives Association ("ISDA") and Securities Industry and Financial Markets Association ("SIFMA") (collectively "Plaintiffs") challenge a recent rulemaking by Defendant United States Commodity Futures Trading Commission ("CFTC" or "Commission") setting position limits on derivatives tied to 28 physical commodities. See Position Limits for Futures and Swaps, 76 Fed. Reg. 71,626 (Nov. 18, 2011) ("Position Limits Rule").  The CFTC promulgated the Position Limits Rule pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank").

The heart of Plaintiffs' challenge is that the CFTC misinterpreted its statutory authority under the Commodity Exchange Act of 1936 ("CEA"), as amended by Dodd-Frank.  The central question for the Court, then, is whether the CFTC promulgated the Position Limits Rule based on a correct and permissible interpretation of the statute at issue.  Before the Court are the following motions: 1) Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 14), Plaintiffs' Motion for Summary Judgment (Dkt. No. 31) and Defendant's Cross Motion for Summary Judgment (Dkt. No. 38).  For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is

**GRANTED,** the CFTC's Cross-Motion for Summary Judgment is **DENIED,** and Plaintiffs' Motion for Preliminary Injunction is **DENIED AS MOOT.**[1]

## FACTUAL BACKGROUND

ISDA is a trade association with more than 825 members that "represents participants in the privately negotiated derivatives industry." (Compl. ¶ 9). SIFMA is an "association of hundreds of securities firms, banks, and asset managers" whose claimed mission is to "support a strong financial industry, investor opportunity, capital formation, job creation, and economic growth, while building trust and confidence in the financial markets." (Id. ¶ 10). According to Plaintiffs, the commodity derivatives markets are "crucial for helping producers and purchasers of commodities manage risk, ensuring sufficient market liquidity for bona fide hedgers, and promoting price discovery of the underlying market." (Id. ¶ 15). The CFTC, of course, is an agency of the U.S. government with regulatory authority over the commodity derivatives market.

### Relevant Derivatives Contracts

Three types of commodity derivatives are implicated in this case: futures contracts, options contracts and swaps. (Dkt. No. 31 at 5). A futures contract is a contract between parties to buy or sell a specific quantity of a commodity at a particular date and location in the future. (Id. at 3). An options contract is a contract between parties where the buyer has the right, but not the obligation, to buy or sell a specific quantity of a commodity at a point in the future. (Id.).

---

[1]     The Court finds it appropriate to consolidate consideration of the cross motions for summary judgment with Plaintiffs' Motion for Preliminary Injunction given that: the Position Limits Rule has not yet gone into effect; briefing on summary judgment is ripe; the parties have had a full and fair opportunity to present their entire cases on the merits and, thus, there is no prejudice from consolidation; and the parties have concurred that this case is properly disposed of on summary judgment. See Fed. Civ. P. Rule 65(a)(2); see also 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2950, 239 (2d ed. 1995) (stating that consolidation will be considered proper "if it is clear that consolidation did not detrimentally affect the litigants as, for example, when the parties in fact presented their entire cases . . . .").

Futures contracts and options contracts result in either physical delivery or a cash settlement between parties. (Id.). In a physical delivery contract, the buyer takes physical delivery of the commodity when the contract expires. (Id.). At the conclusion of a cash-settled contract, a cash transfer occurs that is equivalent to the difference between the price set forth in the contract and the market price at the time the contract expires. (Id.). Swaps involve one or more exchanges of payments based on changes in the prices of specified underlying commodities without transferring ownership of the underlying commodity. (Id. at 5).

A position limit "caps the maximum number of derivatives contracts to purchase (long) or sell (short) a commodity that an individual trader or group of traders may own during a given period." (Compl. ¶ 21). A position limit may impose a ceiling on either a "spot-month" position or a "non-spot-month" position. (Id. at ¶ 22). A "spot month" is a specific period of time (which varies by commodity under the rules) that immediately precedes the date of delivery of the commodity under the derivatives contract. (Id.). As Plaintiffs explain, "[a] spot-month position limit, therefore, caps the position that a trader may hold or control in contracts approaching their expiration. A non-spot-month position limit caps the position that may be held or controlled in contracts that expire in periods further in the future or in all months combined." (Id.).

### Commodity Exchange Act of 1936 and the 2010 Dodd-Frank Amendments

The main issue in this case is whether the Dodd-Frank amendments to Section 4a of the CEA (codified at 7 U.S.C. § 6a)[2] mandated that the CFTC impose a new position limits regime in the commodity derivatives market. It is undisputed that, prior to Dodd-Frank, the CEA vested the Commission with discretion to set position limits on futures and options contracts in commodity derivatives markets. See 7 U.S.C. § 6a (stating that CFTC has authority to proclaim and fix position limits "from time to time" "as the Commission finds are necessary to diminish,

---

[2]     This Court will refer to the statute by its United States Code number.

eliminate, or prevent [excessive speculation].").  Title VII of the Dodd-Frank Act amended Section 6a in several respects.  The full text of Section 6a, with the Dodd-Frank amendments reflected in red-lined format, is attached to this Opinion as Appendix A.

## The Position Limits Rule

### Notice of Proposed Rulemaking

Dodd-Frank went into effect on July 21, 2010.  On January 26, 2011, the CFTC issued a Notice of Proposed Rulemaking ("NPRM"), stating that Title VII of Dodd-Frank "requires" the Commission "to establish position limits for certain physical commodity derivatives."  Position Limits for Derivatives, 76 Fed. Reg. 4,752 (Jan. 26, 2011).  At an open meeting on January 13, 2011 prior to the issuance of the NPRM, Commissioner Michael V. Dunn stated that, "to date CFTC staff has been unable to find any reliable economic analysis to support either the contention that excessive speculation is affecting the market we regulate or that position limits will prevent excessive speculation."  Transcript of Open Meeting on the Ninth Series of Proposed Rulemakings Under the Dodd-Frank Act at 9 (Jan. 13, 2011).  Dunn also shared his "fear" that "at best position limits are a cure for a disease that does not exist, or at worst it's a placebo for one that does."  Id.  Commissioners Jill Sommers and Scott D. O'Malia also expressed fundamental concerns with the position limits proposal before the agency.  Id. at 12-15; 18-22.

In the NPRM, the CFTC proposed to establish position limits for futures contracts, options contracts and swaps for 28 physical commodities.  In discussing its statutory authority, the CFTC stated its view that it was:

> not required to find that an undue burden on interstate commerce resulting from excessive speculation exists or is likely to occur in the future in order to impose position limits.  Nor is the Commission required to make an affirmative finding that position limits are necessary to prevent sudden or unreasonable fluctuations

> or unwarranted changes in prices or otherwise necessary for
> market protection.  <u>Rather the Commission may impose position
> limits prophylactically</u>, based on its reasonable judgment that such
> limits are necessary for the purpose of 'diminishing, eliminating,
> or preventing' such burdens on interstate commerce . . . .

76 Fed. Reg. at 4754 (emphasis added).  The CFTC stated that the "basic statutory mandate in

section [6]a of the Act to establish position limits to prevent 'undue burdens' associated with

'excessive speculation' has remained unchanged—and has been reaffirmed by Congress several

times—over the past seven decades."  <u>Id</u>.  In discussing the Dodd-Frank amendments to Section

6a, the   Commission noted that:

> [P]ursuant to the Dodd-Frank Act, Congress significantly
> expanded the Commission's authority and mandate to establish
> position limits beyond futures and options contracts to include, for
> example, economically equivalent derivatives.  Congress expressly
> directed the Commission to set limits in <u>accordance with the
> standards set forth in sections [6]a(a)(1) and [6]a(a)(3) of the Act,
> thereby reaffirming the Commission's authority to establish
> position limits as it finds necessary in its discretion to address
> excessive speculation.</u>

<u>Id.</u> at 4755 (emphasis added).  At this stage of the rulemaking, therefore, when discussing the

"standards set forth in section [6]a(a)(1)," the Commission directly referred to its authority to

"establish position limits as it finds necessary in its discretion to address excessive speculation."

<u>Id</u>.

### The Final Rule

During an open meeting on October 18, 2011, the CFTC adopted the Position Limits

Rule by a vote of 3 to 2.  76 Fed. Reg. at 71,699.  Chairman Gary Gensler and Commissioner

Bart Chilton voted in favor of the Rule, with Commissioner Dunn providing the third vote for the

majority.  (Dkt. No. 31 at 10-11); 76 Fed. Reg. at 71,699.  Dunn stated that "no one has

presented this agency any reliable economic analysis to support either the contention that

excessive speculation is affecting the market we regulate or that position limits will prevent the excessive speculation." Transcript of Open Meeting on Two Final Rule Proposals Under the Dodd-Frank Act (hereinafter "10/18/11 Tr. at __") at 13 (Oct. 18, 2011). Dunn expressed his opinion that "position limits may harm the very markets we're intending to protect." Id. at 14. Despite the fact that his opinion on position limits still "ha[d] not changed," Dunn voted in favor of the Rule because he believed Congress had required the Commission to impose position limits:

> Position limits are, in my opinion, a sideshow that has unnecessarily diverted human and fiscal resources away from actions to prevent another financial crisis. To be clear, no one has proven that the looming specter of excessive speculation in the futures market re-regulated even exist, let alone played any role whatsoever in the financial crisis of 2008. Even so, Congress has tasked the CFTC with preventing excessive speculation by imposing position limits. This is the law. The law is clear, and I will follow the law.

10/18/11 Tr. at 11, 13 (emphasis added).

Commissioner Gensler supported Commissioner Dunn's view, stating that by "the Dodd-Frank Act, Congress mandated that the CFTC set aggregate position limits for certain physical commodity derivatives." 76 Fed. Reg. at 71,626, 71,699. The final rule reflected the Commission's view that it was compelled to produce a certain result: "Congress did not give the Commission a choice. Congress directed the Commission to impose position limits and to do so expeditiously." 76 Fed. Reg. at 71,628 (emphasis added).

Commissioners Sommers and O'Malia voted against the final rule and published written dissents. Sommers claimed that, while she was not philosophically opposed to position limits, she did "not believe position limits will control prices or market volatility" in this market. 76 Fed. Reg. at 71,699. Sommers claimed that the rule would inflict the greatest harm on bona fide

hedgers and "ironically" may "result in increased food and energy costs for consumers." Id. Sommers claimed that, in her view, the Commission had "chosen to go way beyond what is in the statute and have created a very complicated regulation that has the potential to irreparably harm these vital markets." 76 Fed. Reg. at 71,700.  By enacting the Rule, she believed that "[the CFTC] is setting itself up for an enormous failure." 76 Fed. Reg. at 71,699.

Commissioner O'Malia claimed that, although he had a number of serious concerns about the Rule, his "principal disagreement is with the Commission's restrictive interpretation of the statutory mandate under Section 4a [7 U.S.C. § 6a] of the [CEA] to establish position limits without making a determination that such limits are necessary and effective in relation to the identifiable burdens of excessive speculation on interstate commerce." Id. at 71,700 (emphasis added).  As O'Malia stated, "the Commission ignores the fact that in the context of the Act, such discretion is broad enough to permit the Commission to not impose limits if they are not appropriate." Id. at 71,701.  In O'Malia's view, the CFTC had "fail[ed] to comply with Congressional intent" and "misse[d] an opportunity to determine and define the type and extent of speculation that is likely to cause sudden, unreasonable and/or unwarranted commodity price movements so that it can respond with rules that are reasonable and appropriate." Id. at 71,700. O'Malia also faulted the Commission for promulgating the rule without any evidence that the position limits would actually benefit the market:

- "Historically, the Commission has taken a much more disciplined and fact-based approach in considering the question of position limits; a process that is lacking from the current proposal." Id. at 71,700.

- "The Commission voted on this multifaceted rule package without the benefit of performing an objective factual analysis based on the necessary data to determine whether these particular limits . . . will effectively prevent or deter excessive speculation." Id. at 71,702.

7

- "By failing to put forward data evidencing that commodity prices are threatened by the negative influence of a defined level of speculation that we can define as 'excessive speculation,' and that today's measures are appropriate (i.e. necessary and effective) in light of such findings, I believe that we have failed under the Administrative Procedure Act to provide a meaningful and informed opportunity for public comment." Id.

In the Position Limits Rule, the CFTC established spot-month and non-spot-month position limits for all "Referenced Contracts" as defined under the Rule. (Dkt. No. 31 at 13). A Referenced Contract:

> is defined as a Core Referenced Futures Contract or a futures contract, options contract, swap or swaption directly or indirectly linked to either the price of a Core Referenced Futures Contract or to the price of the commodity underlying a Core Referenced Futures Contract for delivery at the same location as the commodity underlying the relevant Core Referenced Futures Contract.

Id. (internal quotation marks omitted).   The Rule identifies 28 Core Referenced Futures Contracts that will be subject to its provisions.   Id.   The Rule specifies that spot-month position limits shall be based on one-quarter of the estimated spot month deliverable supply as established by the Commission, and will apply to both physical delivery and cash-settled contracts separately.   Id. at 14.   For non-spot-months, different position limit rules apply for legacy Referenced Contracts and non-legacy Referenced Contracts.   Id. at 15.   Legacy Referenced Contracts are contracts that were previously subject to position limits by the CFTC.   Id.   These contracts will remain subject to the preexisting regulations set forth in 17 C.F.R. § 150, although the Rule raised the preexisting limits to higher levels.   Id.

Non-legacy Referenced Contracts are contracts that were not previously subject to position limits.   Id.   The position limits for these contracts are fixed by the Commission based on "10 percent of the first 25,000 contracts of average all-months combined aggregated open interest with a marginal increase of 2.5 percent thereafter."   Id.   In addition to these regulations,

the Rule also established circumstances where a trader must aggregate positions held in multiple accounts.  Id. at 16.  Subject to some exceptions, traders must aggregate all counts in which they have at least a 10% ownership or equity interest.  Id.

**Claims**

Plaintiffs assert the following claims against the CFTC based on the Position Limits Rule: 1) Count One: Violation of the CEA and APA—Failure to Determine the Rule to be Necessary and Appropriate under 7 U.S.C. § 6a(a)(1), (a)(2)(A), (a)(5)(A)); 2) Count Two: Violation of the CEA—Insufficient Evaluation of Costs and Benefits under 7 U.S.C. § 19(a); 3) Count Three: Violation of the APA—Arbitrary and Capricious Agency Action in Promulgating the Position Limits Rule; 4) Count Four: Violation of the APA—Arbitrary and Capricious Agency Action in Establishing Specific Position Limits and Adopting Related Requirements and Restrictions; 5) Count Five: Violation of the APA—Failure to Provide Interested Persons A Sufficient Opportunity to Meaningfully Participate in the Rulemaking; and 6) Count Six: Claim for Injunctive Relief.

**ANALYSIS**

### I.   Standard of Review

When ruling on a summary judgment motion in a case involving final review of an agency action under the APA, the standards of Federal Rule of Civil Procedure 56(c) do not apply because of the limited role of the court in reviewing the administrative record.[3]  See

---

[3]      Local Rule 7(h)(1) requires that a party moving for summary judgment attach a Statement of Undisputed Facts.  In cases where judicial review is based solely on the administrative record, however, a Statement of Undisputed Facts is not required.  LCvR 7(h)(2).  In those cases, "motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record."  Id.  Thus, this Opinion will cite to either the statement of facts accompanying parties' motions which cite to the administrative record or to the record itself.

Charter Operators of Alaska v. Blank, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012).  Summary judgment serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).  The district court must "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." Forsyth Memorial Hosp., Inc. v. Sebelius, 639 F.3d 534, 537 (D.C. Cir. 2011) (citing Troy Corp. v. Browner, 120 F.3d 277, 281 (D.C. Cir. 1997)).

**II.     The Parties' Arguments Regarding the Interpretation of the Dodd-Frank Amendments**

This case largely turns on whether the CFTC, in promulgating the Position Limits Rule, correctly interpreted Section 6a as amended by Dodd-Frank.  Although both sides forcefully argue that the statute is clear and unambiguous, their respective interpretations lead to two very different results: one which mandates the Commission to set position limits without regard to whether they are necessary or appropriate, and one which requires the Commission to find such limits are necessary and appropriate before imposing them.

Plaintiffs argue that Section 6a is clear and unambiguous, and that the statute required the CFTC to make statutorily-required findings of necessity prior to promulgating the Position Limits Rule.  (Dkt. No. 31 at 18-19).  Plaintiffs argue that the CFTC misinterpreted the plain text of Dodd-Frank to mean that the CFTC must impose position limits without regard to whether such limits were appropriate or necessary.  Plaintiffs argue that the statutory requirement included an obligation to determine whether specific position limits and the specific commodities to which they were tied were necessary and appropriate.  (Dkt. No. 14 at 19).

Plaintiffs point out that, under Section 6a(a)(1), the CFTC has the discretion to establish position limits from time to time "as the Commission finds are necessary to diminish, eliminate, or prevent" the burden on interstate commerce caused by excessive speculation.  (Id. at 19).  Under Plaintiffs' view, that necessity standard applies to any position limits set pursuant to Dodd-Frank because the Dodd-Frank amendments expressly incorporate that standard.  See § 6a(a)(2) (stating that position limits shall be established "[i]n accordance with the standards set forth in paragraph (1) of this subsection . . . ."); (Dkt. No. 31 at 20-21).

Plaintiffs also argue that the CFTC failed to find that it was appropriate to set position limits, in violation of the clear language of Sections 6a(a)(2) and (a)(5).  See §§ 6a(a)(2)(A) ("the Commission shall by rule, regulation, or order establish limits on the amount of positions, as appropriate . . . that may be held by any person . . . .") (emphasis added); 6a(a)(5) ("the Commission shall establish limits on the amount of positions, including aggregate position limits, as appropriate, . . .) (emphasis added).  Plaintiffs argue that the "as appropriate" clauses in Sections 6a(a)(2) and (a)(5) modify "shall," thus imposing a requirement on the CFTC that it shall only set limits if the Commission finds it "appropriate" to do so.

Finally, Plaintiffs argue that the CFTC's interpretation of the statute is internally inconsistent.  By imposing position limits for contracts related to only certain (and not all) commodities, the Commission "acknowledged that it had the discretion to establish position limits for some commodity contracts and not others."  (Dkt. No. 14 at 23).  As Plaintiffs point out, however, the text of Section 6a "nowhere distinguishes between different commodities." (Dkt. No. 14 at 23; Dkt. No. 31 at 22); 76 Fed. Reg. at 71,665.  Plaintiffs argue that "if, as the Commission concedes, the statute does not require the Commission to establish position limits for all commodities, there is no textual basis to conclude that it is required to regulate any of

them." (Dkt. No. 14 at 23).   Because there is no dispute that the CFTC failed to find that the imposition of position limits was necessary and appropriate, Plaintiffs ask this Court to vacate and remand the Rule to the agency.

For its part, the Commission also argues that Section 6a is clear and unambiguous.   The Commission, however, takes the unwavering position that Congress mandated the agency to set position limits and stripped it of all discretion <u>not to</u> impose limits.   The CFTC argues that it was not required to find that position limits were necessary or appropriate before imposing them and that, by adding Sections 6a(a)(2)-(7), Congress made the imposition of speculative limits mandatory.   (Dkt. No. 25 at 20-23).   Specifically, the CFTC points out that Congress stated that "with respect to physical commodities . . . the Commission <u>shall</u> by rule, regulation or order establish limits on the amounts of positions, as appropriate, . . . that may be held by any person . . ."   § 6a(a)(2)(A); (Dkt. No. 25 at 24).

The Commission also argues that Congress referred to the position limits as "required" and imposed time limits on the agency under Sections 6a(a)(2)(B)(i) (". . . the limits required under subparagraph (A) shall be established within 180 days . . ." and 6a(a)(2)(B)(ii) (". . . the limits required under subparagraph (A) shall be established within 270 days . . ."), further reflecting the fact that the Dodd-Frank amendments were a mandate to set position limits.   The CFTC points to other mandatory language to support its view, including Sections 6a(a)(2)(C) ("in establishing the limits required under subparagraph (A) . . .") and 6a(a)(3) ("in establishing the limits required in paragraph (2), the Commission, as appropriate, shall set limits . . . ."). According to the CFTC, if Congress intended for the CFTC to establish limits on a case-by-case basis, it would not have required that the limits be imposed on such short deadlines.   Moreover,

the CFTC argues that, under Plaintiffs' view, the Dodd-Frank amendments to Section 6a would be rendered meaningless.

Finally, the CFTC argues that, under Dodd-Frank, Congress directed the Commission to "conduct a study of the effects (if any) of the position limits imposed . . . within 12 months after the imposition of the limits." Congress further directed that the Commission "shall" submit a copy of that report to Congress, and Congress shall conduct a hearing within 30 days. See 15 U.S.C. § 8307. According to the Commission, the reporting requirement is further evidence that the Dodd-Frank amendments compelled and mandated the Commission to set limits.

In sum, although each party believes the statute is clear and unambiguous, their respective "plain readings" compel different results. Ultimately, however, this Court need not choose between the competing interpretations. As explained below, Section 6a is ambiguous as to the precise question at issue: whether the CFTC is required to find that position limits are necessary and appropriate prior to imposing them. Because the Position Limits Rule is based on the CFTC's erroneous conclusion that the CEA is unambiguous on this issue, the Court "may neither defer to the agency's construction nor endorse plaintiffs' construction." See Humane Soc'y of U.S. v. Kempthorne, 579 F. Supp. 2d 7, 15 (D.D.C. 2008). Instead, the Court must remand this rule to the agency.

### III.  The CFTC's Interpretation of Section 6a as Amended by Dodd-Frank

#### a.  Chevron Step One

Because this case involves the CFTC's interpretation of a statute it is charged with implementing, this Court applies the two-part test of Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). See Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin., 471 F.3d 1350, 1353 (D.C. Cir. 2006). Under step one of the Chevron test, the Court

first must consider "whether Congress has directly spoken to the precise question at issue." Pub. Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 154 (D.C. Cir. 1990) (quoting Chevron, 467 U.S. at 842). If so, the Court and the agency "must give effect to the unambiguously expressed intent of Congress." Arizona v. Thompson, 281 F.3d 248, 253 (D.C. Cir. 2002) (quoting Chevron, 467 U.S. at 842–43); see also Northeast Hosp. Corp. v. Sebelius, 657 F.3d 1, 4 (D.C. Cir. 2011) (citing Chevron, 467 U.S. at 842–43).

Under Chevron Step One, the Court examines the statute de novo, employing traditional tools of statutory construction. Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007). The Court must assess the statutory text at issue, the statute as a whole, and review legislative history where appropriate. Coal Employment Project v. Dole, 889 F.2d 1127, 1131 (D.C. Cir. 1989) (citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281 (1988) and Ohio v. U.S. Dep't of the Interior, 880 F.2d 432, 441 (D.C. Cir. 1989)). "This inquiry using the traditional tools of construction may be characterized as a search for the plain meaning of the statute. If this search yields a clear result, then Congress has expressed its intention as to the question, and deference [to the agency's interpretation] is not appropriate." Bell Atl. Tel. Co. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (citing Hammontree v. NLRB, 894 F.2d 438, 441 (D.C. Cir. 1990)).

If, however, the statute is silent or ambiguous, the Court moves on to Chevron Step Two and defers to the agency's interpretation if it is based on a permissible construction of the statute. Peter Pan, 471 F.3d at 1353 (internal quotation marks and citations omitted). "A statute is considered ambiguous [under Chevron] if it can be read more than one way." Am. Fed'n of Labor & Cong. of Indus. Org. v. Fed. Election Comm'n, 333 F.3d 168, 173 (D.C. Cir. 2003) (citing United States v. Nofziger, 878 F.2d 442, 446-47 (D.C. Cir. 1989)). "Because the

judiciary functions as the final authority on issues of statutory construction, an agency is given no deference at all on the question whether a statute is ambiguous." Wells Fargo Bank, N.A. v. Fed. Deposit Ins. Corp., 310 F.3d 202, 205-06 (D.C. Cir. 2002) (internal citations and quotation marks omitted).

### i. Section 6a(a)(1) Plainly Requires the CFTC to Find That Position Limits are Necessary.

The first question for the Court is whether Section 6a(a)(1) requires the Commission to find that position limits are necessary prior to imposing them. This is important, of course, because the so-called "mandate" of Dodd-Frank in Section 6a(a)(2) expressly incorporates the "standards" of paragraph (1). The relevant portion of Section 6a(a)(1) states:

> For the purpose of diminishing, eliminating, or preventing such burden, the Commission shall, from time to time, after due notice and opportunity for hearing, by rule, regulation, or order, proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person . . . under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility, or swaps traded on or subject to the rules of a designated contract market or a swap execution facility, or swaps not traded on or subject to the rules of a designated contract market or a swap execution facility that performs a significant price discovery function with respect to a registered entity, as the Commission finds are necessary to diminish, eliminate, or prevent such burden.

§ 6a(a)(1) (emphasis added).

The Commission does not argue—nor could it—that this section standing alone strips the agency of any discretion not to set position limits if it would be unnecessary to do so. In fact, the statute expressly directs the agency to set position limits "from time to time." Id. The precise question, therefore, is whether the language of Section 6a(a)(1) clearly and unambiguously requires the Commission to make a finding of necessity prior to imposing position limits. The answer is yes.

The contested language in Section 6a(a)(1) has remained largely unchanged from the initial passage of the CEA to the Dodd-Frank amendments.  Compare Pub. L. No. 74-675, ch. 545, 49 Stat. 1491, 1492 (June 15, 1936) ("For the purpose of diminishing, eliminating, or preventing such burden, the commission shall, from time to time . . . proclaim and fix such limits on the amount of trading . . . which may be done by any person as the commission finds is necessary to diminish, eliminate or prevent such burden.") (emphasis added) with Pub. L. No. 111-203, Title VII, § 737(a) to (c), 124 Stat. 1722 (July 21, 2010) ("For the purpose of diminishing, eliminating, or preventing such burden, the Commission shall, from time to time . . . proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person  . . . as the Commission finds are necessary to diminish, eliminate, or prevent such burden.") (emphasis added).[4]

Consistent with this longstanding requirement, the Commission made necessity findings in its rulemakings establishing position limits for 45 years after the passage of the CEA.  See In the Matter of Limits on Position and Daily Trading in Wheat, Corn, Oats, Barley, Rye and Flaxseed for Future Delivery, 3 Fed. Reg. 3145, 3146 (Dec. 24, 1938) ("[T]rading in any one grain for future delivery on a contract market, by a person who holds or controls a speculative net position of more than 2,000,000 bushels, long or short in any one future or in all futures combined in such grain on such contract market, tends to cause sudden and unreasonable fluctuations and changes in the price of such grain . . . in order to diminish, eliminate, or prevent

---

[4]     In 1935, Congress provided an unambiguous interpretation of the phrase "as the Commission finds are necessary" in an "Explanation of the Bill": "[Section 4a of the CEA] gives the Commodity Exchange Commission the power, after due notice and opportunity for hearing and a finding of a burden on interstate commerce caused by such speculation, to fix and proclaim limits on futures trading. . . ."  H.R. Rep. 74-421, at 5 (1935) (emphasis added).  This text clearly indicates that Congress intended for the CFTC to make a "finding of a burden on interstate commerce caused by such speculation" prior to enacting position limits.

the undue burden of excessive speculation in grain futures which causes unwarranted price changes, <u>it is necessary to establish limits</u> on the amount of speculative trading under contracts of sale of grain for future delivery on contract markets, which may be done by any one person.") (emphasis added); <u>see</u> <u>also</u> In the Matter of Limits on Position and Daily Trading in Cotton for Future Delivery, 5 Fed. Reg. 3,198 (Aug. 28, 1940); Limits on Position and Daily Trading in Eggs for Future Delivery, 16 Fed. Reg. 8,106 (Aug. 16, 1951); Limits on Position and Daily Trading in Cottonseed Oil for Future Delivery, 18 Fed. Reg. 443 (Jan. 22, 1953); Limits on Position and Daily Trading in Soybean Oil for Future Delivery, 18 Fed. Reg. 444 (Jan. 22, 1953); Limits on Position and Daily Trading in Lard for Future Delivery, 18 Fed. Reg. 445 (Jan. 22, 1953); Limits on Position and Daily Trading in Onions for Future Delivery, 21 Fed. Reg. 5,575 (July 25, 1956).

The CFTC argues that, although it made necessity findings in these prior rulemakings, the agency never stated that a finding of necessity was required.  (Dkt. No. 38 at 19, n.12).  This argument is without merit.  The plain text of the statute requires that position limits be set "as the <u>Commission finds are necessary</u> to diminish, eliminate, or prevent [excessive speculation]."  § 6a(a)(1).  The text does not state (nor has it ever) that the CFTC may do away with or ignore the necessity requirement in its discretion.  There is no ambiguity as to whether the statute requires the CFTC to make such findings, and the CFTC has never apparently treated the statute as ambiguous on this point.  Accordingly, the Court concludes that § 6a(a)(1) unambiguously requires that, prior to imposing position limits, the Commission find that position limits are necessary to "diminish, eliminate, or prevent" the burden described in Section 6a(a)(1).

> **ii. The Commission's Arguments That Section 6a(a)(1) Does Not Require a Necessity Finding Are Unavailing.**

For 45 years after the passage of the CEA, the CFTC made necessity findings prior to imposing position limits under Section 6a(a).   The CFTC has not cited to any express interpretation in which the CFTC took the position that no necessity finding was required.   Nor has the CFTC cited to any prior interpretation in which the CFTC took the position that the specific language of Section 6a(a) (now Section 6a(a)(1)) was ambiguous on this point.   Fully aware that Section 6a(a)(1) is problematic for its current position, the CFTC makes a number of arguments in an attempt to get out from underneath the statute's plain language requiring a necessity finding.   Notwithstanding the CFTC's various—and at times inconsistent— interpretations, the necessity requirement remains in Section 6a(a)(1).

<u>"Necessary" Only Modifies the "Amounts of Trading"</u>

First, in its Opposition to Plaintiffs' Motion for Preliminary Injunction, the CFTC argued that, because "necessary" is more closely preceded by the phrase "proclaim and fix such limits on the amounts of trading," it is "far more plausible" to interpret this provision as requiring the Commission only to find that amounts of trading were necessary, not that limits in general are necessary.   (Dkt. No. 25 at 24).   The Commission has wisely abandoned this interpretation on summary judgment.   The plain language of § 6a(a)(1) and the Commission's position limits rulemakings since 1936 undermine this strained interpretation.

<u>The Dodd-Frank Amendments "Converted" Section 6a(a)(1)</u>

At oral argument on Plaintiffs' Motion for Preliminary Injunction, the Commission offered another argument in support of its view that no necessity finding was required.   In discussing the Dodd-Frank amendments of Sections 6a(a)(2)-(7), the Commission argued that "those amendments basically converted the authorization in 6a(1)."   2/27/12 Tr. at 26.   In other words, the Commission stated that its "primary argument is you have to look at that language,

the language in the Dodd-Frank amendments, to see how the authorization that was always there to the commission to put position limits in place, and which, in the exercise of its judgment, became a mandate in 2010." Id. There is nothing in the plain language of the statute, however, that supports the Commission's argument that the discretion in Section 6a(a)(1) was somehow "converted" by Dodd-Frank. If anything, the Dodd-Frank amendments are subject to the preexisting standards of Section 6a(a)(1), not the other way around. See § 6a(a)(2)(A) ("In accordance with the standards set forth in paragraph (1) of this subsection. . . . ").

<u>Section 6a(a)(1) Imposes No Substantive Requirements on the Commission</u>

Now, on summary judgment, the Commission argues that the "necessary" language actually imposes no substantive requirement at all. (Dkt. No. 38 at 19). Seemingly inconsistent with its earlier position that Section 6a(a)(1) requires the CFTC to find only that the actual "amounts of trading" are "necessary," the Commission argues that the language only means that this Court must afford deference to the CFTC to "make a judgment," and that any action the agency takes must be "rationally related to the purpose of the statute or its specific provisions." (Dkt. No. 38 at 19) (relying principally on <u>Mourning v. Family Publications Service, Inc.</u>, 411 U.S. 356 (1973)). Again, the CFTC's argument is without merit. First, the Court must give effect to the meaning of each word of the statute, which states that the Commission shall impose limits as the agency "<u>finds are necessary</u>." § 6a(a)(1). Moreover, the language of Section 6a(a)(1) is more limited and tied to a more specific objective than the general empowering provision that was at issue in <u>Mourning</u>. See <u>Mourning</u>, 411 U.S. at 361-62 (stating that Federal Reserve Board shall prescribe regulations "as in the judgment of the Board are necessary or proper to effectuate the purposes of [the Act]. . . ."); <u>see</u> <u>also</u> <u>AFL-CIO v. Chao</u>, 409 F.3d 377, 384 (D.C. Cir. 2005). In any event, <u>Mourning</u> has been interpreted by courts in our Circuit to

apply during the <u>Chevron</u> Step Two analysis, and that the Court's deference to the agency is still limited by the particular language of a statute at issue.  <u>See</u> <u>AFL-CIO</u>, 409 F.3d at 384; <u>Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n</u>, 383 F. Supp. 2d 123, 144 (D.D.C. 2005).

In relying on <u>Mourning</u>, it appears that the Commission is confusing two different issues with respect to Section 6a(a)(1).  Section 6a(a)(1) contains a clear statutory requirement that the CFTC <u>find</u> that any position limits "are necessary to diminish, eliminate, or prevent" the burden on interstate commerce described in the statute.  That point is wholly different from whether any particular rule, regulation or order is "<u>necessary</u> to diminish, eliminate or prevent such burden." Whether Section 6a(a)(1) requires such a finding is clear and unambiguous.  Whether any particular regulation setting position limits is actually "necessary to diminish, eliminate or prevent such burden" is not before this Court because the CFTC has taken the position that it is not required to make that finding.

The distinction between these two questions is illustrated in the D.C. Circuit's opinion in <u>AFL-CIO v. Chao</u>.  In that case, the Circuit considered whether the Secretary of Labor exceeded her authority when she promulgated a rule under 29 U.S.C. § 438, which states that: "[t]he Secretary shall have authority to issue, amend, and rescind . . . such . . . reasonable rules and regulations . . . as <u>[s]he may find necessary to prevent the circumvention or evasion of [Title II's] reporting requirements</u>."  29 U.S.C. § 438 (emphasis added); <u>AFL-CIO</u>, 409 F.3d at 386.  The Circuit asked whether the specific rule at issue "comport[ed] with the <u>statutory requirements</u> that the Secretary 'find [the rule] necessary to prevent' evasion of reporting requirements."  <u>AFL-CIO</u>, 409 F.3d at 386 (quoting 29 U.S.C. § 438) (emphasis added).  Because the Circuit found the word "necessary" to be inherently ambiguous, the Circuit proceeded under <u>Chevron</u> Step Two to review with deference whether the "Secretary's interpretation of "what is 'necessary'" as

embodied in the rule was "limited to preventing such circumvention or evasion," as set forth in the governing statute. Id. at 387. In so doing, the Circuit referred on numerous instances to the fact that the "plain text" of the statute "limits the Secretary's authority with respect to trust reporting." Id. at 390. The Circuit also noted that the statute "required" a "determination" that the rule was "necessary to prevent union circumvention or evasion of Title II reporting requirements." Id. at 389 (emphasis added). Moreover, although then-Circuit Judge Roberts dissented in part to the majority opinion, he nevertheless agreed that the statute required the Secretary to make necessity findings: ". . . the Secretary has not so found, much less made a determination that such a report would be necessary to prevent circumvention or evasion of union reporting requirements. Our dissenting colleague acknowledges the Secretary must make such findings." Id. at 390 (emphasis added).

Ultimately, the Circuit held that the Secretary had exceeded her authority under the statute because the rule "reache[d] information unconnected to the circumvention or evasion of union Title II reporting requirements." Id. Thus, although the Secretary was entitled to deference under Chevron Step Two as to whether the specific rule promulgated was "necessary" to meet the specific purpose of the statute, what was not ambiguous was that there was a "statutory requirement" that she must "make such findings." Id. For precisely these reasons, this Court is not persuaded by the CFTC's argument that Section 6a(a)(1) imposes no "substantive" requirements on the agency.

<u>The CFTC's 1981 Rulemaking Renders the Necessity Finding Unnecessary</u>

Finally, relying on a 1981 rulemaking, the CFTC asks this Court to accept its argument that the Commission is no longer required to make a finding that position limits are necessary prior to imposing them. The CFTC attempts to validate its interpretation in two ways. First, the

CFTC argues that its interpretation of Section 6a(a)(1) doing away with a necessity finding is entitled to <u>Chevron</u> deference.  (Dkt. No. 38 at 18, n.10; Dkt. No. 55 at 6, n.4).  Second, the Commission argues that Congress ratified its interpretation and, therefore, the Commission is no longer required to make a necessity finding as it did numerous times between 1936 and 1981.

As set forth above, the language of Section 6a(a)(1) is clear and unambiguous regarding the Commission's duty to make a necessity finding.  Accordingly, the CFTC's interpretation of the statute is not entitled to any <u>Chevron</u> deference, particularly where the agency has never treated the statute as ambiguous.  <u>See</u> <u>Arizona</u>, 281 F.3d at 253 (quoting <u>Chevron</u>, 467 U.S. at 842–43 for the proposition that if the language of the statute is clear, the court and agency "must give effect to the unambiguously expressed intent of Congress.").

Moreover, Congress has not ratified any CFTC interpretation of 6a(a)(1) doing away with the necessity finding requirement.  The CFTC argues that, in its 1981 rulemaking, it changed its interpretation of Section § 6a(a) to allow for the establishment of position limits without a finding of necessity.  (Dkt. No. 38 at 19).  The CFTC relies on the fact that, in that rulemaking, the CFTC required exchanges to establish position limits for all futures contracts for which there were not already limits.  (<u>Id</u>. at 20).  In doing so, the CFTC did not require exchanges to make a finding that excessive speculation was a problem or that position limits were the correct solution. <u>Id</u>.  The CFTC also cites to the rule's preamble which states that "Section 4a(1) represents an express Congressional finding that excessive speculation is harmful to the market, and a finding that speculative limits are an effective prophylactic measure."  Establishment of Speculative Position Limits, 46 Fed. Reg. 50,938, 50,940 (Oct. 16, 1981).  The CFTC argues that Congress ratified the CFTC's interpretation of § 6a(a) when it amended the CEA in 1982 without overturning the CFTC's construction of the statute.  (Dkt. No. 38 at 20-21).

The CFTC takes a roundabout route to ratification, and one that this Court declines to follow.  The CFTC has not offered any longstanding agency interpretation that abrogated the agency's duty to make necessity findings under § 6a(a)(1).  Nothing that the CFTC relies on in the 1981 rulemaking speaks directly to the interpretation of § 6a(a)(1) that CFTC now advances in this case.  Moreover, the 1981 interpretation that the CFTC does cite—that the statute allows the agency to prophylactically impose position limits and that the CFTC need not find that excessive speculation actually exists beforehand—does not appear to be in dispute in this case. This authority is squarely in the plain text of Section 6a.  See § 6a(a)(1) (stating that the CFTC has the authority to set position limits "as the Commission finds are necessary to diminish, eliminate, or prevent [excessive speculation].") (emphasis added).  Moreover, Plaintiffs do not appear to contest that the CFTC may impose position limits prophylactically, "so long as it makes an informed determination that there is a reasonable likelihood that excessive speculation will pose a problem in a particular market, and that position limits are likely to curtail it without imposing undue costs."  (Dkt. No. 45 at 2).  As Plaintiffs correctly note, "[w]hat the plain language of Section 6a(a)(1) does not permit is the establishment of position limits—whether prophylactic or remedial—without any necessity finding at all."  (Id.).

The fact that the CFTC did not make a necessity finding in its 1981 rulemaking does not constitute an interpretation from which this Court can infer congressional ratification.  See Autolog Corp. v. Regan, 731 F.2d 25, 32 (D.C. Cir. 1984) ("When an agency interpretation has been officially published and consistently followed, Congress is presumed to be aware of the administrative interpretation of a statute and to adopt that interpretation when it re-enacts a

statute without change.") (emphasis added) (internal citations and quotation marks omitted).[5] To accept the agency's argument now, this Court would have to find that Congress ratified by silence an interpretation of Section 6a(a)(1) that the CFTC made by silence. The Court simply cannot draw such a conclusion on this record.

### iii.   Sections 6a(a)(2), (a)(3) and (a)(5) are ambiguous

Although the CFTC seeks <u>Chevron</u> deference as to its reading of Section 6a(a)(1), the CFTC "is not claiming deference with respect to Congress' mandate (which comes from the Dodd-Frank amendments, sections 6a(a)(2)-(7))." (Dkt. No. 55 at 6, n.4).  Upon a review of the entire amended Section 6a, the Court cannot hold that the Dodd-Frank amendments in sections 6a(a)(2), (a)(3) and (a)(5) constitute a clear and unambiguous mandate.

---

[5]  It appears that the Commission has not even consistently followed its purported 1981 interpretation abrogating the statutory requirement of finding necessity. In its Cross-Motion for Summary Judgment, the CFTC admits that "[f]or a period of time beginning in the 1990s until the passage of Dodd-Frank, the Commission took a different approach . . . allowing exchanges to substitute trader reporting obligations for fixed limits." (Dkt. No. 38 at 7).  By permitting some exchanges to set position accountability levels in lieu of position limits the CFTC was making a conclusion that position limits <u>were not necessary</u> for those exchanges. In addition, in 2001, the CFTC promulgated a rule providing guidance for boards of trade designated as contract markets on how to comply with the Core Principles listed in 7 U.S.C. § 7.  <u>See</u> A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations**,** 66 Fed. Reg. 42,256 (Aug. 10, 2001).  Core Principle 5 provides the following: "To reduce the potential threat of market manipulation or congestion (especially during trading in the delivery month), the board of trade shall adopt for each contract of the board of trade, as is necessary and appropriate, position limitations or position accountability for speculators."  7 U.S.C. § 7(d)(5)(A).  The CFTC, in providing guidance on compliance with Core Principle 5, stated, "In general, position limits are not necessary for markets where the threat of excessive speculation or manipulation is nonexistent or very low."  17 C.F.R. § 38 app. B (Core Principle 5) (effective August 10, 2001 until August 20, 2012); 66 Fed. Reg. at 42,280.  The CFTC has only recently repealed this provision in a final rulemaking issued on June 19, 2012.  <u>See</u> Core Principles and Other Requirements for Designated Contract Markets, 77 Fed. Reg. 36,612, 36,718 (June 19, 2012).

As Plaintiffs point out, the CFTC has offered no meaningful explanation for how either of these two rules "could possibly comport with its supposed 1981 view that Congress, in Section 6a(a)(1), had <u>already</u> determined that excessive speculation exists in all markets and that position limits were always effective to combat it."  (Dkt. No. 45 at 5).

**1.  "In accordance with the standards set forth in paragraph (1)"**

First, it is wholly unclear to what extent the CFTC's authority in Section 6a(a)(2) is dependent on the statutory requirement in subsection 6a(a)(1) that the agency find position limits "necessary."  The very first clause of Section 6a(a)(2) begins "[i]n accordance with the standards set forth in paragraph (1) of this subsection . . . <u>the Commission shall</u> by rule, regulation, or order <u>establish limits on the amount of positions</u> . . . ."  Section § 6a(a)(2) (emphasis added).  It is clear that Congress incorporated and directed the agency to set any limits in Section 6a(a)(2) "in accordance with the standards" of the CFTC's existing authority in Section 6a(a)(1).  What is unclear, however, is what "standards" Congress meant to govern any limits set pursuant to Section 6a(a)(2).

The CFTC argues that the term "standards" in Section 6a(a)(2) does not refer to the "necessary" standard of paragraph (1), but rather the so-called aggregation standards to "positions held and trading done by any persons directly or indirectly controlled by such person . . . ." § 6a(a)(1); (Dkt. No. 38 at 24).  The CFTC argues that its reading is consistent with the "first relevant dictionary definition" of "standard" as "something set up and established by authority as a rule for the measure of quantity, weight, extent, value, or quality."  <u>Id</u>. at 24-25 (citing <u>Merriam-Webster's Third Collegiate Dictionary</u> 1216 (11th ed. 2011)).

The CFTC's argument is unavailing.  First, the term "standard" or "standards" does not appear anywhere in Section 6a(a)(1).  Thus, there is no clear indication of the specific "standards" to which Congress referred.  Second, the CFTC's selective reading of subsection (a)(1) renders any language but the supposed aggregation standards mere surplusage.  <u>See</u> <u>Humane Soc'y</u>, 579 F. Supp. 2d at 16 ("But this reading of Section 1533(a)(1)—a reading that emphasizes one part of the provision and ignores the others—is hardly the only plausible one.")

(citing United States v. Villanueva-Sotelo, 515 F.3d 1234, 1237 (D.C. Cir. 2008)).  It is just as plausible that the standards to which Congress referred were those directing the Commission to set position limits only "as the Commission finds are necessary to diminish, eliminate, or prevent such burden."  § 6a(a)(1).  This interpretation would be consistent with other equally-applicable dictionary definitions of the term "standards."  See Webster's Third New International Dictionary 2223 (1981) (defining "standard" as "something that is established by authority, custom, or general consent as a model or example to be followed."); see also Black's Law Dictionary 1535 (9th ed. 2009) ("A model accepted as correct by custom, consent, or authority").  In any event, our Circuit has warned against relying solely on dictionary definitions, as the CFTC urges, because "citing to dictionaries creates a sort of optical illusion, conveying the existence of certainty—or 'plainness'—when appearance may be all there is.'"  Ctr. For Individual Freedom v. Van Hollen, No. 12-5117, slip. op. at 4 (D.C. Cir. Sept. 18, 2012) (per curiam) (quoting A. Raymond Randolph, Dictionaries, Plain Meaning, and Context in Statutory Interpretation, 17 HARV. J.L. & PUB. POL'Y 71, 72 (1994)).

Finally, and most importantly, the CFTC's current position regarding the introductory clause of subsection (a)(2) is not based on any reasoned interpretation in which the CFTC engaged at the agency level.  The Commission has neither pointed to—nor can this Court locate--any interpretation of this clause in the final rule.  There appears to be nothing in the final rule giving any effect to or explaining how the position limits set were "in accordance with the standards of paragraph (1)."  The only reference that this Court can locate exists in the NPRM.  That reference, however, suggests that the CFTC (at least initially) interpreted the introductory clause of subsection (a)(2) as Plaintiffs currently interpret it:

> Congress expressly directed the Commission to set limits in accordance with the standards set forth in sections 4a(a)(1) and

> 4a(a)(3) of the Act, thereby reaffirming the Commission's
> authority to establish position limits as it finds necessary in its
> discretion to address excessive speculation.

76 Fed. Reg. at 4755 (emphasis added). Accordingly, at the NPRM stage, the Commission apparently viewed the contested language of Section 6a(a)(2) to refer to the CFTC's authority in subsection 6a(a)(1) "to establish position limits as it finds necessary in its discretion . . . ." Of course, the Commission was free to amend its interpretation of the statutory language by the time the final rule was adopted. It appears, however, that because the CFTC believed that Congress had compelled a particular result, the agency failed to confront or interpret this language in any way. The agency's reliance on one of many dictionary definitions of "standards" in this Court in the first instance is unpersuasive and entitled to no deference at all.

This Court is left with no clear indication of Congress' intent when it directed the Commission to set position limits in Section 6a(a)(2) "in accordance with the standards set forth in paragraph (1) of this subsection . . . ." It is unclear whether Congress: 1) intended for the CFTC to first find that any position limits promulgated under Dodd-Frank be "necessary to diminish, eliminate, or prevent" the burden on interstate commerce; 2) was solely referring to the so-called aggregation standards in (a)(1), as the CFTC suggests; 3) was referring to both the "necessary" standard and the aggregation standards; or 4) was referring to neither the "necessary" standard nor the aggregation standards. Nor does a review of the other provisions of Section 6a(a)(2) elucidate this ambiguity. As such, paragraph (a)(2) cannot be read as a clear and unambiguous mandate to set position limits without regard to any of the necessity or discretion-conferring standards of Section 6a(a)(1).

### 2. "As appropriate"

The parties also disagree over whether the Dodd-Frank amendments to Section 6a required the CFTC to determine that imposing position limits was "appropriate."  The "as appropriate" language appears in three contested sections (emphasis added in each):

Section 6a(a)(2)(A):

> In accordance with the standards set forth in paragraph (1) of this subsection . . . the Commission shall by rule, regulation, or order establish limits on the amount of positions, <u>as</u> <u>appropriate</u>, other than bona fide hedge positions, that may be held by any person . . .

Section 6a(a)(3):

> In establishing the limits required in paragraph (2), the Commission, <u>as</u> <u>appropriate</u>, shall set limits –
>
> (A) on the number of positions that may be held by any person for the spot month, each other month, and the aggregate number of positions that may be held by any person for all months; and
>
> (B) to the maximum extent practicable, <u>in</u> <u>its</u> <u>discretion</u> . . .

Section 6a(a)(5)(A):

> Notwithstanding any other provision of this section, the Commission shall establish limits on the amount of positions, including aggregate position limits, <u>as</u> <u>appropriate</u>, other than bona fide hedge positions . . . .

Again, each party believes the statute is clear and unambiguous.  Neither party disputes that the "as appropriate" language in these sections confers discretion in the agency.  The parties part ways, however, when it comes to what exactly that phrase was meant to modify.  The CFTC contends that Congress meant "as appropriate" in Sections 6a(a)(2)(A) and 6a(a)(5)(A) to modify the actual levels of the limits, whereas Plaintiffs contend that "as appropriate" was meant to modify "shall."  The answer, of course, is material.  If Plaintiffs are correct, then the CFTC had

the authority to determine that position limits were not "appropriate" at this particular time and, thus, not impose them at all.

The statute, however, is ambiguous on this point. The CFTC fails to offer any compelling authority for its argument that, because the term "as appropriate" is closer to or comes after "establish limits on the amount of positions" in subsections (a)(2) and (a)(5), the CFTC was only required to find the "amount of positions" appropriate. (Dkt. No. 25 at 24; Dkt. No. 38 at 25). In its Opposition to Plaintiffs' Motion for Preliminary Injunction, the CFTC relied on the Rule of Last Antecedent, as described in Sutherland Statutory Construction § 47:33, as support for its construction of the "as appropriate" language. (Dkt. No. 25 at 24). The CFTC's argument, however, is wrong for at least two reasons. First, a complete review of the authority upon which the CFTC relies reveals that the Rule of the Last Antecedent is not dispositive here:

> Referential and qualifying words and phrases, <u>where no contrary intention appears</u>, refer solely to the last antecedent….The rule is another aid to discovery of intent or meaning and is not inflexible and uniformly binding. Where the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent. <u>Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma</u>.

2A N. Singer & J. Singer, SUTHERLAND STATUTORY CONSTRUCTION § 47:33 (7th ed. 2011) (hereinafter "Sutherland") (emphasis added).

In this case, the "as appropriate" clauses in (a)(2) and (a)(5) are separated from their antecedents by a comma on either side. According to Sutherland, this fact is evidence that the phrase was "supposed to apply to all antecedents instead of only to the immediately preceding one." <u>Id</u>. If that is the case, "as appropriate" modifies both "shall" in subsections 6a(a)(2) and (a)(5) as well as the "amount of positions." Moreover, unlike the traditional cases in which the

Rule of the Last Antecedent has been found to apply, the clauses in question are not part of a list. See United States v. Pritchett, 470 F.2d 455, 456, 458-59 (D.C. Cir. 1972) (holding that, in statute providing that "provisions of section 22-3204 shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty," the phrase "on duty" modified only the last antecedent).

In their amicus brief, members of the House Democratic Conference Committee on H.R. 4173 point to legislative history of an early iteration of the Act as reflected in House Report 111-385. That language stated that "Section 6(a) requires the CFTC to set appropriate position limits for all physical commodities other than excluded commodities." (Dkt. No. 49 at 3). According to amici, this reflects that the use of the word "appropriate" in the text was intended to describe the level of the position limit, not whether the limits themselves were appropriate. (Id. at 3-4). But that is not the final language Congress used. Congress set the "as appropriate" language apart from all other clauses with commas. It could have merely, as written in the legislative history, placed the word "appropriate" before "limits" in subsections (a)(2)(A) and (a)(5). This portion of legislative history, thus, does not conclusively explain how the statute, as written, clearly indicates that the phrase "as appropriate" modifies position limits. Nor does this legislative history exclude the interpretation that the CFTC could find it appropriate to set no position limits for some commodities.

Second, the CFTC's construction of the statute as a mandate is at least partially undermined by Congress' use of the clause "as appropriate" in subsection (a)(3): "In establishing the limits required in paragraph (2), the Commission, as appropriate, shall set limits . . . ." § 6a(a)(3). Here, under the CFTC's logic, "as appropriate" is closest to the verb "shall" and, as

such, modifies it.  This would undermine the CFTC's position that subsection (a)(3) constituted a mandate and that the agency had no discretion not to set limits on the positions described in that subsection.

Further lending to the ambiguity is that subsection (a)(5)(A) governing "economically equivalent contracts" begins with the phrase "[n]otwithstanding any other provision of this section, the Commission shall establish limits on the amount of positions, including aggregate position limits, as appropriate, . . . ."  § 6a(a)(5)(A).  Accordingly, it would seem that—unlike subsection (a)(2)(A) in which the CFTC is bound to set limits in accordance with the "standards" of paragraph (1)—subsection (a)(5)(A) is to apparently operate free of any other provision of Section 6a.  If that is the case, this would undermine the CFTC's argument that subsection (a)(2)(A) operates as a standalone mandate, as it is clear from the "notwithstanding" language in subsection (a)(5)(A) that Congress knew how to divorce subsections of Section 6a from each other.  On the other hand, however, Congress still used the "as appropriate" language conferring discretion in subsection (a)(5)(A).

In short, it is wholly unclear whether Congress meant "as appropriate" in subsections (a)(2)(A), (a)(3) and (a)(5)(A) to modify the verb "shall" or other parts of those subsections.  The CFTC did not recognize these ambiguities and interpret the statute accordingly in the first instance.  The Court cannot conclude that the "as appropriate" clauses clearly modify the verb "shall" in each instance, nor can it conclude given traditional tools of statutory construction that "as appropriate" was meant only to grant the Commission authority to set the "amount of positions" as it saw "appropriate."

### 3.  Section 6a(a)(6)

There appears to be no dispute that Section 6a(a)(6) is a mandate upon the Commission to set aggregate position limits in at least three circumstances.  See § 6a(a)(6)(A)-(C).  As Plaintiffs concede, Section 6a(a)(6) is a provision "that is not at issue in this case and that in any event does not use the key phrase 'as appropriate' or expressly incorporate the necessity standard of Section 6a(a)(1)."  (Dkt. No. 45 at 10).

The Court declines, however, to reach a determination on whether the aggregation standards promulgated in the final rule are arbitrary and capricious under 5 U.S.C. § 706(2)(A) or in violation of the cost-benefit analysis requirements of 7 U.S.C. § 19.  Nor is the Court in a position to determine whether the Commission's aggregation policies should stand alone severed from the final rule.  The Commission has informed the Court that it has issued a Notice of Proposed Rulemaking ("Aggregation Notice") to revisit "several provisions" of the Position Limits Rule governing aggregation of speculative positions.  (Dkt. Nos. 61, 63); see also Dkt. No. 63-1 (stating that, through the Aggregation Notice, CFTC is considering proposed changes to seven aggregation provisions of final rule).  The CFTC apparently is considering whether to modify many of the aggregation provisions with which Plaintiffs take issue in this case.  See Aggregation Position Limits for Futures and Swaps, 77 Fed. Reg. 31,767 (May 30, 2012) (proposing amendments to, among other provisions, the information sharing exemption and the 10% ownership standard).  Because the aggregation rules are currently under consideration and may be changed after the Position Limits Rule goes into effect, the Commission's Division of Market Oversight also issued a "no action" letter to all market participants excusing them from compliance with certain portions of the rule under certain circumstances.  (Dkt. No. 63-1).

Given that several provisions of the aggregation rules—rules which the Commission refers to as a "central feature of any position limits regime"—are under consideration and may

be modified, it is not appropriate for this Court to interfere in the rulemaking at this stage.  (Dkt. No. 38 at 42).  Indeed, it is wholly unclear whether any challenges to the aggregation rules are even ripe at this time.  See Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (prudential ripeness principles protects "the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."); Ohio Forestry Ass'n Inc. v. Sierra Club, 523 U.S. 726, 735 (1998) (administrative claim is not ripe where the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real.").  Because the entire rule will be vacated, the Commission can on remand, if it so chooses, modify and finalize any aggregation rules as part of any new regime it may promulgate.

### 4.   Interpretation of Section 6a as a Whole

The Court is mindful that, in searching for the plain meaning of Section 6a, the Court must not take words in isolation, must view them in context, and must attempt to give effect to all words in the statute.  Doing so does not, however, elucidate any of the ambiguities of the statute.

There is no question, as the CFTC argues, that Congress used traditionally mandatory language throughout the Dodd-Frank amendments to Section 6a.  The CFTC relies on that language as support for its view that Congress stripped the CFTC of any discretion not to impose position limits even if the agency did not find it "necessary" or "appropriate" to do so.  (Dkt. No. 25 at 23-24).  For example, the CFTC relies on language stating that the Commission "shall" establish limits (subsection 6a(a)(2)(A)); that Congress imposed 180-day and 270-day deadlines on the limits "required" under subparagraph 6a(a)(2)(A) (subsection 6a(a)(2)(B)); and that Congress referred to the limits "required" under subparagraph (A) in other sections (6a(a)(2)(C);

6a(a)(2)(3)).  The CFTC also points to the statute requiring the Commission to conduct a study of the "effects (if any) of the position limits imposed" and submit a report to Congress within 12 months.  (Dkt. No. 38 at 22-23 (citing 15 U.S.C. § 8307)).  Although the CFTC is correct that these provisions taken in isolation seemingly create a mandatory regime, the agency and this Court is required to attempt to give effect to all parts of the statute, including the ambiguous language.  See SUTHERLAND at § 28:12 (stating that "when two provisions of code conflict, if reconciliation is possible, effect should be given to both sections").

Upon a review of the entire Section 6a as amended by Dodd-Frank, the Court finds that there are at least two plausible readings of the statute.  First is the CFTC's interpretation: that the CFTC was mandated to set position limits, that it was stripped of any discretion not to set limits, that it was not required to find (either implicitly or explicitly) that the imposition of position limits both generally and with respect to certain commodities was necessary, that it was not required to determine whether the actual imposition of limits was appropriate both generally and with respect to certain commodities, and that it was required to impose those limits expeditiously.[6]

This interpretation, however, renders other parts of Section 6a mere surplusage. Significantly, it fails to give any meaningful effect to the very first clause of Section 6a(a)(2), which requires that the CFTC establish position limits "[i]n accordance with the standards set forth" in subsection (a)(1).  As one court has held, although the inference the agency "'draw[s] as to the statute's meaning is not by any means unreasonable, it is also not inevitable and thus not

---

[6]      So rigid is the Commission's view of the Dodd-Frank "mandate" that, at oral argument, agency counsel represented to the Court that the agency intended to eventually set position limits on derivatives tied to every non-exempt physical commodity.  2/27/12 Tr. at 31.

mandatory." See Humane Soc'y, 579 F. Supp. 2d at 19 (citing Air Transp. Ass'n of America v. FAA, 169 F.3d 1, 4 (D.C. Cir. 1999)).

The other plausible interpretation of Section 6a is the one that Plaintiffs offer.  As Plaintiffs argue, "[t]he only reasonable reading of the Dodd-Frank amendments to Section 6a is that Congress intended the Commission to immediately gather evidence relating to whether excessive speculation was harming commodity markets and to impose position limits where necessary and appropriate to prevent an undue burden on the economy."  (Dkt. No. 26 at 9).  In other words, Plaintiffs do not seem to contest that the CFTC may be required to impose position limits, but that that obligation does not arise until the Commission first makes a finding that such position limits are necessary to combat the burden described in 6a(a)(1).

This Circuit has instructed that when "'construing a statute we are obliged to give effect, if possible, to every word Congress used.'"  Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior, 252 F.3d 473, 481 (D.C. Cir. 2001) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)).  Moreover, it is well-settled that a statute is considered ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.  See Nofziger, 878 F.2d at 446–47 (statute is ambiguous if it can be read in more than one way); see also SUTHERLAND at §§ 46:4, 45:2.  Simply because a statute "is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction . . . ."  PDK Labs. Inc. v. U.S. DEA, 362 F.3d 786, 796 (D.C. Cir. 2004); see also Nat'l Rifle Ass'n of America, Inc. v. Reno, 216 F.3d 122, 131 (D.C. Cir. 2000) ("Though we owe no deference to the Attorney General's interpretation of statutory language at this stage of Chevron analysis, the plausibility of her view highlights the statute's ambiguity.") (citing Nofziger, 878 F.2d at 446–47) (emphasis added).

In sum, the Dodd-Frank amendments do not constitute a clear and unambiguous mandate to set position limits, as the Commission argues.   Nor are those amendments clear and unambiguous in Plaintiffs' favor.   The Court cannot uphold the CFTC's interpretation of the amendments under <u>Chevron</u> Step One.   Nor, as set forth below, is this Court able to review the agency's interpretation under <u>Chevron</u> Step Two.

### b. <u>Chevron</u> Step Two

Under <u>Chevron</u> step two, if a statute is silent or ambiguous on a particular issue, the Court must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statutory purpose.   <u>See</u> <u>Pub. Citizen</u>, 901 F.2d at 154 (citing <u>Chevron</u>, 467 U.S. at 844–45).   The law of this Circuit is clear, however, that "<u>Chevron</u> step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face."   <u>Peter Pan</u>, 471 F.3d at 1354; <u>see</u> <u>also</u> <u>Arizona</u>, 281 F.3d at 254 (stating that "[d]eference to an agency's statutory interpretation is only appropriate when the agency has exercised its <u>own</u> judgment, not when it believes that interpretation is compelled by Congress.") (internal quotation marks omitted).

It is well-settled in this Circuit that "deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress." <u>Peter Pan</u>, 471 F.3d at 1352, 1354 (internal quotation marks and citations omitted) (vacating and remanding agency decision because agency "premised its construction on the plain language of the statute, which it treated as unambiguous, and because we find that the statutory language is in fact ambiguous . . . ."); <u>see</u> <u>also</u> <u>Sec'y of Labor, Mine Safety & Health Admin. v. Nat'l Cement Co. of California, Inc.</u>, 494 F.3d 1066, 1075 (D.C. Cir. 2007) ("Because the Secretary did not

recognize the ambiguities inherent in the statutory terms, we do not defer to her plain meaning interpretation but instead remand for her to treat the statutory language as ambiguous.").

The CFTC correctly concedes that it is not entitled to <u>Chevron</u> deference with regard to its interpretation of Sections 6a(a)(2)-(7).  (Dkt. No. 55 at 6, n.4).  It is undisputed that the CFTC viewed the statute as clear and unambiguous, and that it viewed the Dodd-Frank amendments as compelling a particular result: that the agency was required to set position limits regardless of whether the agency thought it necessary and appropriate.  That view was expressed throughout the rulemaking.  <u>See</u> 76 Fed. Reg. at 71,626 ("[T]he CEA mandates that the Commission establish position limits for futures and options contracts traded on a designated contract market . . . ."); <u>id</u>. at 71,627 ("The Commission is required to establish position limits as Congress intentionally used the word, 'shall,' to impose the mandatory obligation.''); <u>id</u>. at 71,628 ("The Commission disagrees that it must first determine that position limits are necessary before imposing them or that it may set limits only after it has conducted a complete study of the swaps market.  Congress did not give the Commission a choice.  Congress directed the Commission to impose position limits and to do so expeditiously"); <u>id</u>. at 71,627 ("[T]he Commission construes the amended CEA to mandate the Commission to impose position limits at the level it determines to be appropriate to diminish, eliminate, or prevent excessive speculation and market manipulation."); <u>id</u>. at 71,629, n.30 (stating that "Congress did not disturb the language under which the Commission previously acted to impose position limits, and added new language that makes clear that the types of limits described in sections 4a(a)(2), (a)(5), and (a)(6) are required").  Even Commissioner Dunn, who expressed his grave concerns about setting position limits in general, provided the third vote in favor of the rule because he believed that "Congress

has tasked the CFTC with preventing excessive speculation by imposing position limits.  This is the law.  The law is clear, and I will follow the law."  10/18/11 Tr. at 11.

The Commission continued to take this position during this litigation.  <u>See</u> Dkt. No. 38 at 23 ("There is only one plausible reading of the Dodd-Frank amendments: Congress unconditionally required the Commission to impose limits and to do so expeditiously"); <u>id</u>. ("[N]o other confirmation of the mandate beyond the language and structure of the Dodd-Frank amendments is needed"); <u>id</u>. at 1 ("But Plaintiffs ignore that Congress mandated that the Commission promulgate the Rule.").

As discussed above, the Dodd-Frank amendments to Section 6a are ambiguous and lend themselves to more than one plausible interpretation.  When a statute is ambiguous, "it is incumbent upon the agency not to rest simply on its parsing of the statutory language.  It must bring its experience and expertise to bear in light of competing interests at stake" to resolve the ambiguities in the statute.  <u>PDK Labs.</u>, 362 F.3d at 794, 797-98 (holding that agency's interpretation of statute was not entitled to deference because agency erroneously believed the meaning of the statute was plain and failed to rely on its expertise to discern the meaning of the statute); <u>see also</u> <u>Peter Pan</u>, 471 F.3d at 1354; <u>Arizona</u>, 281 F.3d at 254.  Where an agency has failed to do so, it "is not for the court 'to choose between competing meanings.'"  <u>PDK Labs.</u>, 362 F.3d at 797-98 (quoting <u>Alarm Indus. Commc'ns Comm. v. FCC</u>, 131 F.3d 1066, 1072 (D.C. Cir. 1997)) (holding that Court must remand to the agency to resolve the ambiguity in the statute).  "[I]f we find that an agency's stated rationale for its decision is erroneous, we cannot sustain its action on some other basis the agency did not mention."  <u>PDK Labs.</u>, 362 F.3d at 798 (citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 200 (1947)).

The law of this Circuit, therefore, requires in this circumstance that the Court remand the rule to the agency so that it can fill in the gaps and resolve the ambiguities.[7]  See PDK Labs., 362 F.3d at 798; see also Alarm Indus., 131 F.3d at 1072 (holding that statute did not have a plain meaning, as the Commission believed it did, and vacating and remanding the case to the Commission to resolve the ambiguity); Humane Soc'y, 579 F. Supp. 2d at 13 (noting that "when an agency wrongly concludes that its interpretation is mandated by the statute, a court will not impose its own interpretation of the statute.").

The Court expresses no opinion on whether the construction of Section 6a the CFTC now advances is permissible under Chevron Step Two.  Although the Court does not foreclose the possibility that the CFTC could, in the exercise of its discretion, determine that it should impose position limits without a finding of necessity and appropriateness, it is not plain and clear that the statute requires this result.  See Arizona, 281 F.3d at 256 ("Although we do not foreclose the possibility that HHS could, in the exercise of its discretion, determine that the allocation of common costs to TANF is not reasonably calculated to accomplish TANF's purpose, the statute does not require HHS to reach that conclusion.").  Because the statute is ambiguous and a remand to the agency is warranted, the Court need not address Plaintiffs' other claims that the rule and its specific features violated the APA.

### c.  View of Congressional Amici and Legislative History

The Court received two amicus curiae briefs from members of Congress that were involved in the development of the Dodd-Frank Act.  (Dkt. Nos. 48 & 49).  Both groups wrote

---

[7]     As this Circuit has held, it "may be that here, as in other cases, the strict dichotomy between clarity and ambiguity is artificial, that what we have is a continuum, a probability of meaning.  In precisely those kinds of cases, it is incumbent upon the agency not to rest simply on its parsing of the statutory language."  PDK Labs., 362 F.3d at 797.

in support of the CFTC.   In one brief, the House Democratic Members of the Conference Committee ("House Democratic Members") on H.R. 4173 assert that the CFTC has historically had the power to establish position limits prophylactically.   (Dkt. No. 49 at 2).   The House Members state that the "CFTC was not required or even expected to analyze and determine whether or not it considered position limits to be efficacious in addressing possible harm from speculative trading."   (Id. at 3).   To support this proposition, they cite to instances in the legislative history where Congress made statements referring to the amendments as a "mandate" or a "requirement."  (Id. at 3-5).

Another amicus brief was filed by 19 current United States Senators, some (but not all) of whom were involved in the development of the Dodd-Frank Act.   (Dkt. No. 48 at 1).   The Senators similarly state that "Dodd-Frank was designed and intended" to make CFTC position limits mandatory.   (Id. at 3).   Engaging in their own exercise of statutory interpretation, the Senators make most of the same arguments the CFTC makes and point to much of the same "mandatory" language.   The Senators also urge this Court to conclude that the clear language of the Dodd-Frank amendments lead to only one result: that "Congress' drafting choice [] points only to the conclusion that Congress believed position limits to be 'required.'"   (Id. at 5).   The Senators also argue that the legislative history shows that the language of the Dodd-Frank amendments to Section 6a evolved from permissive to mandatory and, as such, reflect that the CFTC has no discretion not to impose position limits.   (Id. at 16-20); (see also id. at 24) ("At each step in the legislative process, Congress made the position limits requirement stronger."). The Senators also cite to statements made by members of the House indicating their view that the Dodd-Frank amendments mandated the imposition of position limits.   (Id. at 21-23).

The Court appreciates the efforts of amici to assist in determining the meaning of the relevant provisions of the CEA.  The Court has considered amici's interpretations of both the legislative history and statutory text.  Given the fundamental ambiguities in the statute, however, the Court is not persuaded by their arguments.  Ultimately, the "judiciary functions as the final authority on issues of statutory construction . . . ."  Wells Fargo Bank, 310 F.3d at 205-06.  The views of amici do not override the ambiguities of the actual language that appears in the statute, which the CFTC failed to interpret in the first instance.  In any event, amici do not point to any conclusive reasons to dispel the fundamental concerns that this Court has about the ambiguities in the statute.[8]

## IV.    Vacatur and Remand

Plaintiffs request that this Court vacate the Position Limits Rule and remand this matter back to the agency.  (Dkt. No. 31 at 18, n.12).  The CFTC contends that, even were this Court to find in Plaintiffs' favor, the Court has discretion to—and should—remand the rule to the CFTC without vacatur.  (Dkt. No. 38 at 15, n.9).

---

[8]    For example, no one cites to legislative history that sheds any light on what Congress meant when it directed that any position limits under Section 6a(a)(2) must be established "In accordance with the standards set forth in paragraph (1) of this subsection . . . ."  § 6a(a)(2) (emphasis added).  Apparently that language was added after the Introduced Bill but before the Engrossed Bill.  Despite mentioning many differences between the Introduced Bill versus the Engrossed Bill, the Senators do not provide guidance on the inclusion of "in accordance with the standards" in the Engrossed Bill.  (Dkt. 48 at 17-20).  Nor does the CFTC offer any explanation.  Accordingly, although amici ask this Court to hold that the language of the Act evolved from permissive to mandatory and that the Dodd-Frank amendments required the Commission to set position limits no matter what, the same evolution reflects that Congress tied any new position limits to the "standards" of the Commission's longstanding discretionary authority in Section 6a(a)(1).  Thus, even were this Court to give great weight to the legislative history, the Court cannot conclude that Congress has "directly spoken" to the issue of whether the Commission was stripped of any discretion not to impose position limits.

The CFTC is correct that the Court has discretion to decide whether to vacate the rule on remand. See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("While unsupported agency action normally warrants vacatur . . . this court is not without discretion.") (internal quotation marks and citations omitted). When deciding whether to vacate the Court considers two factors: "seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993). In this case, both factors weigh in favor of vacating the rule on remand.

First, as set forth above, the CFTC's error in this case was that it fundamentally misunderstood and failed to recognize the ambiguities in the statute. In circumstances such as this, our Circuit has found it appropriate to vacate the agency action on remand. See, e.g., Peter Pan, 471 F.3d at 1354-55; Nat'l Cement, 494 F.3d at 1077; PDK Labs., 362 F.3d at 799. By failing to acknowledge the statutory ambiguities in Section 6a, the CFTC instead relied exclusively on a "plain meaning" reading of the statute. The agency failed to bring its expertise and experience to bear when interpreting the statute and offered no explanation for how its interpretation comported with the policy objectives of the Act. The Court cannot be sure that the agency will interpret the statute in the same way and arrive at the same conclusion after further review and cannot be sure whether a similar position limits rule will withstand challenge under the APA. See Humane Soc'y, 579 F. Supp. 2d at 21.

Second, it would be far more disruptive if the Position Limits Rule were allowed to go into effect while on remand. As Plaintiffs note, remand without vacatur is often warranted once a rule has gone into effect and, as such, there is no apparent way to restore the status quo. (Dkt. No. 31 at 18, n.12); Sugar Cane Growers Coop. of Florida v. Veneman, 289 F.3d 89, 97 (D.C.

Cir. 2002) (holding that remand without vacatur was warranted where the rule had already gone into effect and, as such "[t]he egg ha[d] been scrambled and there [was] no apparent way to restore the status quo ante.").   In this case, the Position Limits Rule, which according to both parties is a significant and unprecedented change in the operation of the commodity derivatives market, has not yet gone into effect.   Moreover, the CFTC itself is reviewing and possibly revising its aggregation policies.   (Dkt. Nos. 61, 63).   The Court finds that vacatur of the rule would merely maintain the status quo and cause far less disruption than vacating the regime after it has gone into effect.

## **CONCLUSION**

For the foregoing reasons, the Position Limits Rule is vacated and remanded to the Commission for further proceedings consistent with this Opinion.   Moreover, Plaintiffs' Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied. An Order accompanies this Memorandum.


Date: September 28, 2012                          _____
                                                 ROBERT L. WILKINS
                                                 United States District Judge

**APPENDIX A**

Effective: July 21, 2010

7 U.S.C.A. § 6a

§ 6a. Excessive speculation

(a) Burden on interstate commerce; trading or position limits

(1) In general

Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets or derivatives transaction execution facilities, or ~~on electronic trading facilities with respect to~~ swaps that perform or affect a significant price discovery ~~contract~~function with respect to registered entities causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity. For the purpose of diminishing, eliminating, or preventing such burden, the Commission shall, from time to time, after due notice and opportunity for hearing, by rule, regulation, or order, proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person, including any group or class of traders, under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility, or swaps traded on ~~an electronic trading~~or subject to the rules of a designated contract market or a swap execution facility ~~with respect to a~~, or swaps not traded on or subject to the rules of a designated contract market or a swap execution facility that performs a significant price discovery ~~contract~~function with respect to a registered entity, as the Commission finds are necessary to diminish, eliminate, or prevent such burden. In determining whether any person has exceeded such limits, the positions held and trading done by any persons directly or indirectly controlled by such person shall be included with the positions held and trading done by such person; and further, such limits upon positions and trading shall apply to positions held by, and trading done by, two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single person. Nothing in this section shall be construed to prohibit the Commission from fixing different trading or position limits for different commodities, markets, futures, or delivery months, or for different number of days remaining until the last day of trading in a contract, or different trading limits for buying and selling operations, or different limits for the purposes of paragraphs (1) and (2) of subsection (b) of this section, or from exempting transactions normally known to the trade as "spreads" or "straddles" or "arbitrage" or from fixing limits applying to such transactions or positions different from limits fixed for other transactions or positions. The word "arbitrage" in domestic markets shall be defined to mean the same as "spread" or "straddle". The Commission is authorized to define the term "international arbitrage".

(2) Establishment of limitations

    (A) In general

In accordance with the standards set forth in paragraph (1) of this subsection and consistent with the good faith exception cited in subsection (b)(2), with respect to physical commodities other than excluded commodities as defined by the Commission, the Commission shall by rule, regulation, or order establish limits on the amount of positions, as appropriate, other than bona fide hedge positions, that may be held by any person with respect to contracts of sale for future delivery or with respect to options on the contracts or commodities traded on or subject to the rules of a designated contract market.

    (B) Timing

        (i) Exempt commodities

For exempt commodities, the limits required under subparagraph (A) shall be established within 180 days after July 21, 2010.

        (ii) Agricultural commodities

For agricultural commodities, the limits required under subparagraph (A) shall be established within 270 days after July 21, 2010.

    (C) Goal

In establishing the limits required under subparagraph (A), the Commission shall strive to ensure that trading on foreign boards of trade in the same commodity will be subject to comparable limits and that any limits to be imposed by the Commission will not cause price discovery in the commodity to shift to trading on the foreign boards of trade.

(3) Specific limitations

In establishing the limits required in paragraph (2), the Commission, as appropriate, shall set limits--

    **(A)** on the number of positions that may be held by any person for the spot month, each other month, and the aggregate number of positions that may be held by any person for all months; and

    **(B)** to the maximum extent practicable, in its discretion--

        **(i)** to diminish, eliminate, or prevent excessive speculation as described under this section;

        **(ii)** to deter and prevent market manipulation, squeezes, and corners;

**(iii)** to ensure sufficient market liquidity for bona fide hedgers; and

**(iv)** to ensure that the price discovery function of the underlying market is not disrupted.

(4) Significant price discovery function

In making a determination whether a swap performs or affects a significant price discovery function with respect to regulated markets, the Commission shall consider, as appropriate:

(A) Price linkage

The extent to which the swap uses or otherwise relies on a daily or final settlement price, or other major price parameter, of another contract traded on a regulated market based upon the same underlying commodity, to value a position, transfer or convert a position, financially settle a position, or close out a position.

(B) Arbitrage

The extent to which the price for the swap is sufficiently related to the price of another contract traded on a regulated market based upon the same underlying commodity so as to permit market participants to effectively arbitrage between the markets by simultaneously maintaining positions or executing trades in the swaps on a frequent and recurring basis.

(C) Material price reference

The extent to which, on a frequent and recurring basis, bids, offers, or transactions in a contract traded on a regulated market are directly based on, or are determined by referencing, the price generated by the swap.

(D) Material liquidity

The extent to which the volume of swaps being traded in the commodity is sufficient to have a material effect on another contract traded on a regulated market.

(E) Other material factors

Such other material factors as the Commission specifies by rule or regulation as relevant to determine whether a swap serves a significant price discovery function with respect to a regulated market.

(5) Economically equivalent contracts

**(A)** Notwithstanding any other provision of this section, the Commission shall establish limits on the amount of positions, including aggregate position limits, as

appropriate, other than bona fide hedge positions, that may be held by any person with respect to swaps that are economically equivalent to contracts of sale for future delivery or to options on the contracts or commodities traded on or subject to the rules of a designated contract market subject to paragraph (2).

**(B)** in establishing limits pursuant to subparagraph (A), the Commission shall--

**(i)** develop the limits concurrently with limits established under paragraph (2), and the limits shall have similar requirements as under paragraph (3)(B); and

**(ii)** establish the limits simultaneously with limits established under paragraph (2).

(6) Aggregate position limits

The Commission shall, by rule or regulation, establish limits (including related hedge exemption provisions) on the aggregate number or amount of positions in contracts based upon the same underlying commodity (as defined by the Commission) that may be held by any person, including any group or class of traders, for each month across--

**(A)** contracts listed by designated contract markets;

**(B)** with respect to an agreement contract, or transaction that settles against any price (including the daily or final settlement price) of 1 or more contracts listed for trading on a registered entity, contracts traded on a foreign board of trade that provides members or other participants located in the United States with direct access to its electronic trading and order matching system; and

**(C)** swap contracts that perform or affect a significant price discovery function with respect to regulated entities.

(7) Exemptions

The Commission, by rule, regulation, or order, may exempt, conditionally or unconditionally, any person or class of persons, any swap or class of swaps, any contract of sale of a commodity for future delivery or class of such contracts, any option or class of options, or any transaction or class of transactions from any requirement it may establish under this section with respect to position limits.

(b) Prohibition on trading or positions in excess of limits fixed by Commission

The Commission shall, in such rule, regulation, or order, fix a reasonable time (not to exceed ten days) after the promulgation of the rule, regulation, or order; after which, and until such rule, regulation, or order is suspended, modified, or revoked, it shall be unlawful for any person--

**(1)** directly or indirectly to buy or sell, or agree to buy or sell, under contracts of sale of such commodity for future delivery on or subject to the rules of the contract market or markets, or ~~derivatives transaction~~swap execution facility or facilities ~~or electronic trading facility~~ with respect to a significant price discovery contract, to which the rule, regulation, or order applies, any amount of such commodity during any one business day in excess of any trading limit fixed for one business day by the Commission in such rule, regulation, or order for or with respect to such commodity; or

**(2)** directly or indirectly to hold or control a net long or a net short position in any commodity for future delivery on or subject to the rules of any contract market or ~~derivatives transaction~~swap execution ~~facility or electronic trading~~ facility with respect to a significant price discovery contract in excess of any position limit fixed by the Commission for or with respect to such commodity: *Provided*, That such position limit shall not apply to a position acquired in good faith prior to the effective date of such rule, regulation, or order.

(c) Applicability to bona fide hedging transactions or positions

**(1)** No rule, regulation, or order issued under subsection (a) of this section shall apply to transactions or positions which are shown to be bona fide hedging transactions or positions as such terms shall be defined by the Commission by rule, regulation, or order consistent with the purposes of this chapter. Such terms may be defined to permit producers, purchasers, sellers, middlemen, and users of a commodity or a product derived therefrom to hedge their legitimate anticipated business needs for that period of time into the future for which an appropriate futures contract is open and available on an exchange. To determine the adequacy of this chapter and the powers of the Commission acting thereunder to prevent unwarranted price pressures by large hedgers, the Commission shall monitor and analyze the trading activities of the largest hedgers, as determined by the Commission, operating in the cattle, hog, or pork belly markets and shall report its findings and recommendations to the Senate Committee on Agriculture, Nutrition, and Forestry and the House Committee on Agriculture in its annual reports for at least two years following January 11, 1983.

**(2)** For the purposes of implementation of subsection (a)(2) for contracts of sale for future delivery or options on the contracts or commodities, the Commission shall define what constitutes a bona fide hedging transaction or position as a transaction or position that--

**(A)(i)** represents a substitute for transactions made or to be made or positions taken or to be taken at a later time in a physical marketing channel;

**(ii)** is economically appropriate to the reduction of risks in the conduct and management of a commercial enterprise; and

**(iii)** arises from the potential change in the value of--

**(I)** assets that a person owns, produces, manufactures, processes, or merchandises or anticipates owning, producing, manufacturing, processing, or merchandising;

**(II)** liabilities that a person owns or anticipates incurring; or

**(III)** services that a person provides, purchases, or anticipates providing or purchasing; or

**(B)** reduces risks attendant to a position resulting from a swap that--

**(i)** was executed opposite a counterparty for which the transaction would qualify as a bona fide hedging transaction pursuant to subparagraph (A); or

**(ii)** meets the requirements of subparagraph (A).

(d) Persons subject to regulation; applicability to transactions made by or on behalf of United States

This section shall apply to a person that is registered as a futures commission merchant, an introducing broker, or a floor broker under authority of this chapter only to the extent that transactions made by such person are made on behalf of or for the account or benefit of such person. This section shall not apply to transactions made by, or on behalf of, or at the direction of, the United States, or a duly authorized agency thereof.

(e) Rulemaking power and penalties for violation

Nothing in this section shall prohibit or impair the adoption by any contract market, derivatives transaction execution facility, or by any other board of trade licensed, designated, or registered by the Commission or by any electronic trading facility of any bylaw, rule, regulation, or resolution fixing limits on the amount of trading which may be done or positions which may be held by any person under contracts of sale of any commodity for future delivery traded on or subject to the rules of such contract market or derivatives transaction execution facility or on an electronic trading facility, or under options on such contracts or commodities traded on or subject to the rules of such contract market, derivatives transaction execution facility, or electronic trading facility or such board of trade: *Provided*, That if the Commission shall have fixed limits under this section for any contract or under section 6c of this title for any commodity option, then the limits fixed by the bylaws, rules, regulations, and resolutions adopted by such contract market, derivatives transaction execution facility, or electronic trading facility or such board of trade shall not be higher than the limits fixed by the Commission. It shall be a violation of this chapter for any person to violate any bylaw, rule, regulation, or resolution of any contract market, derivatives transaction execution facility, or other board of trade licensed, designated, or registered by the Commission or electronic trading facility with respect to a significant price discovery contract fixing limits on the amount of trading which may be done or positions which may be held by any person under contracts of sale of any commodity for future delivery or under

options on such contracts or commodities, if such bylaw, rule, regulation, or resolution has been approved by the Commission or certified by a registered entity pursuant to section 7a-2(c)(1) of this title: *Provided*, That the provisions of section 13(a)(5) of this title shall apply only to those who knowingly violate such limits.